PILLSBURY WINTHROP SHAW PITTMAN LLP
DAVID J. TSAI (SBN 244479)
  david.tsai@pillsburylaw.com
ALEKZANDIR MORTON (SBN 319241)
  alekzandir.morton@pillsburylaw.com
NATALIE TRUONG (SBN 346680)
  natalie.truong@pillsburylaw.com
Four Embarcadero Center, 22nd Floor
San Francisco, CA  94111-5998
Telephone:        415.983.1000
Facsimile:        415.983.1200

Attorneys for Plaintiff
Inventec Corporation

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| INVENTEC CORPORATION, a Taiwan corporation,<br><br>Plaintiff,<br><br>vs.<br><br>X CORP., a Delaware corporation,<br><br>Defendant. | Case No. 26-cv-5145<br><br>**PLAINTIFF INVENTEC CORPORATION'S COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiff Inventec Corporation ("Plaintiff" or "Inventec") brings this Complaint against Defendant X Corp. ("Defendant" or "X Corp.") and alleges as follows:

**NATURE OF ACTION**

1.      According to numerous press reports and filed lawsuits, and on information and belief, following Elon Musk's takeover of the company in October 2022, X Corp., formerly Twitter, Inc. ("Twitter" or "X Corp.") has refused to honor numerous agreements with its vendors and suppliers. This lawsuit involves one of those suppliers, Inventec, a global manufacturer of computers, servers, notebooks, and other products in the wireless communication field, and X Corp.'s failure and refusal to pay Inventec for components that Inventec procured for X Corp., which X Corp. agreed to take

COMPLAINT                                                          1

110114977

responsibility for.  As a result of X Corp.'s contractual breaches and failure to pay for goods and components, Inventec has been damaged in an amount of at least $30,000,000.00.

## PARTIES

2.     Inventec is, and at all relevant times was, a corporation duly organized and existing under the laws of the country of the Republic of China also known as Taiwan, with its principal place of business in Taipei, Taiwan.

3.     Upon information and belief, Defendant X Corp. is a corporation organized and existing under the laws of Nevada, with its principal place of business in Bastrop, Texas.

4.     At all relevant times, X Corp. transacted business within the Northern District of California.

## JURISDICTION AND VENUE

5.     This Court possesses diversity jurisdiction under 28 U.S.C. § 1332, as Inventec is a citizen of Taiwan and X Corp. is a citizen of Nevada and Texas.  There is complete diversity of citizenship between Inventec and X Corp., and the amount in controversy exceeds $75,000.

6.     This Court has personal jurisdiction over X Corp. pursuant to a binding jurisdiction clause within an agreement giving rise to the present dispute that was negotiated and executed by the parties, which states that "[a]ny legal action or proceeding arising under this Agreement will be brought exclusively in the federal or state courts located in the Northern District of California, in the city of San Francisco, and the parties hereby irrevocably consent to the personal jurisdiction and venue therein."  Further, this Court has personal jurisdiction over X Corp. because at all relevant times, it has conducted commercial activities within the State of California that are substantial, continuous, and systematic.

7.     Venue is proper under 28 U.S.C. § 1391(b) and based on X Corp.'s express prior consent in the agreement to the venue of this Court.  Further, venue is proper in this District because a substantial part of the events, acts and omissions giving rise to the claims occurred in this District.

110114977

**FACTUAL ALLEGATIONS**

8.      Founded in 1975, Inventec is a leading global manufacturer of computers, telephones, notebooks, servers, and products related to cloud computing, wireless communication, and intelligent devices.

9.      Inventec is also a leading original equipment manufacturer ("OEM") and original design manufacturer ("ODM") company for such products.  Inventec also makes and sells products under its own label.

10.     Inventec sells highly customized products designed pursuant to their clients' unique specifications.  Inventec also designs products based on their clients' unique specifications, and produces and sells those products to clients on a private label or white label basis so that clients may conserve resources by not having to invest in manufacturing products themselves.

11.     Inventec manufactures and designs, among numerous other products, server racks, which are open frames or cabinets designed for organizing and securing information technology ("IT") equipment.

12.     Those racks often include specific network switches, which are networking hardware that connect devices on a computer network by forwarding data between devices; a network switch allows multiple IT devices to communicate with one another.

13.     X Corp. is a social media company that operates the internet site of the same name, and which engaged Inventec to design X Corp.'s specifications and manufacture non-standard server racks for its use.

14.     On or about December 13, 2020, Inventec and X Corp. entered into a Master Purchase Agreement ("MPA") pursuant to which Inventec agreed to sell and deliver various products to X Corp., including, as relevant here, non-standard server racks and switches.  A true and correct copy of the Master Purchase Agreement is attached hereto as **Exhibit A**.

15.     The racks were custom manufactured by Inventec to X Corp.'s unique specifications and therefore constitute non-standard components.

16.     Given the long lead time to procure components for non-standard racks, including switches, it is standard industry practice and necessary for ODM's like Inventec to procure

components well in advance of the anticipated delivery date of the racks.  This includes non-standard components such as those that are at issue in this case.

17.    Accordingly, Section 4.4 of the Master Purchase Agreement holds X Corp. liable for cancellations of certain components.  Specifically, it provides:

> **4.4    Forecast.**  Forecast provided by Twitter for Supplier's standard Components are non-binding.  For non-standard Components (any components that are customized per Twitter's request), Twitter anticipates providing Supplier with a three-month rolling forecast.

18.    Notably, Section 4.4 expressly states that forecasts are not binding on X Corp. as to standard components.  However, this provision did not state that forecasts were not binding on X Corp. as to non-standard components; instead, the risk of loss as to non-standard components would fall on X Corp. by negative inference—if X Corp. was not intended to bear the risk of loss as to non-standard components, Section 4.4 would have expressly stated as much just as it did for standard components.

19.    The course of performance and course of dealing between the parties over the years further confirms their mutual understanding that X Corp.'s forecasts for non-standard components were binding, and thus X Corp. bore the risk of loss for non-standard components pursuant to Section 4.4 of the MPA.

20.    In particular, during November and December of 2021, Inventec regularly checked in with X to ensure that the parties were aligned on the 2022 forecast quantity.  As early as November 8, 2021, Inventec sent a detailed email to X regarding purchasing raw materials to fulfill X's request for 521 non-standard racks.  In this same email, Inventec asked X to confirm if Inventec's understanding was correct and emphasized to X that Inventec needed to prepare raw materials for the non-standard racks ahead of time given the supply chain constraints. On or around November 13, 2021, an X employee, Marianne Gatmaitan, confirmed that Inventec should prepare the raw materials for X's 521 non-standard racks demand.  Thus, X Corp. understood that by approving the purchase of the needed components, X Corp. was assuming liability for these components in the event that the components were not used in the manufacture of the products forecasted by X Corp.

110114977

21.    From December 2020 through early 2022, Inventec and X Corp. had a successful business relationship, with Inventec receiving and fulfilling multiple purchase orders from X Corp. for non-standard racks, based on X Corp.'s anticipated order forecast.

22.    On or about April 19, 2022, X Corp. instructed Inventec to issue orders for switches to cover X Corp.'s forecast for 2022 through January 2023.

23.    On or about April 20, 2022, X Corp. indicated a revised forecast for the 2022 year through January 2023 ("the 2023 Forecast") of 505 non-standard server racks.  In accordance with industry standard practices, as well as the course of dealing between the parties and the MPA, Inventec took steps to procure the components necessary to manufacture the non-standard server racks.

24.    On or about April 27, 2022, X Corp. confirmed that Inventec had placed purchase orders for the switches.

25.    On or about June 15, 2022, X Corp. lowered its forecast for non-standard server racks for the 2023 Forecast to 442, notwithstanding that Inventec had already moved forward with procuring components necessary to manufacture and build the 505 server racks X Corp. previously projected.

26.    On or about July 26, 2022, X Corp. once again lowered the 2023 Forecast for non-standard server racks to 215 racks.  In particular, X Corp. indicated that it would require zero racks in November 2022, and decreased the forecast for August, September, and October 2022 dramatically— from 146 racks to 84 racks.

27.    On or around August 16, 2022, X Corp. and Inventec had a meeting to discuss the excess inventory that X Corp. previously required Inventec to secure.

28.    On or around August 17, 2022, Inventec again raised the issue of the forecast decrease for the non-standard server racks with X Corp.

29.    From August 2022 through October 2022, the parties discussed the forecast decrease which resulted in Inventec having excess inventory.  On or about October 4, 2022, X Corp. proposed, and ultimately agreed, that it would purchase 168 non-standard server racks from Inventec, with delivery no later than December 2022.  Recognizing its liability for the non-standard components, X Corp. made that proposal to "resolve[]…without any further obligation or liability to X Corp. " claims related to the "2022 forecasts."  X also requested that the purchase order for the 168 non-standard

110114977

racks be executed within approximately the next 30 days, following the internal standard process for review and approvals.  Inventec replied stating that they understood X's required management approval as part of X's internal process and asked X Corp.'s representative, Christopher Kan, to assist with facilitating the purchase order approval so Inventec could have it within two weeks, given that Inventec's shipment and production had been suspended for several months.  Mr. Kan responded asking Inventec to send quotes for the remaining 135 non-standard racks—which Inventec provided X Corp. with— and said that he would start working on the purchase order approval process.  Mr. Kan also confirmed that he would be sending an agreement that formally documented the parties' terms and conditions as discussed.

30.    The parties' agreement was memorialized in an agreement (the "Rack Forecast Agreement") on or about October 18, 2022, when Mr. Kan confirmed that X Corp.'s chief executive officer approved of the Rack Forecast Agreement orally and in writing.  Pursuant to the Rack Forecast Agreement, X Corp. was to issue one or more purchase orders to confirm delivery of the 168 units.  A true and correct copy of the Rack Forecast Agreement is attached hereto as **Exhibit C**.  A true and correct copy of the email from Mr. Kan accepting the Rack Forecast Agreement on behalf of X. Corp. is attached hereto as **Exhibit B**.

31.    Consistent with this Rack Forecast Agreement, Inventec shipped to X Corp. thirty-three (33) of the agreed upon 168 racks pursuant to Purchase Order Nos. 10138087, 10140379, and 10140380.  X Corp. took delivery and paid for them in accordance with the terms of the Rack Forecast Agreement.

32.    On information and belief, on or about October 27, 2022, Elon Musk ("Mr. Musk") completed his acquisition of X Corp., at which time he became its chief executive officer ("CEO").

33.    On information and belief, X Corp. did not formally execute the Rack Forecast Agreement after giving affirmative assent to its terms because the intended signatory to the Rack Forecast Agreement was unexpectedly terminated at Mr. Musk's direction during the turmoil that occurred at X Corp. following Mr. Musk's purchase of X Corp.

34.    On information and belief, Mr. Musk intentionally created a chaotic environment at X Corp. following his acquisition (including by terminating key personnel who were involved in

110114977

commercial transactions with suppliers and vendors) in an attempt to refuse to honor X Corp.'s contractual obligations with certain of X Corp.'s vendors, including Inventec, among others.

35.    On information and belief, X Corp., at Mr. Musk's direction, attempted to renegotiate prices and contractual terms with certain of its vendors and suppliers, refusing to pay what it owed without good cause to do so.

36.    Indeed, around the same time Mr. Musk was acquiring X Corp., Inventec was notified that the Rack Forecast Agreement was cancelled.  When Inventec brought this up with Mr. Kan, he responded stating that "[t]he agreement was withdrawn and needed further review. My apologies." Inventec replied asking for the status of the Rack Forecast Agreement and accompanying purchase order because Inventec wanted to provide X Corp. with the requested non-standard racks as soon as possible.  On October 28, 2022, Mr. Kan responded that X Corp.'s "CFO was let go yesterday.  He was a key person in our agreement and PO process.  I am waiting on further instructions from our management team."  A true and correct copy of Mr. Kan's October 28, 2022 correspondence is attached hereto as **Exhibit D**.

37.    Despite its agreement to do so, X Corp. failed and/or refused to issue any purchase orders for the other 135 of the 168 racks agreed to in the Rack Forecast Agreement (the "Agreed Upon Racks") in order to consume excess non-standard components.  Inventec sent X Corp. an invoice for the Agreed Upon Racks, confirming that X Corp. owes Inventec $31,735,789 for the Agreed Upon Racks.  Yet, X Corp. attempted to cancel its agreed-to obligation to purchase the Agreed Upon Racks.

38.    That is, X Corp. required Inventec to build non-standard racks with specific switches for its benefit, a product which X Corp. was fully aware required a significant amount of lead time to procure.  X Corp. then failed to provide appropriate notice or good cause for significantly decreasing the quantity of non-standard product it required, thereby damaging Inventec by requiring it to go out-of-pocket by millions of dollars to build those non-standard racks for X Corp.

39.    X Corp. refused and continues to refuse to pay for the non-standard Agreed Upon Racks.

40.    Additionally, in or about January 2023, Inventec sent X Corp. an invoice ("Invoice No. U320001889") in the amount of $1,729,954 for the switches ("Switches") X Corp. had specifically

110114977

instructed Inventec to purchase because of the approximate 1-year lead time associated with procuring those components.  Inventec acquired the Switches in reliance upon X Corp.'s instructions.

41.    X Corp. refused and continues not to pay for the Switches.

42.    Inventec made multiple demands on X Corp. for payment on the combined balance of $33,465,743 due to Inventec for the Switches and Agreed Upon Racks.

43.    X Corp. refused to pay the combined balance of $33,465,743 due to Inventec for the Switches and Agreed Upon Racks.

44.    In addition to its attempts to resolve the issue of its excess non-standard components with X Corp., Inventec immediately attempted to mitigate its damages through various means, including but not limited to cancelling approximately $12,086,527.00 worth of non-standard components that had not yet been delivered to Inventec, attempting to sell the delivered but unused components to other third parties, attempting to use the unused components in manufacturing products for other Inventec customers, and attempting to repurpose the unused components for Inventec's use to absorb the relevant costs itself.  Inventec has been able to recoup approximately $4.9 million by re-selling and/or repurposing the unused components that were intended to be used in products for X Corp.  However, due to the nature of the components, Inventec has been and continues to be limited in its ability to resell or reuse a substantial amount of components—which hold a significant total value—despite Inventec's best efforts.  Accordingly, Inventec continues to be damaged in the amount of at least $30 million for excess non-standard components that it procured for X Corp. but was unable to dispose of through mitigation efforts after X Corp. breached its contractual obligations.

45.    Inventec has incurred and continues to incur significant storage and handling expenses for the remaining unused components.

46.    Because it was left with no other options, Inventec files this action to recover from X Corp. what X Corp. owes Inventec for the unused non-standard components.

## COUNT I

**(Breach of Contract Against X Corp. – Master Purchase Agreement)**

47.    Inventec incorporates by reference and realleges paragraphs 1-46 above of this Complaint as if fully set forth herein.

COMPLAINT                                                8

110114977

48. As stated above, X Corp. and Inventec entered into the Master Purchase Agreement, which is a valid and binding agreement.

49. Inventec has fully performed all its obligations under the Master Purchase Agreement.

50. X Corp. failed to properly compensate Inventec for the price of the excess non-standard components purchased by Inventec at the direction of X Corp. for the manufacture of non-standard products for X Corp., breaching Section 4.4 of the MPA as understood by the Parties, as evidenced by the course of performance of the Parties over the years.

51. X Corp. also engaged in the wrongful termination of the MPA in violation of at least Section 13.3 of the MPA, impairing Inventec's ability to mitigate procurement risks. Section 13.3 of the MPA provides:

> **13.3. Termination for Convenience.** Twitter may immediately terminate this Agreement and/or any open Purchase Orders at any time, for any reason or no reason, by providing thirty (30) days prior written notice to Supplier of its election to terminate.

52. Despite Inventec's repeated requests for payment, X Corp. has declined to cure, or attempt to cure, its breach of the MPA.

53. As a direct and proximate result of X Corp.'s breach, Inventec has been damaged in an amount to be proved at trial for a total of at least $30 million, with interest at the legal rate on that amount from the due date of each of the relevant invoices and costs.

**COUNT II**

**(Breach of Contract Against X Corp. – Rack Forecast Agreement)**

54. Inventec incorporates by reference and realleges paragraphs 1-53 above of this Complaint as if fully set forth herein.

55. As stated above, X Corp. and Inventec negotiated the Rack Forecast Agreement, which both X Corp. and Inventec approved of and agreed to abide by. On information and belief, X Corp. did not formally execute the Rack Forecast Agreement after giving affirmative assent to its terms because the intended signatory to the Rack Forecast Agreement was unexpectedly terminated at Mr. Musk's direction during the turmoil that occurred at X Corp. following Mr. Musk's purchase of X Corp. On information and belief, Mr. Musk intentionally created a chaotic environment at X Corp.

110114977

following his acquisition (including by terminating off key personnel who were involved in commercial transactions with suppliers and vendors) in an attempt to refuse to honor X Corp.'s contractual obligations.

56.    Although X Corp. did not formally execute the Rack Forecast Agreement, it did affirmatively assent to it through its words and conduct and therefore entered into an enforceable written agreement with Inventec.

57.    Pursuant to the Rack Forecast Agreement, X Corp. agreed it would purchase and receive 168 Agreed Upon Racks from Inventec.  The parties also began performing the terms of the Rack Forecast Agreement in a manner consistent with their longstanding course of performance.

58.    X Corp. breached the Rack Forecast Agreement by failing to purchase all 168 Agreed Upon Racks from Inventec, instead purchasing only thirty-three (33) of those racks.

59.    Inventec has performed all of its obligations under the Rack Forecast Agreement, except those obligations that have been excused or rendered impossible of performance by X Corp.'s conduct.

60.    X Corp. had a contractual duty to pay for the Agreed Upon Racks, which it refused to issue purchase orders for, and thereby breached the Rack Forecast Agreement by attempting to cancel the Agreed Upon Racks, without lawful cause.

61.    X Corp. further breached the Rack Forecast Agreement by failing and refusing to pay for the non-standard Agreed Upon Racks.

62.    Despite Inventec's repeated requests for payment, X Corp. has declined to cure, or attempt to cure, its breach of the Rack Forecast Agreement.

63.    As a direct and proximate result of X Corp.'s breach, Inventec has been damaged in an amount to be proved at trial for a total of at least $30 million, with interest at the legal rate on that amount from the due date of each of the relevant invoices and costs.

## COUNT III

**(Breach of Oral Agreement Against X Corp. – Rack Forecast Agreement)**

64.    Inventec incorporates by reference and realleges paragraphs 1-63 above of this Complaint as if fully set forth herein.

110114977

65.    As stated above, X Corp. and Inventec negotiated the Rack Forecast Agreement, which both X Corp. and Inventec approved of and agreed to abide by.

66.    To the extent that the Rack Forecast Agreement is not deemed an enforceable written agreement due to Mr. Musk laying off the intended signatory of the Rack Forecast Agreement after X Corp. affirmatively assented to the agreement but before it formally signed it, then Inventec alleges in the alternative that it and X Corp. entered into an enforceable oral agreement, the terms of which are memorialized in the Rack Forecast Agreement.

67.    Pursuant to the Rack Forecast Agreement, X Corp. agreed it would purchase and receive 168 Agreed Upon Racks from Inventec.  The parties also began performing the terms of the Rack Forecast Agreement in a manner consistent with their longstanding course of performance.

68.    X Corp. breached the Rack Forecast Agreement by failing to purchase all 168 Agreed Upon Racks from Inventec, instead purchasing only thirty-three (33) of those racks.

69.    Inventec has performed all of its obligations under the Rack Forecast Agreement, except those obligations that have been excused or rendered impossible of performance by X Corp.'s conduct.

70.    X Corp. had a contractual duty to pay for the Agreed Upon Racks, which it refused to issue purchase orders for, and thereby breached the Rack Forecast Agreement by attempting to cancel the Agreed Upon Racks, without lawful cause.

71.    X Corp. further breached the Rack Forecast Agreement by failing and refusing to pay for the non-standard Agreed Upon Racks.

72.    Despite Inventec's repeated requests for payment, X Corp. has declined to cure, or attempt to cure, its breach of the Rack Forecast Agreement.

73.    As a direct and proximate result of X Corp.'s breach, Inventec has been damaged in an amount to be proved at trial for a total of at least $30 million, with interest at the legal rate on that amount from the due date of each of the relevant invoices and costs.

110114977

## COUNT IV

**(Breach of Contract Against X Corp. – Written Confirmation and**

**Inventec Invoice No. U320001889)**

74.    Inventec incorporates by reference and realleges paragraphs 1-73 above of this Complaint as if fully set forth herein.

75.    X Corp.'s written confirmation that Inventec should order the Switches, and resulting Inventec Invoice No. U320001889, are a contract between Inventec and X Corp. for the order and delivery of the Switches.

76.    Inventec has performed all of its obligations under the contract.

77.    X Corp. had a contractual duty to pay for the Switches, as payment on Invoice No. U320001889 became due.

78.    X Corp. breached the contract by failing to pay for the Switches as payment became due.

79.    Despite Inventec's repeated requests for payment, X Corp. has declined to cure, or attempt to cure, its breach of the contract.

80.    As a direct and proximate result of X Corp.'s breach, Inventec has been damaged in an amount to be proved at trial for a total of at least $1.7 million, with interest at the legal rate on that amount from the due date of each of the relevant invoices and costs.

## COUNT V

**(Promissory Estoppel Against X Corp. – Rack Forecast Agreement)**

81.    Inventec incorporates by reference and realleges paragraphs 1-80 above of this Complaint as if fully set forth herein.

82.    For the reasons alleged in paragraphs 54-73 above, the Rack Forecast Agreement is a valid and enforceable written or oral contract.  However, to the extent the Rack Forecast Agreement is deemed not to be a valid and enforceable written or oral contract for any reason, then Inventec asserts this claim for Promissory Estoppel in the alternative.

110114977

83.    In approving the purchase of components by Inventec, X Corp. made clear and unambiguous promises to pay Inventec a total of at least $30 million should X Corp. not purchase the Agreed Upon Racks.

84.    The promises made by X Corp., as reflected in the Rack Forecast Agreement were supported by consideration.  However, Inventec pleads in the alternative that the Court should enforce the promises made by X Corp. to prevent an injustice.

85.    In reliance of X Corp.'s promise of payment made in the Rack Forecast Agreement, Inventec expended resources, including but not limited to purchasing and delivering thirty-three (33) of the 168 Agreed Upon Racks to X Corp.

86.    Inventec's reliance on X Corp.'s promise of payment was not only reasonable, but also entirely foreseeable in light of the parties' entering into the Rack Forecast Agreement and X Corp. purchasing and receiving thirty-three (33) of the 168 Agreed Upon Racks.

87.    Without cause, X Corp. attempted to cancel its orders for Agreed Upon Racks after Inventec had already ordered, procured, designed, customized and/or manufactured these non-standard components.

88.    Because of its reliance on X Corp's promise, Inventec has been injured at least in the amount of $30 million with interest at the legal rate on that amount from the due date of each of the relevant invoices and costs.

## COUNT VI

**(Breach of the Covenant of Good Faith and Fair Dealing Against X Corp.)**

89.    Inventec incorporates by reference and realleges paragraphs 1-88 above of this Complaint as if fully set forth herein.

90.    The MPA and Rack Forecast Agreement are written contracts between Inventec and X Corp.

91.    Implied in the MPA and Rack Forecast Agreement, as well as the longstanding course of performance between the parties, was a covenant that X Corp. would act in good faith and deal fairly with Inventec, that X Corp. would do nothing to interfere with Inventec's interests and

COMPLAINT                                    13

110114977

commitments, and that X Corp. would give at least the same level of consideration to the interests of Inventec as X Corp. would give its own interests.

92.     X Corp. breached this implied good faith and fair dealing to perform its obligations. X Corp.'s improper objective in so conducting itself was, on information and belief, at all times to delay, and if possible in whole or in part avoid, payment of Inventec's legitimate claims.

93.     In breach of the implied covenant of good faith and fair dealing, X Corp. committed the acts alleged above for the purpose of consciously depriving Inventec from the rights and benefits to which Inventec was entitled under the MPA, the Rack Forecast Agreement, as well as the longstanding course of performance between the parties.

94.     As a direct and proximate result of X Corp.'s conduct, Inventec has suffered, and continues to suffer, damages in an amount to be determined at trial for a total of at least $30 million with interest at the legal rate on that amount from the due date of each of the relevant invoices and costs.

## COUNT VII

### (Intentional Misrepresentation Against X Corp. – Rack Forecast Agreement)

95.     Inventec incorporates by reference and realleges paragraphs 1-94 above of this Complaint as if fully set forth herein.

96.     X Corp.—by and through its agents including, but not limited to, Christopher Kan—represented to Inventec that X Corp. would assume liability of the Agreed Upon Racks, as evidenced by the Rack Forecast Agreement.

97.     To the extent X Corp. contends that X Corp. had no intention of fully compensating Inventec for the procurement of such non-standard components, X Corp. either knew that the representation was false when it made them, or it made the representations recklessly and without regard to their truth.

98.     X Corp. intended that Inventec rely on the representations in order to fraudulently induce Inventec to sign the Rack Forecast Agreement and carry out its terms by procuring and sending the Agreed Upon Racks to X Corp.

COMPLAINT                                           14

110114977

99.    Inventec reasonably relied on X Corp.'s representations in deciding to procure and send the Agreed Upon Racks to X Corp. and continuing to do so until X Corp. abruptly ceased payment and refused to issue purchase orders for the remaining 135 Agreed Upon Racks.  X Corp. has refused, and to a large extent ignored, Inventec's repeated requests for compensation of the costs.

100.    As a direct and proximate result of X Corp.'s conduct, Inventec suffered and continues to suffer, damages in an amount to be determined at trial for a total of at least $30 million with interest at the legal rate on that amount from the due date of each of the relevant invoices and costs.

## COUNT VIII

### (Negligent Misrepresentation Against X Corp. – Rack Forecast Agreement)

101.    Inventec incorporates by reference and realleges paragraphs 1-100 above of this Complaint as if fully set forth herein.

102.    X Corp.—by and through its agents including, but not limited to, Christopher Kan—represented to Inventec that X Corp. would assume liability of the Agreed Upon Racks, as evidenced by the Rack Forecast Agreement.

103.    To the extent X Corp. contends that X Corp. had no intention of fully compensating Inventec for the procurement of such components, X Corp. made false representations in order to fraudulently induce Inventec to sign the Rack Forecast Agreement and carry out its terms by procuring and sending the Agreed Upon Racks to X Corp.

104.    Inventec reasonably relied on X Corp.'s representations in deciding to procure and send the Agreed Upon Racks to X Corp. and continuing to do so until X Corp. abruptly ceased payment and refused to issue purchase orders for the remaining 135 Agreed Upon Racks. X Corp. has refused, and to a large extent ignored, Inventec's repeated requests for compensation of the costs.

105.    As a direct and proximate result of X Corp.'s conduct, Inventec suffered and continues to suffer, damages in an amount to be determined at trial for a total of at least $30 million with interest at the legal rate on that amount from the due date of each of the relevant invoices and costs.

110114977

**PRAYER FOR RELIEF**

WHEREFORE, Inventec respectfully prays for judgment and relief as follows:

A.    The Court award Inventec damages in amount to be determined at trial for a total of at least $30 million;

B.    The Court award Inventec its costs of suit and reasonable attorneys' fees incurred in this action;

C.    The Court award pre-judgment and post-judgment interest on all damages awarded; and

D.    The Court award such other relief as the Court may deem just and proper.

**JURY DEMAND**

Inventec demands a trial by jury, pursuant to Fed. R. Civ. P. 38, on all claims set forth in the Complaint and all other triable issues.

Dated: May 29, 2026                                    Respectfully submitted,

                                                       PILLSBURY WINTHROP SHAW PITTMAN LLP


                                                       _David J. Tsai_
                                                       David J. Tsai

                                                       Attorneys for Plaintiff
                                                       Inventec Corporation

COMPLAINT                                16

110114977