**SAWYER & LABAR LLP**
Adrian Sawyer, State Bar No. 203712
sawyer@sawyerlabar.com

1700 Montgomery Street, Suite 108
San Francisco, California 94111
Telephone: 415.262.3820

**GIBBS & BRUNS LLP**
Anthony Kaim *(pro hac vice pending)*
akaim@gibbsbruns.com
Caitlin Halpern *(pro hac vice pending)*
chalpern@gibbsbruns.com
Nick Beachy *(pro hac vice pending)*
nbeachy@gibbsbruns.com
Elisa Wulfsberg *(pro hac vice pending)*
ewulfsberg@gibbsbruns.com

1100 Louisiana St # 5300
Houston, TX 77002
713-650-8805 *(phone)*
713-750-0903 *(fax)*

*Attorneys for Defendant X Corp.*

SAWYER & LABAR LLP
1700 MONTGOMERY ST, STE 108
SAN FRANCISCO, CA 94111
TELEPHONE: 415.262.3820
www.sawyerlabar.com

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN FRANCISCO DIVISION**

| | |
|---|---|
| INVENTEC CORPORATION,<br>Plaintiff,<br>v.<br>X CORP.,<br>Defendant. | Case No. 3:26-cv-05145-WHO<br>**X CORP.'S MOTION TO DISMISS**<br>Date: August 12, 2026<br>Time: 2:00 pm<br>Courtroom: 2, 17th Floor<br>Judge: William H. Orrick |

SAWYER & LABAR LLP
1700 MONTGOMERY ST, STE 108
SAN FRANCISCO, CA 94111
TELEPHONE: 415.262.3820
www.sawyerlabar.com

## CONTENTS

AUTHORITIES ..... iii
I. INTRODUCTION ..... 1
II. STATEMENT OF ISSUES TO BE DECIDED ..... 2
III. STATEMENT OF RELEVANT FACTS ..... 2
IV. LEGAL STANDARD ..... 5
V. ARGUMENT ..... 5
A. Breach of Contract (Count I) ..... 6
1. X committed to pay only for Products ordered and delivered pursuant to a Purchase Order. ..... 6
2. Under the MPA, X is not liable for forecasts. ..... 7
3. Inventec does not adequately allege X wrongfully terminated the MPA. ..... 12
B. Breaches of Other Alleged Contracts ..... 12
1. The unsigned Rack Forecast Agreement is not a contract (Count II). ..... 13
2. Inventec's oral contract claim is untimely and barred (Count III). ..... 14
3. A "written confirmation" email cannot override an integrated master agreement (Count IV). ..... 14
C. Promissory Estoppel (Count V) ..... 15
D. Breach of the Covenant of Good Faith and Fair Dealing (Count VI) ..... 17
1. Inventec's failure to ground its claim in a specific provision is fatal. ..... 17
2. The implied covenant cannot create new duties. ..... 18
E. Intentional and Negligent Misrepresentation (Counts VII and VIII) ..... 19
1. The claims are barred by the statute of limitations. ..... 19
2. Inventec's fraud claims are barred by the economic loss rule. ..... 19
F. A recent decision in a near-identical case confirms that Inventec's claims should be dismissed. ..... 20
VI. CONCLUSION ..... 21

SAWYER & LABAR LLP
1700 MONTGOMERY ST, STE 108
SAN FRANCISCO, CA 94111
TELEPHONE: 415.262.3820
www.sawyerlabar.com

## AUTHORITIES

**Cases** **Page(s)**

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) .......... 5

*Avidity Partners, LLC v. State of California*,
221 Cal. App. 4th 1180 (Cal. App. 2013) .......... 16

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) .......... 5

*Brinderson-Newberg Joint Venture v. Pac. Erectors, Inc.*,
971 F.2d 272 (9th Cir. 1992) .......... 8, 12

*In re Convergent Techs. Sec. Litig.*,
948 F.2d 507 (9th Cir. 1991) .......... 9

*Day v. GEICO Cas. Co.*,
No. 21-CV-02103-BLF, 2022 WL 2135746 (N.D. Cal. June 14, 2022) .......... 17, 18

*Douglas E. Barnhart, Inc. v. CMC Fabricators, Inc.*,
211 Cal. App. 4th 230 (Cal. App. 2012) .......... 15

*Drake v. Option One Mortg. Corp.*,
No. SACV0901450CJCRNBX, 2010 WL 11464891 (C.D. Cal. Apr. 15, 2010) .......... 16

*Foley v. Interactive Data Corp.*,
765 P.2d 373 (Cal. 1988) .......... 19

*Foster Poultry Farms v. Alkar–Rapidpak–MP Equip., Inc.*,
868 F. Supp. 2d 983 (E.D. Cal. Apr. 11, 2012) .......... 19

*Gorovenko v. Activate Clean Energy, LLC*,
No. 8:24-CV-00058-JLS-ADS, 2024 WL 3550489 (C.D. Cal. June 7, 2024) .......... 12

*Graebner v. James*,
No. C 12-01694 WHA, 2012 WL 6156729 (N.D. Cal., Dec. 11, 2012) .......... 19

*Guz v. Bechtel Nat. Inc.*,
24 Cal. 4th 317 (Cal. 2000) .......... 17

*Haggard v. Kimberly Quality Care, Inc.*,
46 Cal. Rptr. 2d 16 (Cal. App. 1995) .......... 12

*Inter-Mark USA, Inc. v. Intuit, Inc.*,
No. C-07-04178 JCS, 2008 WL 552482 (N.D. Cal. Feb. 27, 2008) .......... 17

*J.B.B. Investment Partners, Ltd. v. Fair*,
232 Cal.App.4th 974 (Cal. 2014) .......... 13, 14

*JMP Sec. LLP v. Altair Nanotechnologies Inc.*,
880 F. Supp. 2d 1029 (N.D. Cal. 2012) .......... 20

*Jones v. Wachovia Bank*,
230 Cal. App. 4th 935 (Cal. App. 2014) .......... 16

*Kroetch v. BAC Home Loan Services*,
No. C 11-2860 MEJ, 2011 WL 4502350 (N.D. Cal. Sept. 27, 2011) .......... 17

*Love v. The Mail on Sunday*,
No. CV057798ABCPJWX, 2006 WL 4046180 (C.D. Cal. Aug. 15, 2006) .......... 17

*Microsoft Corp. v. Hon Hai Precision Indus. Co.*,
No. 19-CV-01279-LHK, 2020 WL 836712 (N.D. Cal. Feb. 20, 2020) .......... 19

*Morgan v. Aurora Loan Services, LLC*,
No. CV124350CASMRWX, 2012 WL 12952304 (C.D. Cal. Aug. 13, 2012) .......... 16

*Openshaw v. FedEx Ground Package Sys., Inc.*,
576 F. App'x 685 (9th Cir. 2014) .......... 18

*Oracle USA, Inc. v. XL Glob. Services, Inc.*,
No. C 09-00537 MHP, 2009 WL 2084154 (N.D. Cal. July 13, 2009) .......... 19, 20

*Roth v. Garcia Marquez*,
942 F.2d 617 (9th Cir. 1991) .......... 13

*Seoul Semiconductor Co. v. Finelite, Inc.*,
694 F. Supp. 3d 1199 (N.D. Cal. 2023) .......... 12

*Singelyn v. PNC Bank Nat'l Ass'n*,
No. EDCV 22-02026-CJC (SPX), 2024 WL 1601857 (C.D. Cal. Jan. 12, 2024) .......... 16

*Sonic-Calabasas A, Inc. v. Moreno*,
311 P.3d 184 (Cal. 2013) .......... 8

*Stanley v. Univ. of S. California*,
178 F.3d 1069 (9th Cir. 1999) .......... 12

*Stephenson v. Drever*,
947 P.2d 1301 (Cal. 1997) .......... 11

*Thompson v. Asimos*,
212 Cal. Rptr. 3d 158 (Cal. App. 2016) .......... 11

*Thompson Won v. Wells Fargo Bank, N.N.*,
2026 WL 1540058 (N.D. Cal. June 1, 2026) .......... 6

SAWYER & LABAR LLP
1700 MONTGOMERY ST, STE 108
SAN FRANCISCO, CA 94111
TELEPHONE: 415.262.3820
www.sawyerlabar.com

*Thrifty Payless, Inc. v. The Americana at Brand, LLC*,
218 Cal. App. 4th 1230 (Cal. App. 2013) .......... 17

*Vasquez v. Los Angeles Cnty.*,
487 F.3d 1246 (9th Cir. 2007) .......... 5

*Vizio Inc. v. Gemtek Tech. Co.*,
No. SACV13160JLSRNBX, 2014 WL 10538995 (C.D. Cal. Aug. 27, 2014) .......... 9, 11, 12

*W. Am. Ins. v. Shaghal Ltd.*,
No. CV2107751CJCJPRX, 2022 WL 17370532 (C.D. Cal. June 23, 2022) .......... 17

*Wiwynn Corp. v. X Corp.*,
2025 WL 409388 (N.D. Cal. Jan. 31, 2025) .......... 20, 21

**Statutes**

Cal. Civ. Code § 3300 .......... 12

Cal. Civ. Proc. Code §§ 338(d), 339 .......... 19

Cal. Civ. Proc. Code § 339 .......... 14

Cal. Com. Code § 1304 .......... 18

Cal. Com. Code § 2202 .......... 11

Cal. Com. Code § 2209 .......... 13

SAWYER & LABAR LLP
1700 MONTGOMERY ST, STE 108
SAN FRANCISCO, CA 94111
TELEPHONE: 415.262.3820
www.sawyerlabar.com

SAWYER & LABAR LLP
1700 MONTGOMERY ST, STE 108
SAN FRANCISCO, CA 94111
TELEPHONE: 415.262.3820
www.sawyerlabar.com

## NOTICE OF MOTION AND MOTION TO DISMISS

TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE that at 2:00 p.m. on August 12, 2026, or as soon thereafter as the matter may be heard, before Hon. William H. Orrick, via Zoom, Defendant X Corp. ("**X**") will and hereby does move for an order dismissing Plaintiff Inventec Corporation's ("**Inventec**") Complaint with prejudice for failure to state a claim under Rule 12(b)(6) of the Federal Rules of Civil Procedure. The motion is based on this Notice of Motion and accompanying Memorandum of Points and Authorities, all pleadings and papers on file in this action, the oral argument of counsel, and such other materials and evidence as may be presented to the Court.

X requests that the Court dismiss Inventec's Complaint with prejudice because Inventec fails to state a claim upon which relief can be granted.

## MEMORANDUM OF POINTS AND AUTHORITIES

### I. INTRODUCTION

Inventec purchases computer components to build web servers for its customers, including X (formerly Twitter). In 2022, following delays in Inventec's supply chain and decreases in X's demand, X did not order as many servers as Inventec had hoped. That should have been the end of the story. Inventec had only received X's ***non-binding forecasts***, so X was not required to buy any servers, and no sale was ever made. If Inventec had excess inventory, it should have just returned, repurposed, or resold the brand-new components. Instead, four years later, when the relevant limitations periods had expired or were about to expire, Inventec sued.

Inventec has no viable claim. Under the parties' Master Purchase Agreement ("**MPA**"), the sole written contract executed by the parties, X agreed to pay only for final products that were delivered pursuant to a Purchase Order, not piecemeal components ordered in anticipation of a future Purchase Order. Of course, Inventec had to order parts before it could build the final product. That's why, consistent with the contract, X sent Inventec ***non-binding*** forecasts of its anticipated demand.

But X's forecasts were not promises of future purchases. The parties agreed that X still had to issue a Purchase Order to consummate the sale and trigger X's payment obligation under the MPA. Until then, Inventec assumed the risk that X's demand would change.

## II. STATEMENT OF ISSUES TO BE DECIDED

Whether Inventec has alleged facts that state a claim for (1) breach of the MPA, (2) breach of an unsigned Rack Forecast Agreement, (3) breach of an alleged oral contract, (4) breach of a contract allegedly formed by email, (5) promissory estoppel, (6) breach of the implied covenant of good faith and fair dealing, (7) intentional misrepresentation, and (8) negligent misrepresentation.

## III. STATEMENT OF RELEVANT FACTS

Inventec is a company that designs and assembles computer equipment. It sells internet servers to companies like X, which require large amounts of processing power to keep their websites running. X started buying servers from Inventec around 2020, when the parties entered into a written MPA. Compl. Ex. A (ECF No. 1-1).

The MPA does not require X to buy anything. Consistent with the standard use of such agreements, it simply outlines the process through which X could purchase servers from Inventec. To purchase servers under the MPA, X must first issue a Purchase Order. A "**Purchase Order**" is X's "written order to [Inventec] to purchase Products, which might include (but [are] not limited to) Product descriptions, quantities, price, delivery dates and shipment methods." *Id.* at 2. The MPA makes clear that the Purchase Order provides the controlling price term: "***[f]or Products delivered by Supplier and accepted by [X], [X] will pay Supplier the price specified in the applicable Purchase Order(s)***." *Id.* § 2.1.[1]

The MPA also details the delivery and payment process—which is, again, tethered to a Purchase Order. First, "[s]upplier shall deliver the Products to the location(s) and on the delivery date(s) stated in a Purchase Order." *Id.* § 2.2. Then, "within sixty (60) days following receipt," "[X]

[1] Emphasis is added throughout unless otherwise noted.



SAWYER & LABAR LLP
1700 MONTGOMERY ST, STE 108
SAN FRANCISCO, CA 94111
TELEPHONE: 415.262.3820
www.sawyerlabar.com

SAWYER & LABAR LLP
1700 MONTGOMERY ST, STE 108
SAN FRANCISCO, CA 94111
TELEPHONE: 415.262.3820
www.sawyerlabar.com

will pay each invoice, referencing [X's] Purchase Order." *Id.* § 2.4.[2] No other provision requires payment by X. To the contrary, the MPA states: "Unless otherwise specified in this Agreement, ***[X] will not reimburse Supplier for any expenses incurred by Supplier*** in connection with its obligations." *Id.* § 2.4. Only a Purchase Order creates a binding commitment to take and pay for servers under the MPA. And the Complaint admits that X never issued any Purchase Orders for Products incorporating the components at issue. *See* Compl. ¶ 37.

Separately, the MPA contemplates a process by which X could provide Inventec ***non-binding*** forecasts of its estimated future demand. MPA § 4.4 (Forecast). The MPA specifies that any "[f]orecast provided by [X] for Supplier's standard components are non-binding." *Id.* As to "non-standard components (any components that are customized per [X's] request)," the MPA states only that "[X] anticipates providing [Inventec] with a three-month rolling forecast." *Id.* The parties' F6IVT Product Exhibit, which is incorporated into the MPA and controls in the event of a conflict, *see, e.g.*, MPA §§ 4.3, 15.14(D), extends the forecast window to four months, changes "anticipates providing" to "shall provide," and confirms that all of X's rolling forecasts are non-binding. Ex. 1 ("**Product Exhibit**") at 1, 14 § E(l) ("[X] shall provide Supplier with a rolling non-binding four (4) month forecast.").

If X did provide forecasts to Inventec, the Product Exhibit required Inventec to "maintain an inventory of raw materials and components necessary" to meet X's forecasts and to share monthly updates with X "on the extent of such inventory." *Id.* at 14 § E(n)(ii). And if Inventec became "aware that it may encounter difficulty meeting any forecast quantity of Products," it was required to "immediately notify" X of the expected shortfall. *Id.* at 14 § E(n)(iii). This sequence protected X by, for example, ensuring that Inventec would have the correct components on hand to fulfill X's Purchase Orders, ***if and when*** X issued such Purchase Orders.

[2] *See also id.* § 4.1 ("Unless otherwise provided for in a Purchase Order by the Parties in writing, [X] shall pay all undisputed invoice amounts for accepted Products within forty-five (45) days from Product delivery. Supplier shall send a separate invoice for each delivery under a Purchase Order, and each invoice must show, but not limited to, [X's] Purchase Order number ….").

Consistent with these contractual provisions, X regularly provided non-binding forecasts to Inventec and updated them as its anticipated server needs changed. *See e.g.*, Compl. ¶¶ 20–28. In turn, Inventec alleges that upon receiving X's forecasts, it purchased raw materials (*id.* ¶ 20)—precisely what Inventec was required to do under the Product Exhibit. Product Exhibit at 14 § E(n)(ii). However, where X did not later issue a Purchase Order for the Products assembled with those raw materials, X did not (and was not obligated to) pay for them. Compl. ¶¶ 37, 39. Exhibit B to the Complaint demonstrates this exact process: X's demand changed, so Inventec asked if it could expect a "new forecast." Compl. Ex. B (ECF No. 1-2) at 6–7. But in that same thread, Inventec repeatedly made clear that it needed X to issue a ***Purchase Order*** before it would deliver Products and before X would be required to pay for such Products. *Id.* at 6 ("159 racks are awaiting PO"); *id.* at 5 ("Let's get the POs, thanks."); at 3 ("Is there any good news … [about] the PO release date?").

Nothing in the MPA or the Product Exhibit supports Inventec's allegation that by sharing a forecast, X was promising to purchase servers or pay for components. X could modify its non-binding forecasts at any time. In fact, X could even change an ***already-issued Purchase Order*** at any time: "[X] reserve[d] the right to change a Purchase Order by submitting a written change order to [Inventec] that reflects changes in delivery date, delivery location or quantity of Products." MPA § 4.1 ("Changes"). And if X and Inventec could not agree on an "appropriate equitable adjustment," for that change, "[X] reserve[d] the right to cancel the Purchase Order with no liability." *Id.*

The MPA makes X responsible for unused components in exactly one circumstance: when X "***cancel[s] a Purchase Order***" for "custom manufactured Products." MPA § 4.3 ("Cancellations"). And even in that case, X's liability is limited to reimbursement for custom materials/components that were procured prior to cancellation of the Purchase Order, that were identified in a Product Exhibit prior to the issuance of the Purchase Order, and that Inventec "cannot otherwise sell on the open market or to others, use for itself or others, recover its payment or be

SAWYER & LABAR LLP
1700 MONTGOMERY ST, STE 108
SAN FRANCISCO, CA 94111
TELEPHONE: 415.262.3820
www.sawyerlabar.com

SAWYER & LABAR LLP
1700 MONTGOMERY ST, STE 108
SAN FRANCISCO, CA 94111
TELEPHONE: 415.262.3820
www.sawyerlabar.com

relieved of its payment obligations for, or otherwise mitigate its inventory." *Id.* Then, and only then, does X assume liability for excess materials.

The MPA's (lone) liability provision reinforces the point: there is no binding obligation until X issues a Purchase Order. Inventec assumed the risk that X would not issue Purchase Orders for the full scope of its non-binding forecasts—or that X might change a Purchase Order even after it had been issued*. See* MPA § 4.1. Here, when X's demands changed, it did not issue Purchase Orders at all. That was its right under the MPA.

Finally, and importantly, the MPA, and subsequent Product Exhibits, "constitute[] the complete and exclusive understanding and agreement of the parties with respect to the subject matter" *Id.* § 15.11. Any "waiver, modification, or amendment" of the MPA's terms must be "in writing and signed" by both Inventec and X. *Id.* Inventec claims that X breached two other contracts—an unsigned Rack Purchase Agreement and an alleged "written confirmation" for Inventec to place an order—but neither purported contract included such a waiver and neither was signed by the parties.

## IV. LEGAL STANDARD

A cause of action must be dismissed if it fails to "state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). A complaint must have "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007); *see also Ashcroft v. Iqbal*, 556 U.S. 662 (2009). Thus, Inventec must plead "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555. Rather, "conclusory allegations of law and unwarranted inferences will not defeat an otherwise proper motion to dismiss." *Vasquez v. Los Angeles Cnty*., 487 F.3d 1246, 1249 (9th Cir. 2007).

## V. ARGUMENT

Inventec's core contract claim fails because it admittedly never received Purchase Orders for the components at issue. Dismissal is also warranted for Inventec's other theories, which draw on

SAWYER & LABAR LLP
1700 MONTGOMERY ST, STE 108
SAN FRANCISCO, CA 94111
TELEPHONE: 415.262.3820
www.sawyerlabar.com

forecasts, component lists, emails, and other extrinsic communications to no legal effect. The claims for breaches of purported contracts *other than* the MPA, along with Inventec's extra-contractual claims, are barred by the MPA itself—and in some instances by the statute of limitations or other legal bars.

### A. Breach of Contract (Count I)

The MPA is straightforward: Inventec gets paid after receiving a Purchase Order and delivering a Product. MPA §§ 2.1, 2.2, 2.4. Inventec concedes neither occurred. *See, e.g.*, Compl. ¶¶ 37, 45. Applying the unambiguous MPA and Products Exhibits to these pleaded facts, Inventec cannot prevail on any breach-of-contract claim, however framed.[3]

#### 1. X committed to pay only for Products ordered and delivered pursuant to a Purchase Order.

Under the contract's plain terms, X has a duty to pay only if two conditions are satisfied: (1) X issues a formal Purchase Order, and (2) X accepts delivery of a finished Product.

***First, X must issue a Purchase Order.*** A "Purchase Order" is defined as X's "written order to [Inventec] to purchase Products, which might include (but not limited to) Product descriptions, quantities, price, delivery dates and shipment methods." MPA at 2; *see also id.* § 2.4 (Payment) ("[X] will pay each invoice, referencing [X's] Purchase Order….").

***Second, Inventec must deliver a Product.*** A Product "means the items identified on Purchase Orders issued by [X]." *Id.* at 2. "For Products delivered by Supplier and accepted by [X], [X] will pay Supplier the price specified in the applicable Purchase Order(s)." *Id.* § 2.1 (Prices).

***Inventec concedes that no Purchase Orders were issued.*** While Inventec claims that X "approv[ed]" Inventec's component purchases, Compl. ¶ 20, "approvals" are not Purchase Orders.

---

[3] The MPA is properly before the Court on this motion to dismiss. *See* Compl. Ex. A; Fed. R. Civ. P. 10(c) ("A copy of a written instrument that is an exhibit to a pleading is a part of the pleading for all purposes."). So is the Product Exhibit, which is incorporated by reference into the MPA, so the Complaint necessarily relies on it, *see, e.g.*, MPA §§ 4.3, 15.14(D), and there is no question as its relevance or authenticity. *See* Product Exhibit; *Won v. Wells Fargo Bank, N.A.*, 2026 WL 1540058, at *5 (N.D. Cal. June 1, 2026).

SAWYER & LABAR LLP
1700 MONTGOMERY ST, STE 108
SAN FRANCISCO, CA 94111
TELEPHONE: 415.262.3820
www.sawyerlabar.com

Indeed, Inventec alleges that X "refused to issue any purchase orders." *Id.* ¶ 37. In doing so, Inventec pleads its way out of court. Without a Purchase Order, there is no price term, no payment term, no valid invoice, and no liability for Inventec's inventory. *See* MPA §§ 2.1, 2.2, 2.4, 4.1, 4.3, 4.4. The MPA provides that "[u]nless otherwise specified in this Agreement, [X] will not reimburse Supplier for any expenses incurred by Supplier in connection with its obligations." *Id.* § 2.4.

Inventec cannot point to any part of the MPA making X liable for undelivered components without a Purchase Order, because none exists. Indeed, the MPA expressly addresses X's duty to "reimburse Supplier for non-standard, custom materials/components." MPA § 4.3 ("Cancellations"). But this duty only arises ***after X cancels a Purchase Order***. X can only be liable for components "procured by [Inventec] prior to cancellation [of] the cancelled Purchase Order(s)," up to "the amount to be paid for the applicable Products in the cancelled Purchase Order(s)." *Id.* Here, there was no Purchase Order, let alone a canceled one.

Under the unambiguous MPA, Purchase Orders are a necessary precondition to X's liability. Inventec acknowledges that no Purchase Orders were issued, and no Products were delivered. Accordingly, Inventec cannot state a claim for breach of contract.[4]

### 2. Under the MPA, X is not liable for forecasts.

Lacking the requisite Purchase Orders, Inventec hangs its claim on forecasts. Inventec oscillates between two theories: In one, X's forecasts are claimed to be binding; in the other, X is allegedly bound by emails approving Inventec's component purchases. *Compare* Compl. ¶ 19 (contending forecasts themselves are binding per MPA Section 4.4), *with id.* ¶ 20 (claiming X's email approvals of component lists based on X's forecasts make X liable). These theories are incompatible, and neither remedies the fatal flaw in Inventec's case: No plausible reading of the MPA puts X on the hook for finished Products without a Purchase Order, much less unassembled components.

[4] This defect cannot be cured by amendment, as Inventec admits that no Purchase Orders were issued for the components at issue and cannot in good faith allege the opposite.

SAWYER & LABAR LLP
1700 MONTGOMERY ST, STE 108
SAN FRANCISCO, CA 94111
TELEPHONE: 415.262.3820
www.sawyerlabar.com

**a. Inventec's interpretation is incompatible with the contract.**

Inventec's textual argument is that Section 4.4 places "the risk of loss as to non-standard components" on X "***by negative inference***." *Id.* ¶ 18. Based only on these interpretive gymnastics, Inventec would impose total liability on X for *all* forecasted custom components—liability that would attach as soon as X sends a forecast. Yet the contract, as supplemented by the Product Exhibit, says the exact opposite: No forecasts are binding.

The MPA refers only to "non-binding" forecasts for standard components, not to "binding" forecasts of any kind.[5] MPA § 4.4. As for custom components, Section 4.4 simply says that X "anticipates providing" a "three-month rolling" forecast. *Id.* The duty Inventec seeks—one that requires X to pay for components based only on estimates of X's future needs—is nowhere to be found.

The Product Exhibit, which supplements the MPA, extends that forecast period and makes clear that for all components, "[X] shall provide Supplier with a rolling ***non-binding*** four (4) month forecast." Product Exhibit at 14 § E(l). The Product Exhibit controls on this issue and expressly refutes Inventec's reading. *See* Product Exhibit at 1 ("In the event of any conflict or inconsistency between the terms of this Product Exhibit and the MPA, the Product Exhibit shall control.").

The parties never agreed to make X liable for forecasts; to the contrary, they expressly agreed that forecasts were non-binding. "[C]ourts may not rewrite agreements and impose terms to which neither party has agreed." *Sonic-Calabasas A, Inc. v. Moreno*, 311 P.3d 184, 201 (Cal. 2013). And courts consider and construe contracts as a whole to avoid rendering provisions meaningless. *See Brinderson-Newberg Joint Venture v. Pac. Erectors, Inc.*, 971 F.2d 272, 278–79 (9th Cir. 1992).

Adding liability for forecasts would disrupt the MPA's calibrated processes for buying and selling Products. Such liability cannot be harmonized with the MPA's other terms. To name a few examples, there is no squaring X's purported liability for forecasted-but-unordered custom

[5] The full MPA provision reads: "Forecast provided by [X] for [Inventec's] standard components are non-binding. For non-standard components (any components that are customized per [X's] request), [X] anticipates providing [Inventec] with a three-month rolling forecast." MPA § 4.4.

SAWYER & LABAR LLP
1700 MONTGOMERY ST, STE 108
SAN FRANCISCO, CA 94111
TELEPHONE: 415.262.3820
www.sawyerlabar.com

components with X's right to "immediately terminate" the MPA "***and/or any open Purchase Orders*** at any time, for any reason or no reason." MPA § 13.3. Additionally, X's right to change or cancel a Purchase Order, and the contractual limitations on those rights, would be rendered meaningless because X would be equally liable before it places an order. *See id.* §§ 4.1, 4.3.

In one remarkably on-point case, a California court rejected a supplier's similar attempt to fashion binding purchases from non-binding forecasts. *See Vizio Inc. v. Gemtek Tech. Co.,* No. SACV13160JLSRNBX, 2014 WL 10538995, at *2–3 (C.D. Cal. Aug. 27, 2014). The facts were nearly identical to those alleged by Inventec: Vizio and Gemtek entered a master supply agreement for the sale of electronics; Vizio provided purchase forecasts; Gemtek acquired inventory based on the forecasts; Vizio never issued a purchase order for the forecasted inventory; and Gemtek claimed damages as a result. *See id.* The court found that the contract did not "permit [] recovery for leftover components except where Vizio submitted a purchase order." *Id.* at *4. The same is true here.

The contract at issue in *Vizio* was strikingly similar to the MPA. For example, the *Vizio* court called attention to the defined terms "Purchase Orders" and "Products":

> If the forecasts were *themselves* purchase orders, as Gemtek claims, the contract's very detailed provisions regarding purchase orders would become surplusage. Moreover, numerous important provisions of the Supply Agreement become meaningless without the use of purchase orders, again rendering large swaths of the agreement surplusage under Gemtek's reading. Even the foundational term "Products," for instance, is defined as items "specified in a Purchase Order by Vizio."

*Id. at* *3 (emphasis original). The MPA uses the same terms in the same way. *See, e.g.*, MPA at 2 (defining "Products" to include "the items identified on Purchase Orders"). And the MPA is hardly unique in this regard. "[I]n the computer industry generally, an 'agreement to purchase' has far different consequences than an actual 'purchase order.' While the former represents a mere forecast of anticipated product demand, the latter is an actual obligation to buy." *In re Convergent Techs. Sec. Litig.*, 948 F.2d 507, 514 (9th Cir. 1991) (citation omitted).

**b. The contract's text refutes Inventec's attempt to re-allocate risk.**

Given no express duty to pay for components, Inventec artfully pleads that the "risk of loss" fell on X. *E.g.*, Compl. ¶ 18. But the MPA and the law impose that risk on Inventec, not X. The contract places the onus on Inventec, not its customer, to recognize and solve shortages of forecasted components. *See* MPA § 6.2 (Inventec must inform X of any "materials or manufacturing capacity constraint that could adversely affect Supplier's ability to meet [X's] requirements. … Supplier will maintain additional supply to cover fallout in the manufacturing process. Supplier will also position purchase orders and forecasts with its sub-tier suppliers in order to maintain the quoted delivery lead-time of the Product to [X]."). The Product Exhibit confirms as much. *See* Product Exhibit at 14 § E(n)(iii) ("If Supplier becomes aware that it may encounter difficulty meeting any forecast quantity of products, it shall immediately notify [X], providing details of the expected shortfall, causes of the shortfall and proposed solution."); *id.* at 14 § E(n)(ii) (Inventec "will maintain an inventory of raw materials and components necessary to manufacture products in accordance with the forecasts."); *see also id.* at 6–7 § E(c) ("Supplier will trigger material demand based on material lead-time, [X] project target schedule, manufacturing process and material screening and preparation…. Supplier routinely purchases products and holds inventory to cater to [X] demand…."). The MPA also provides that Inventec bears "all risk of loss, damage or destruction to the products until delivery to the specified delivery location." MPA § 2.2.

The parties bargained for a single, narrow deviation to Inventec's acceptance of risk: In the cancellation provision of Section 4.3, discussed above, the parties agreed that X may have liability for excess components when Products are ordered through a Purchase Order that is later canceled—*not* when Products are merely forecasted and never ordered. *See* MPA § 4.3.

Where parties put obligations in writing, courts presume that "having expressed some they have expressed all of the conditions by which they intended to be bound," and thus courts should not "enlarge them by implication." *Alameda Cnty. v. S. Pac. Co.*, 360 P.2d 327, 333 (Cal. 1961). By the same token, where express terms specify the rights and duties flowing from a particular event

SAWYER & LABAR LLP
1700 MONTGOMERY ST, STE 108
SAN FRANCISCO, CA 94111
TELEPHONE: 415.262.3820
www.sawyerlabar.com

SAWYER & LABAR LLP
1700 MONTGOMERY ST, STE 108
SAN FRANCISCO, CA 94111
TELEPHONE: 415.262.3820
www.sawyerlabar.com

(here, Section 4.3 specifying X's liability for excess components), that "tends to negate any inference that the parties also intended another consequence to flow from the same event." *Stephenson v. Drever*, 947 P.2d 1301, 1305–06 (Cal. 1997). If the parties meant to shift even more risk to X, they would have: Section 4.3 shows they knew how. The MPA answers the operative question not by "negative inference" but by the express terms of the section immediately preceding Section 4.4—one Inventec completely ignores.

**c. An alleged course of performance cannot overrule the contract.**

Lacking a plausible basis for its claims in the contract's text, Inventec seeks refuge in the parties' purported course of performance. Inventec's theory is this: When X provided forecasts, X "understood that by approving the purchase of the needed components, X Corp. was assuming liability for these components in the event that the components were not used in the manufacture of the products forecasted by X Corp." *Id.* ¶ 20. But the MPA is a fully integrated contract, so Inventec cannot rely on an alleged course of performance.

As to its "subject matter," the MPA "constitutes the complete and exclusive understanding and agreement of the parties" and "supersedes all prior understandings and agreements, whether written or oral." MPA § 15.11. For integrated contracts, "parol evidence may not be used to vary or contradict the words the parties agreed upon, since an integrated writing must be taken as the best and final expression of their intent." *Thompson v. Asimos*, 212 Cal. Rptr. 3d 158, 174 (Cal. App. 2016) (citing Cal. Civ. P. § 1856 and Cal. Com. Code § 2202).

Once again, *Vizio* is on point. Like the MPA, the contract in *Vizio* prohibited unsigned modifications, which foreclosed Gemtek's course-of-performance arguments:

> [While] course of performance is ordinarily relevant in determining whether the parties have waived or modified any contractual term that is inconsistent with their performance … this is not the case where the parties' signed agreement excludes modification except by a signed writing[.] Because the Supply Agreement's provisions concerning purchase orders may not be supplemented or modified by the parties' course of performance, ***Gemtek cannot recover for leftover product where it did not receive a purchase order***.

*Visio*, 2014 WL 10538995, at *3. A "plaintiff cannot rely on post-contract implied terms when [a] contract require[s] all modifications be written." *Stanley v. Univ. of S. California*, 178 F.3d 1069, 1078 (9th Cir. 1999) (citing *Haggard v. Kimberly Quality Care, Inc.,* 46 Cal. Rptr. 2d 16, 21–24 (Cal. App. 1995)); *see also Seoul Semiconductor Co. v. Finelite, Inc.*, 694 F. Supp. 3d 1199, 1211 (N.D. Cal. 2023) (declining to consider course of conduct where the contract was integrated and where modifications required a signed writing).

Inventec's proffered "parol evidence of terms not specifically included in the written contract is not admissible" and cannot salvage its breach of contract claim. *Gorovenko v. Activate Clean Energy, LLC*, No. 8:24-CV-00058-JLS-ADS, 2024 WL 3550489, at *2–3 (C.D. Cal. June 7, 2024) (citing *Brinderson-Newberg*, 971 F.2d at 277).

**3. Inventec does not adequately allege X wrongfully terminated the MPA.**

Finally, X did not breach Section 13.3 by "wrongful termination." Compl. ¶ 51. Inventec includes a conclusory allegation that X terminated the MPA without sufficient notice, but it never alleges when, how, or with what type of notice X terminated the contract.

Additionally, injury must flow from the specific duty breached and be proximately caused by that breach. *See* Cal. Civ. Code § 3300. The termination provisions allow X to "immediately terminate" the MPA and "any open Purchase Orders at any time, for any reason or no reason," by providing 30 days' prior written notice. MPA § 13.3. To state a claim for breach of contract, Inventec would have had to allege that, if given 30 days' written notice, it would not have suffered its purported damages. There is no such allegation; *all* of Inventec's alleged damages stem from excess components, not a lack of 30-days' notice. Without a connection between the purported "wrongful termination" and an injury, Inventec cannot state a claim.

**B. Breaches of Other Alleged Contracts**

The MPA is a fully integrated contract that represents the "complete and exclusive understanding of the parties with respect to the subject matter [t]hereof." MPA § 15.11. Nevertheless,

SAWYER & LABAR LLP
1700 MONTGOMERY ST, STE 108
SAN FRANCISCO, CA 94111
TELEPHONE: 415.262.3820
www.sawyerlabar.com

SAWYER & LABAR LLP
1700 MONTGOMERY ST, STE 108
SAN FRANCISCO, CA 94111
TELEPHONE: 415.262.3820
www.sawyerlabar.com

Inventec also alleges that X breached *other* purported contracts on the same subject matter. *See* Compl. ¶¶ 54–80. The terms of these alleged contracts—which are either unsigned or oral—are incompatible with the MPA, effectively acting as a "waiver, modification or amendment" of the MPA in violation of the MPA's integration and no-oral-modification provisions. MPA § 15.11.

**1. The unsigned Rack Forecast Agreement is not a contract (Count II).**

Inventec admits that X "did not formally execute the Rack Forecast Agreement." Compl. ¶ 55. The analysis can end there, for two independently sufficient reasons.

First, the draft Rack Forecast Agreement expressly refers to and incorporates the MPA. If executed, it would have imposed obligations that "supplement and are incremental to those set forth in the MPA." Compl. Ex. C (ECF No. 1-3) at 3. The MPA's requirement that any "waiver, modification, or amendment" of the MPA's terms must be "in writing and signed by the parties" therefore clearly applies and was not met. MPA § 15.11. A contract that "excludes modification or rescission except by a signed writing … cannot be otherwise modified or rescinded." Cal. Com. Code § 2209.

Second, the parties' signatures were an essential requirement of the deal according to the proposed agreement itself. The draft Rack Forecast Agreement says: "This is a legally binding agreement ***effective upon both parties signing below***." Compl. Ex. C at 4. The agreement was never signed by both parties, so it did not become effective. *See, e.g.*, *Roth v. Garcia Marquez*, 942 F.2d 617, 626-27 (9th Cir. 1991) (affirming dismissal of breach of contract action where the purported agreement was never signed, "a condition precedent" "for the contract to be binding").

Even setting aside those dispositive issues, a party suing to enforce an agreement formalized by email "must prove, based on the context and surrounding circumstances, including the conduct of the parties, that the parties agreed to use [e-mail] to formalize their agreement." *J.B.B. Investment Partners, Ltd. v. Fair*, 232 Cal.App.4th 974, 990 (Cal. 2014) (quoting Cal. Civ. Jury Inst. No. 380). The email correspondence attached to the Complaint confirms that the never-executed Rack

SAWYER & LABAR LLP
1700 MONTGOMERY ST, STE 108
SAN FRANCISCO, CA 94111
TELEPHONE: 415.262.3820
www.sawyerlabar.com

Forecast Agreement lacks legal effect. X's employee asked Inventec to "confirm you are ok with the agreement draft," and Inventec responded: "Sure, ok with the agreement draft, please proceed further." Compl. Ex. B (ECF No. 1-2) at 2. X confirmed that X's "CEO has given his approval as well." *Id.* What was being "approved" was the form of the draft, so that the parties could "proceed" to formal execution. A week later, Inventec asked X to "check what's the status for signature?" Compl. Ex. D (ECF No. 1-4) at 2. X responded that "[t]he agreement was withdrawn and needed further review," and Inventec said "[p]lease give us a hand to make it released as soon as possible." *Id.* Because it was plainly understood that signatures were required for the Rack Forecast Agreement to become effective, no contract was formed. *See, e.g., J.B.B. Investment Partners*, 232 Cal.App.4th at 990 (finding that an email agreeing to terms of a settlement was insufficient to form a contract when no formal agreement was ultimately signed).

**2. Inventec's oral contract claim is untimely and barred (Count III).**

The statute of limitations for an action "upon a contract, obligation or liability not founded upon an instrument of writing" is two years. Cal. Civ. Proc. Code § 339. The allegations underlying Inventec's claim for breach of an oral contract date back to "October 18, 2022," when X allegedly "approved of the Rack Forecast Agreement orally." Compl. ¶ 30. Inventec does not plead any grounds for extending the statute of limitations, *see id.* ¶¶ 64–73, so Count III of Inventec's May 2026 Complaint is untimely. This claim also fails for the same reasons as Inventec's claim based on the written but unsigned Rack Forecast Agreement: any modifications to the MPA must be in writing and signed by the parties, which any supposed oral agreement was not. *See supra* § V.B.1; Compl. ¶ 55.

**3. A "written confirmation" email cannot override an integrated master agreement (Count IV).**

In its final "other contract" claim, Inventec alleges that X breached an agreement to pay for server components called "Switches." *See* Compl. ¶¶ 74–80. Specifically, Inventec alleges that "X Corp.'s written confirmation that Inventec should order the Switches, and resulting Inventec Invoice

SAWYER & LABAR LLP
1700 MONTGOMERY ST, STE 108
SAN FRANCISCO, CA 94111
TELEPHONE: 415.262.3820
www.sawyerlabar.com

No. U320001889, are a contract," which X breached by failing to pay for the Switches. *Id.* ¶ 75. This claim fares no better. The MPA is the "complete and exclusive" agreement governing X's obligation to pay for Products or components procured by Inventec, including Switches. MPA § 15.11. Any "modifications" to the MPA had to be "in writing and signed by the parties," *id.*, which Inventec does not—and cannot in good faith—allege occurred. X's "written confirmation" email, and Inventec's issuance of an invoice for the Switches, therefore did not create a new contract.

Instead, the MPA governs. And under the MPA, X was not obligated to pay invoices issued by Inventec unless the invoices "referenc[ed] [X's] Purchase Order." MPA § 2.4; *see also id.* § 2.1 ("Twitter will pay Supplier the price specified in the applicable Purchase Order(s)."). Invoice No. U320001889—which Inventec conveniently failed to attach to its Complaint—does not reference a Purchase Order ***because X Corp. never issued one***. Ex. 2 ("**Invoice**") (showing "PO#" as blank). X therefore had no obligation to pay the rogue invoice.

Inventec's procurement of the Switches based on their "approximate 1-year lead time," Compl. ¶ 40, was a routine part of its obligation to manage inventory by "trigger[ing] material demand based on material lead-time," Product Exhibit at 6 § E(c)(i)(1). Until X issued a Purchase Order for the Switches, Inventec bore the entire risk of loss. *E.g.*, MPA § 2.2. X never issued a Purchase Order, so that loss was ultimately borne by Inventec.

### C. Promissory Estoppel (Count V)

Inventec next alleges that "[i]n approving the purchase of components by Inventec, X Corp. made clear and unambiguous promises to pay Inventec a total of at least $30 million should X Corp. not purchase the Agreed Upon Racks." *Id.* ¶ 83. Inventec has failed to state a claim because the MPA displaces any such theory.

California law treats contract and promissory estoppel claims "not only as distinct or alternative theories of recovery but also as mutually exclusive." *Douglas E. Barnhart, Inc. v. CMC Fabricators, Inc.*, 211 Cal. App. 4th 230, 243 (Cal. App. 2012). If a promissory estoppel claim

SAWYER & LABAR LLP
1700 MONTGOMERY ST, STE 108
SAN FRANCISCO, CA 94111
TELEPHONE: 415.262.3820
www.sawyerlabar.com

"relies upon obligations arising out of a written agreement for which there was bargained-for consideration," that claim "instead must be pleaded as one for breach of the bargained-for contract." *Singelyn v. PNC Bank Nat'l Ass'n*, No. EDCV 22-02026-CJC (SPX), 2024 WL 1601857, at *4 (C.D. Cal. Jan. 12, 2024). Put another way, "traditional contract principles" govern if the alleged promise "occurred in the context of a bargained-for exchange between the parties." *Morgan v. Aurora Loan Services, LLC*, No. CV124350CASMRWX, 2012 WL 12952304, at *6 (C.D. Cal. Aug. 13, 2012).

Here, X's alleged promises plainly occurred in the context of the bargained-for MPA. The fully integrated MPA is the "complete and exclusive understanding" of the parties as to that "subject matter." MPA § 15.11. If the parties wished to waive, modify, or amend any part of that "exclusive understanding," they had to do so by signed writing. *Id.* Since Inventec has "alleged the existence of a contract that covers the dispute over" liability for forecasted Products and components, its "claim for promissory estoppel fails as a matter of law." *Drake v. Option One Mortg. Corp.*, No. SACV0901450CJCRNBX, 2010 WL 11464891, at *4–5 (C.D. Cal. Apr. 15, 2010).

The MPA also prevents Inventec from adequately alleging the essential element of reliance.[6] Inventec's only alleged act of reliance—"purchasing and delivering" other servers, for which X issued Purchase Orders and paid invoices—was contractually bargained for. Compl. ¶ 85; *cf. Avidity Partners, LLC v. State of California*, 221 Cal. App. 4th 1180, 1208–09 (Cal. App. 2013) (Plaintiff's alleged acts in "reliance on certain alleged promises" was the same as its alleged "duties under the Agreement," so Plaintiff's "claim of promissory estoppel fail[ed] because the reliance it claims was bargained-for consideration under the Agreement."). There can be no promissory estoppel claim if a plaintiff is "already contractually obligated" to do the acts alleged as reliance. *Morgan*, 2012 WL 12952304, at *6.

[6] "The elements of a promissory estoppel claim are (1) a promise clear and unambiguous in its terms; (2) reliance by the party to whom the promise is made; (3) [the] reliance must be both reasonable and foreseeable; and (4) the party asserting the estoppel must be injured by his reliance." *Jones v. Wachovia Bank*, 230 Cal. App. 4th 935, 944–945 (Cal. App. 2014).

SAWYER & LABAR LLP
1700 MONTGOMERY ST, STE 108
SAN FRANCISCO, CA 94111
TELEPHONE: 415.262.3820
www.sawyerlabar.com

**D. Breach of the Covenant of Good Faith and Fair Dealing (Count VI)**

Inventec's claim for breach of the implied covenant of good faith and fair dealing, Compl. ¶¶ 89–94, fails for two reasons. First, a plaintiff alleging breach of the implied covenant must plead the specific contractual provisions that the defendant allegedly frustrated, which Inventec has failed to do. Second, the implied covenant may not create new duties, as Inventec's claim requires.

**1. Inventec's failure to ground its claim in a specific provision is fatal.**

"The covenant of good faith and fair dealing, implied by law in every contract, exists merely to prevent one contracting party from unfairly frustrating the other party's right to receive the benefits of the agreement actually made." *Day v. GEICO Cas. Co*., No. 21-CV-02103-BLF, 2022 WL 2135746, at *2 (N.D. Cal. June 14, 2022) (citing *Guz v. Bechtel Nat. Inc.*, 24 Cal. 4th 317, 349 (Cal. 2000)) (emphasis original). "But the implied covenant can neither substantively *alter* the terms of the contract nor impose substantive duties or limits on the contracting parties beyond those incorporated in the specific terms of their agreement." *Id.* (cleaned up). Since the covenant "functions as a *supplement* to the express contractual covenants," the "precise nature and extent of the duty imposed by the implied covenant depends upon the contours of the underlying contract." *W. Am. Ins. v. Shaghal Ltd*., No. CV2107751CJCJPRX, 2022 WL 17370532, at *3 (C.D. Cal. June 23, 2022) (quoting *Thrifty Payless, Inc. v. The Americana at Brand, LLC*, 218 Cal. App. 4th 1230, 1244 (Cal. App. 2013)) (emphasis original) (cleaned up).

Adhering to these principles, courts routinely dismiss claims that do not allege the "specific contractual provision" that was frustrated. *See, e.g., Day*, 2022 WL 2135746, at *2; *W. Am. Ins.*, 2022 WL 17370532, at *3; *Kroetch v. BAC Home Loan Services*, No. C 11-2860 MEJ, 2011 WL 4502350, at *3 (N.D. Cal. Sept. 27, 2011); *Inter-Mark USA, Inc. v. Intuit, Inc.*, No. C-07-04178 JCS, 2008 WL 552482, at *7 (N.D. Cal. Feb. 27, 2008); *Love v. The Mail on Sunday*, No. CV057798ABCPJWX, 2006 WL 4046180, at *7 (C.D. Cal. Aug. 15, 2006). This gatekeeping is necessary: "To allow a party to plead a breach of contract claim based on a violation of the covenant

SAWYER & LABAR LLP
1700 MONTGOMERY ST, STE 108
SAN FRANCISCO, CA 94111
TELEPHONE: 415.262.3820
www.sawyerlabar.com

of good faith and fair dealing untethered from a specific contractual provision would undermine the certainty a contract provides, especially in light of later changed circumstances favorable to one party over the other." *Day*, 2022 WL 2135746, at *2.

Inventec's claim for breach of the covenant of good faith and fair dealing does not refer to any specific contractual provision and fails for this reason alone. *See* Compl. ¶¶ 89–94.

**2. The implied covenant cannot create new duties.**

Rather than identifying any frustrated provision of the parties' contract, Inventec alleges that the MPA and unexecuted Rack Forecast Agreement implied a covenant that X "would act in good faith and deal fairly," "do nothing to interfere with Inventec's interests and commitments," and "give at least the same level of consideration to the interests of Inventec" as its own. Compl. ¶ 91. The MPA says nothing of the sort. The implied covenant "does not create a separate duty of fairness and reasonableness which can be independently breached." *See* Cal. Com. Code § 1304, cmt. 1. It only means that "a failure to perform or enforce, in good faith, a specific duty or obligation under the contract, constitutes a breach of that contract." *Id.*

The Ninth Circuit rejected an argument like Inventec's in *Openshaw v. FedEx Ground Package Sys., Inc.*, 576 F. App'x 685 (9th Cir. 2014). There, Openshaw claimed FedEx breached the implied covenant by, for example, "not offering Openshaw a spare truck when he needed it" and "not telling Openshaw about a spare driver when he needed one." *Id.* at 688. However, their contract "explicitly obligated Openshaw to provide trucks and drivers and to operate at a national standard." *Id.* The Ninth Circuit thus ruled for FedEx, as the implied covenant of good faith and fair dealing could not be used "to impose a substantive duty on FedEx to *help* Openshaw provide trucks and drivers or to meet delivery standards." *Id.* (emphasis original).

Both Inventec and Openshaw would convert their counterparties' *rights* to have their needs met (X's demand for servers and FedEx's for drivers) into an extra-contractual *duty* to make it easier to meet them (by requiring X to pay for Inventec's inventory and FedEx to provide Openshaw with

SAWYER & LABAR LLP
1700 MONTGOMERY ST, STE 108
SAN FRANCISCO, CA 94111
TELEPHONE: 415.262.3820
www.sawyerlabar.com

trucks and drivers). That is beyond the implied covenant's reach. *Cf. Microsoft Corp. v. Hon Hai Precision Indus. Co.*, No. 19-CV-01279-LHK, 2020 WL 836712, at *7–8 (N.D. Cal. Feb. 20, 2020) (dismissing implied covenant claim that "would effectively write in a requirement that Microsoft help Hon Hai perform its contract obligations").

**E. Intentional and Negligent Misrepresentation (Counts VII and VIII)**

Inventec's claims for intentional and negligent misrepresentation, Compl. ¶¶ 95–105, are untimely and barred by the economic loss rule.

**1. The claims are barred by the statute of limitations.**

"In California the statute of limitations is three years for a fraud or intentional misrepresentation claim and two years for a negligent misrepresentation claim." *Graebner v. James*, No. C 12-01694 WHA, 2012 WL 6156729, at *5 (N.D. Cal., Dec. 11, 2012) (citation omitted); *see also* Cal. Civ. Proc. Code §§ 338(d), 339. Like Inventec's oral contract claim, the facts underlying Inventec's intentional and negligent misrepresentation claims (Counts VII and VIII) date back to October 2022, more than three years ago. Compl. ¶¶ 30, 96, 102. Both of Inventec's fraud claims are therefore barred by the statute of limitations.

**2. Inventec's fraud claims are barred by the economic loss rule.**

The "fundamental rule in California is that no tort cause of action will lie where the breach of duty is nothing more than a violation of a promise which undermines the expectations of the parties to an agreement." *Oracle USA, Inc. v. XL Glob. Services, Inc.*, No. C 09-00537 MHP, 2009 WL 2084154, at *4 (N.D. Cal. July 13, 2009). Contract actions "enforce the intentions of the parties to the agreement"; tort claims "vindicate social policy." *Id.* (citing *Foley v. Interactive Data Corp.*, 765 P.2d 373 (Cal. 1988)). "Virtually any time a contract has been breached, the party bringing suit can allege that the breaching party never intended to meet its obligations. To allow fraud claims in actions such as this one would collapse the carefully-guarded distinction between contract and tort law." *Foster Poultry Farms v. Alkar–Rapidpak–MP Equip., Inc.*, 868 F. Supp. 2d 983, 993–94 (E.D. Cal. Apr. 11, 2012).

Thus, the "threshold question" is whether Inventec "states a claim that arises from something other than contract—i.e., for a breach of some duty that has been placed on [X] to vindicate social policy, rather than to protect [Inventec's] bargained-for expectations." *Oracle*, 2009 WL 2084154, at *4. It does not. "There is no conduct at issue which is independent from the various promises made by the parties in the course of their contractual relationship." *Id.* Instead, Inventec's purported acts of reliance "constitute[d] nothing more than [its] usual performance under the Agreement." *JMP Sec. LLP v. Altair Nanotechnologies Inc.*, 880 F. Supp. 2d 1029, 1044 (N.D. Cal. 2012). Inventec alleges it relied on X's misstatements by "procuring and sending the Agreed Upon Racks to X Corp." Compl. ¶¶ 98, 103. But Inventec was already obligated to take those acts in performing the MPA. This makes for a "direct application" of the economic loss rule, as Inventec "has taken the allegations underpinning a straightforward claim for breach of a commercial contract and recast them as torts." *JMP*, 880 F. Supp. 2d at 1043 (dismissing claims with prejudice because the economic loss rule applies "[h]owever they are framed").

SAWYER & LABAR LLP
1700 MONTGOMERY ST, STE 108
SAN FRANCISCO, CA 94111
TELEPHONE: 415.262.3820
www.sawyerlabar.com

**F. A recent decision in a near-identical case confirms that Inventec's claims should be dismissed.**

In 2024, Inventec's counsel sued X on behalf of a different supplier, Wiwynn Corporation. *See Wiwynn Corp. v. X Corp.*, No. 3:24-cv-05322-AGT (N.D. Cal. Aug. 16, 2024). Many of Wiwynn's claims were nearly identical to the claims Inventec brings here,[7] including claims for promissory estoppel, breach of the implied covenant of good faith and fair dealing, and intentional and negligent misrepresentation. *Compare*, *e.g.*, Inventec Compl. ¶¶ 47–53, 81–105, *with* Wiwynn 1st Am. Compl. ¶¶ 33–64, *Wiwynn Corp.*, No. 3:24-cv-05322-AGT (Oct. 15, 2025) (ECF No. 27). On a motion to dismiss, Judge Tse dismissed all of Wiwynn's claims against X, except for its breach of contract claim based on the MPA (Count I in both actions). *See Wiwynn Corp. v. X Corp.*, 2025

[7] The only difference between the claims is that Inventec relies on the unsigned Rack Forecast Agreement and, as a result, veers even further from the MPA than Wiwynn did.

SAWYER & LABAR LLP
1700 MONTGOMERY ST, STE 108
SAN FRANCISCO, CA 94111
TELEPHONE: 415.262.3820
www.sawyerlabar.com

WL 409388, at *2 (N.D. Cal. Jan. 31, 2025). At a minimum, this Court should follow suit and dismiss all the claims that Judge Tse did.

But this Court can and should go further, because the Inventec MPA and Product Exhibit are even clearer about X's lack of liability for excess components. In particular, the cancellation provision in the Inventec MPA expressly describes narrower circumstances in which X must reimburse the vendor for custom components: Under the Inventec MPA, X is required to "reimburse Supplier for non-standard, custom materials/components" only when (1) those components were "procured by Supplier prior to cancellation for the cancelled Purchase Order(s)," (2) "Supplier cannot otherwise sell [them] on the open market or to others, use for itself or others, recover its payment or be relieved of its payment obligations for, or otherwise mitigate its inventory," and (3) "Supplier had identified all non-standard, custom materials/components for each Product in Product Exhibits prior to the issuance of a Purchase Order by [X] for such Product"—and even then, the amount of any such reimbursement cannot exceed "the amount to be paid for the applicable Products in the cancelled Purchase Order(s)." MPA § 4.3. The Wiwynn MPA, by contrast, provides that for cancellation of "custom manufactured Products" X "shall be liable for any and all remaining materials that Supplier is unable to sell on the open market." *Wiwynn Corp.*, No. 3:24-cv-05322-AGT (Oct. 15, 2025) (ECF No. 27 Ex. A) § 4.3.4. Inventec does not allege that any of the necessary preconditions for reimbursement under Section 4.3—including the issuance of a Purchase Order—occurred.

Because no reasonable interpretation of the MPA and Product Exhibit supports Inventec's claim that X breached the MPA by failing to reimburse Inventec for components it procured based on X's forecasts, Count I should be dismissed.

## VI. CONCLUSION

X respectfully requests that Inventec's Complaint be dismissed with prejudice.

DATED: June 30, 2026

Respectfully submitted,

**SAWYER & LABAR LLP**

By: */s/ Adrian Sawyer*

Adrian Sawyer
State Bar No. 203712
sawyer@sawyerlabar.com

1700 Montgomery Street, Suite 108
San Francisco, California 94111
415-262-3820 *(phone)*

**GIBBS & BRUNS LLP**

Anthony Kaim *(pro hac vice pending)*
akaim@gibbsbruns.com

Caitlin Halpern *(pro hac vice pending)*
chalpern@gibbsbruns.com

Nick Beachy *(pro hac vice pending)*
nbeachy@gibbsbruns.com

Elisa Wulfsberg *(pro hac vice pending)*
ewulfsberg@gibbsbruns.com

1100 Louisiana St # 5300
Houston, TX 77002
713-650-8805 *(phone)*
713-750-0903 *(fax)*

*Attorneys for Defendant X Corp.*

SAWYER & LABAR LLP
1700 MONTGOMERY ST, STE 108
SAN FRANCISCO, CA 94111
TELEPHONE: 415.262.3820
www.sawyerlabar.com