PILLSBURY WINTHROP SHAW PITTMAN LLP
DAVID J. TSAI (SBN 244479)
david.tsai@pillsburylaw.com
ALEKZANDIR MORTON (SBN 319241)
alekzandir.morton@pillsburylaw.com
JOHN STEGER (SBN 341299)
john.steger@pillsburylaw.com
NATALIE TRUONG (SBN 346680)
natalie.truong@pillsburylaw.com
Four Embarcadero Center, 22nd Floor
San Francisco, CA 94111-5998
Telephone: 415.983.1000
Facsimile: 415.983.1200

Attorneys for Plaintiff
Inventec Corporation

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| INVENTEC CORPORATION, a Taiwan corporation,<br><br>Plaintiff,<br><br>vs.<br><br>X CORP., a Delaware corporation,<br><br>Defendant. | Case No. 3:26-cv-05145-WHO<br><br>**INVENTEC CORPORATION'S OPPOSITION TO X CORP.'S MOTION TO DISMISS**<br><br>Date: August 12, 2026<br>Time: 2:00 p.m.<br>Courtroom: 2, 17th floor<br>Judge: Honorable William H. Orrick |

# TABLE OF CONTENTS

Page


I. INTRODUCTION ..... 1

II. FACTUAL BACKGROUND ..... 2

III. LEGAL STANDARD ..... 4

IV. ARGUMENT ..... 4

A. Inventec Sufficiently Pleads Breach of the MPA ..... 4

1. The Plain Language of Section 4.4 Supports Inventec's Interpretation of the MPA. ..... 4

2. X Conflates Liability for Finished Goods with Liability for Custom Components. ..... 7

3. Course of Performance and Course of Dealing Confirm Inventec's Interpretation. ..... 9

4. Inventec Adequately Pleads Wrongful Termination Of The MPA. ..... 9

B. Inventec Sufficiently Pleads Additional Breach Of Contract Claims ..... 11

1. The MPA's Integration Clause Does Not Bar The Parties' Subsequent Agreements. ..... 11

2. The Rack Forecast Agreement Is Enforceable. ..... 13

3. The Alternatively Pleaded Oral Contract Claim Is Timely. ..... 14

4. Inventec has Adequately Pleaded A Written-Confirmation Agreement For The Switches. ..... 15

C. The Complaint Properly and Sufficiently Pleads Promissory Estoppel ..... 16

1. Inventec's Promissory Estoppel Claim Is Based on the Rack Forecast Agreement (Not the MPA) and Is Properly Pleaded in the Alternative to Inventec's Breach of Contract Claim. ..... 16

D. Inventec is Entitled to Bring a Cause of Action for Breach of the Implied Covenant of Good Faith and Fair Dealing ..... 18

1. Inventec Properly Grounds its Claim in Specific Provisions of the MPA or Rack Forecast Agreement. ..... 18

2. Inventec Does Not Seek to Create New Duties but Rather to Enforce the Parties' Reasonable Contractual Expectations. ..... 19

E. The Complaint Properly Pleads Misrepresentation Claims ..... 20

1. Inventec's Misrepresentation Claims are Timely Brought and are Not Barred by the Statute of Limitations. ....21

2. Inventec's Misrepresentation Claims Are Not Barred By the Economic Loss Rule. ....22

F. Inventec's Claims Differ From the Claims Dismissed in the *Wiwynn* Case....24

V. CONCLUSION....25

**TABLE OF AUTHORITIES**

Page(s)

Cases

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ....4

*Astiana v. Hain Celestial Grp., Inc.*,
783 F.3d 753 (9th Cir. 2015) ....16

*Banner Entm't, Inc. v. Superior Court*,
62 Cal. App. 4th 348 (1998) ....13

*Binder v. Aetna Life Ins. Co.*,
75 Cal. App. 4th 832 (1999) ....13

*Brown v. Goldstein*,
34 Cal. App. 5th 418 (2019) ....5

*Clements Fam. Tr. v. Vimmia, LLC*,
No. 8:25-CV-00122-WLH-DFM, 2025 WL 2427782 (C.D. Cal. May 27, 2025) ....18, 19

*Corcoran v. CVS Health Corp.*,
169 F. Supp. 3d 970 (N.D. Cal. 2016) ....16

*DC3 Ent., LLC v. John Galt Ent., Inc.*,
412 F. Supp. 2d 1125 (W.D. Wash. 2006) ....14

*Douglas E. Barnhart, Inc. v. CMC Fabricators, Inc.*,
211 Cal. App. 4th 230 (2012) ....17

*Esteras v. United States*,
606 U.S. 185, 145 S. Ct. 2031 (2025) ....6

*Fleet v. Bank of Am. N.A.*,
229 Cal. App. 4th 1403 (2014) ....17

*Foster Poultry Farms v. Alkar-Rapidpak-MP Equip., Inc.*,
868 F. Supp. 2d 983 (E.D. Cal. 2012) ....22

*Gregorio v. Clorox Co.*,
No. 17-CV-03824-PJH, 2018 WL 732673 (N.D. Cal. Feb. 6, 2018) ....24

*United States v. Hathaway*,
242 F.2d 897 (9th Cir. 1957) ....6, 8

*Headlands Rsrv., LLC v. Ctr. for Nat. Lands Mgmt.*,
523 F. Supp. 2d 1113 (C.D. Cal. 2007) ....5, 11

*In re Insurance Installment Fee Cases*,
211 Cal. App. 4th 1395 (2012) ....12

*J.B.B. Investment Partners, Ltd. v. Fair*,
232 Cal. App. 4th 974 (2014) ....... 14

*Joli Grace, LLC v. Country Visions, Inc.*,
No. 2:16-1138 WBS EFB, 2016 WL 6996643 (E.D. Cal. Nov. 30, 2016) ....... 23

*Kalitta Air, L.L.C. v. Cent. Texas Airborne Sys., Inc.*,
315 F. App'x 603 (9th Cir. 2008) ....... 24

*Marsu, B.V. v. Walt Disney Co.*,
185 F.3d 932 (9th Cir. 1999) ....... 18

*Microsoft Corp. v. Hon Hai Precision Indus. Co.*,
No. 19-CV-01279-LHK, 2020 WL 836712 (N.D. Cal. Feb. 20, 2020) ....... 20

*Mike Nelson Co. v. Hathaway*,
No. F 05–0208, 2005 WL 2179310 (E.D. Cal. Sept. 8, 2005) ....... 17

*Molsbergen v. U.S.*,
757 F.2d 1016 (9th Cir. 1985) ....... 16

*Openshaw v. FedEx Ground Package Sys., Inc.*,
576 F. App'x 685 (9th Cir. 2014) ....... 19

*Pacific Contours Corp. v. Fives Machining Sys., Inc.*,
No. SACV 18-00413-DOC, 2018 WL 6204579 (C.D. Cal. Oct. 29, 2018) ....... 23

*Putnam v. Putnam Lovell Grp. NBF Sec., Inc.*,
No. C 05–1330 CW, 2006 WL 1821207 (N.D. Cal. June 30, 2006) ....... 17

*R. Power Biofuels, LLC v. Chemex LLC*,
No. 16-CV-00716-LHK, 2017 WL 1164296 (N.D. Cal. Mar. 29, 2017) ....... 23

*Reinhardt v. Gemini Motor Transp.*,
879 F. Supp. 2d 1138 (E.D. Cal. 2012) ....... 18

*Robinson Helicopter Co., Inc. v. Dana Corp.*,
34 Cal.4th 979 (2004) ....... 22, 23, 24

*Rosenthal-Zuckerman v. Epstein, Becker & Green Long Term Disability Plan*,
39 F. Supp. 3d 1103 (C.D. Cal. 2014) ....... 5

*Roth v. Garcia Marquez*,
942 F.2d 617 (9th Cir. 1991) ....... 14

*Supermail Cargo, Inc. v. United States*,
68 F.3d 1204 (9th Cir. 1995) ....... 21

*Suski v. Coinbase, Inc.*,
55 F.4th 1227 (9th Cir. 2022) ....... 11

*TreeFrog Devs., Inc. v. Seidio, Inc.*,
No. 13CV0158-IEG KSC, 2013 WL 4028096 (S.D. Cal. Aug. 6, 2013) ....... 16

*Trunov v. Rusanoff*,
No. 12–CV–04149 NC, 2012 WL 6115608 (N.D. Cal. Dec. 10, 2012) ........ 17

*Virun, Inc. v. Cymbiotika, Inc.*,
No. 8:22-cv-00325-SSS-DFM, 2022 WL 17371057 (C.D. Cal. Aug. 18, 2022) ........ 4

*Vizio Inc. v. Gemtek Tech. Co., No. SACV13160JLSRNBX*,
2014 WL 10538995 (C.D. Cal. Aug. 27, 2014) ........ 8

*Waller v. Truck Ins. Exch., Inc.*,
11 Cal.4th 1 (1995) ........ 4

*Wartell v. Wells Fargo Bank, N.A.*,
755 F. Supp. 3d 1252 (N.D. Cal. 2024) ........ 21

*Williams v. Gerber Prods. Co.*,
552 F.3d 934 (9th Cir. 2008) ........ 4

*Wiwynn Corp. v. X Corp.*,
2025 WL 409388 (N.D. Cal. Jan. 31, 2025) ........ 8

*Wiwynn Corp. v. X Corp.*,
No. 3:24-cv-05322-AGT (N.D. Cal.) ........ 8, 24, 25

*In re Yahoo! Inc. Customer Data Sec. Breach Litig.*,
No. 16-MD-02752-LHK, 2017 WL 3727318 (N.D. Cal. Aug. 30, 2017) ........ 20

Statutes and Codes

California Civil Code
Section 1550 ........ 13
Section 1565 ........ 13
Section 1717 ........ 17

California Code of Civil Procedure
Section 339 ........ 14
Section 1856 ........ 9
Section 1856(c) ........ 9
Section 1856(g) ........ 9

California Commercial Code
Section 2725 ........ 14
Section 2725(1) ........ 14

Rules and Regulations

Federal Rules of Civil Procedure
Rule 8 ........ 10
Rule 8(d)(3) ........ 16
Rule 12(b)(6) ........ 21

## I. INTRODUCTION

This lawsuit centers on whether Defendant X Corp. ("X") is liable for custom components that Inventec procured for X-specific products at X's direction. These were not generic, off-the-shelf materials. They were non-standard components that were purchased in reliance on X's forecasts, approved by X, and that X knew Plaintiff Inventec Corporation ("Inventec") could not reuse, repurpose, or resell to other customers.

X asks the Court to decide, at the pleading stage, that Inventec alone must absorb more than $30 million in custom inventory that X asked Inventec to procure, approved the purchase of, and later agreed to consume. That is not what the Parties' agreements say, not how the Parties performed during the lifetime of their commercial relationship, and not a result that can be imposed on a Rule 12(b)(6) motion.

Contrary to X's assertions, this is not about converting X's forecasts into purchase orders or forcing X to buy every finished rack it forecasted. Inventec alleges no such theory. The issue is narrower: whether X may forecast demand for non-standard components customed for X, direct Inventec to procure those components, confirm that procurement, and then disclaim responsibility after unilaterally reducing its demand, leaving Inventec with components that could not reasonably be reused, repurposed, or resold. The Master Purchase Agreement ("MPA") clearly supports (or, at a minimum for the pleading stage, is at least reasonably susceptible to) Inventec's answer: no.

Section 4.4 of the MPA states that forecasts for standard components are "non-binding." It does not say the same for non-standard components. Instead, it treats "components that are customized per Twitter's request" separately. The Product Exhibit, incorporated by reference into the MPA, reinforces that distinction by limiting X's non-liability only to "common" materials (*i.e.*, not custom or non-standard components). X's motion centers on improperly reading the words "standard" and "common" out of these provisions, while collapsing two distinct concepts: purchase obligations for finished goods (not at issue here) and responsibility for custom components procured at X's direction (the heart of Inventec's lawsuit).

At this stage, Inventec need not prove that its interpretation is the only possible reading of the Parties' agreements. It need only plead a reasonable interpretation that supports liability. Because the

MPA's text, the Product Exhibit, the Parties' course of performance, and X's partial performance all support Inventec's contractual and non-contractual claims, X's motion should be denied.

## II. FACTUAL BACKGROUND

Inventec is a global manufacturer of electronic products and computer equipment. Compl. at ¶ 8. X, then known as Twitter, Inc. ("Twitter"), engaged Inventec to manufacture custom server racks for X's data-center infrastructure. *Id.* at ¶¶ 9–10. These server racks (called "Products") are generally composed of two types of components: (1) standard components (*i.e.*, components that are not customized) and (2) non-standard components (*i.e.*, components that are "customized per Twitter's request"). *Id.* at ¶¶ 15–17.

On or about December 13, 2020, Twitter and Inventec entered into the MPA in which Inventec agreed to sell, and Twitter agreed to purchase, custom server racks. *Id.* at ¶ 14. Due to the long lead time to procure the necessary components for these custom racks, Twitter agreed in the MPA to provide forecasts to Inventec of its anticipated purchases on a rolling basis. *See* Section 4.4 of the MPA ("Forecast provided by Twitter for Supplier's standard Components are non-binding. For non-standard Components (any components that are customized per Twitter's request), Twitter anticipates providing Supplier with a three-month rolling forecast."). Because non-standard components are "customized per Twitter's request," the MPA treats forecasts differently as between standard components and non-standard components. Specifically, Section 4.4 of the MPA explicitly provides that forecasts for "standard Components" are "non-binding," *i.e.*, Twitter would not be required to consume (through the purchase of racks or reimbursement of component costs) the standard components purchased by Inventec pursuant to the forecasts. On the other hand, the MPA explicitly differentiates "non-standard Components," reflecting the Parties' understanding that forecasts for such components—which are customized at Twitter's request and constitute a substantial purchase risk for Inventec should Twitter change its mind about whether to purchase racks—would result in X bearing responsibility for purchased non-standard components that are not otherwise consumed. *Id.* at ¶¶ 18–19.

This understanding was reflected in the Parties' course of dealing over the life of the MPA. In late 2021 and 2022, X issued forecasts for non-standard racks, and Inventec procured materials to meet

those forecasted needs. *Id.* at ¶¶ 20–25. In November 2021, Inventec asked X to confirm whether Inventec should prepare raw materials for X's forecasted demand for 521 non-standard racks. Inventec asked for this confirmation because X would be liable for any unused non-standard components, and thus it wanted X's further written confirmation that Inventec should proceed with purchasing those components. And that is precisely what happened; in apparent recognition that it would be responsible for unused non-standard components, X confirmed that Inventec should proceed with purchasing them. *Id.* at ¶ 20.

After explicitly authorizing Inventec to purchase sufficient non-standard components to manufacture 521 custom racks, in June 2022 X later reduced its forecasted demand to 442 custom racks. *Id.* at ¶ 26. In July 2022, X reduced its forecast again to 215 custom racks, with zero racks forecasted for November 2022. *Id.* at ¶ 27. Those reductions left Inventec holding the bag on millions of dollars' worth of excess non-standard components (*i.e.*, components customized at X's request) that X had expressly instructed Inventec to purchase. *Id.* at ¶¶ 28, 38, 44.

In recognition that it was liable for the cost of those excess non-standard components, X agreed to consume them in manufactured custom racks by negotiating the Rack Forecast Agreement with Inventec. *Id.* at ¶¶ 29–31. Pursuant to that agreement, X committed to purchase 168 non-standard racks from Inventec. *Id.* at 29. Confirming X's understanding at the very highest levels of management that it was responsible for the cost of the non-standard components, X's representative, Christopher Kan, informed Inventec that X's CEO had approved the Rack Forecast Agreement both orally and in writing. *Id.* at ¶¶ 29–30. X then issued purchase orders for 33 of the 168 agreed racks, accepted delivery, and paid Inventec for those racks. *Id.* at ¶ 31. But after the acquisition of X by Elon Musk, X refused to issue purchase orders for the remaining 135 racks and refused to pay Inventec for the resulting excess non-standard component inventory. *Id.* at ¶¶ 32–39.

Inventec immediately attempted to mitigate its damages, including by cancelling approximately $12 million in components and attempting to resell, reuse, or repurpose unused materials. *Id.* at ¶ 44. Those efforts recovered approximately $4.9 million, but Inventec still suffered substantial losses because the non-standard components were customized for X and could not readily

be used elsewhere. *Id.* at ¶¶ 44–45. As a direct result of X's actions, Inventec has suffered damages of at least $30 million. *Id.* at ¶ 45.

## III. LEGAL STANDARD

To survive a motion to dismiss, a complaint need only plead sufficient factual matter to state a claim that is plausible on its face. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A claim is plausible when the pleaded facts allow the Court to draw a reasonable inference that the defendant is liable for the alleged misconduct. *Id.* The Court must accept all well-pleaded factual allegations as true and construe them in the light most favorable to the plaintiff. *Williams v. Gerber Prods. Co.*, 552 F.3d 934, 937 (9th Cir. 2008).

That standard is particularly important where, as here, the motion turns on competing interpretations of contractual language. At the pleading stage, a plaintiff need not prove that its interpretation is the only correct one. Dismissal is improper where the contract is reasonably susceptible to the plaintiff's interpretation. *See Virun, Inc. v. Cymbiotika, Inc.*, No. 8:22-cv-00325-SSS-DFM, 2022 WL 17371057, at *5 (C.D. Cal. Aug. 18, 2022). If the Parties' competing interpretations are both plausible, the dispute cannot be resolved on a Rule 12(b)(6) motion. *Id.*

## IV. ARGUMENT

### A. Inventec Sufficiently Pleads Breach of the MPA

X's arguments for dismissal of Count I for breach of the MPA are premised on an erroneous and strained interpretation of the MPA. When properly construed, the MPA clearly establishes X's liability for custom (*i.e.*, "non-standard") components. Regardless, Inventec need not at the pleading stage establish that its interpretation of the MPA is correct; instead, it need only establish that its interpretation is "reasonable"—a hurdle that Inventec easily clears.

#### 1. The Plain Language of Section 4.4 Supports Inventec's Interpretation of the MPA.

Under California law, the court must "look first to the language of the contract in order to ascertain its plain meaning or the meaning a layperson would ordinarily attach to it." *Waller v. Truck Ins. Exch., Inc.*, 11 Cal.4th 1, 18 (1995). "In sum, courts must give a reasonable and commonsense

interpretation of a contract consistent with the parties' apparent intent." *Brown v. Goldstein*, 34 Cal. App. 5th 418, 438 (2019) (internal quotations and citation omitted).

X's attack on Count I rests on a selective reading of the MPA that ignores the contract language most directly addressing this dispute. X cites provisions governing purchase orders, invoices, delivery, and cancellation of finished goods (*i.e.*, provisions governing responsibility for *finished products*), but barely confronts Section 4.4—the provision that specifically discusses X's liability for purchased *non-standard components* arising from forecasts. The Court must read the MPA as a whole, not through X's curated excerpt of largely irrelevant provisions.

Section 4.4 expressly provides that "[f]orecast provided by Twitter for Supplier's ***standard*** Components are non-binding. . . ." Compl. at ¶ 17 (emphasis added). The provision does not state that forecasts for non-standard components are non-binding. Instead, it separately provides: "For non-standard Components (any components that are customized per Twitter's request), Twitter anticipates providing Supplier with a three-month rolling forecast." *Id.*

The distinction is obvious and must be given effect. If forecasts for both standard and non-standard components were equally non-binding, there would have been no reason to limit the "non-binding" language to "standard" components. X's reading thus renders the word "standard" surplusage, contrary to settled principles of contract interpretation. Courts must interpret contracts to give effect to every provision and avoid rendering language meaningless. *Headlands Rsrv., LLC v. Ctr. for Nat. Lands Mgmt.*, 523 F. Supp. 2d 1113, 1126 (C.D. Cal. 2007). Courts also presume that where parties include language in one place but omit it in another, the omission was intentional. *See Rosenthal-Zuckerman v. Epstein, Becker & Green Long Term Disability Plan*, 39 F. Supp. 3d 1103, 1107 (C.D. Cal. 2014) (holding that Employee Policy that "is silent as to whether § 403(b) pension plans contributions constitute AMRE," but explicitly defines AMRE for other types of persons "demonstrates that when Defendants. . . wanted to include pension plan contributions in the definition of AMRE for a plan beneficiary, they knew how to do it," and thus "Defendants' decisions to not mention pension plan contributions in the definition of employee AMRE shows that the definition of employee AMRE does not include § 403(b) pension plans contributions").

If the Parties had intended that the forecasts for custom components were also non-binding, the contract would have said so explicitly—just as it stated explicitly for standard components. The omission demonstrates a deliberate distinction. As an analogy, a sign that says, "No parking on Sundays" naturally implies that parking is permitted on other days; otherwise, the sign would simply say "No parking." *Cf. Esteras v. United States*, 606 U.S. 185, 210, 145 S. Ct. 2031, 2049 (2025) ("suppose a sign at the entrance of a park said: 'No gasoline- or electric-powered vehicles allowed.' Under the *expressio unius canon*, it would be fair to infer that standard bikes are permitted."). So too here. By stating that forecasts for ***standard*** components are non-binding, Section 4.4 naturally implies that forecasts for ***non-standard*** components are treated differently. Section 4.4 could have said: "Forecasts for standard and non-standard components are non-binding." It did not. Instead, it used the word "standard" to *qualify* the non-binding language. X's reading would improperly erase the word "standard" from Section 4.4. Instead, the Court must give that word meaning. *See United States v. Hathaway*, 242 F.2d 897, 900 (9th Cir. 1957) ("A fundamental rule of construction is that a court must give effect to every word or term employed by the parties and reject none as meaningless or surplusage in arriving at the intention of the contracting parties.").

X's invocation of the Product Exhibit does nothing to change the reasonableness of Inventec's interpretation of Section 4.4. To the contrary, the Product Exhibit confirms Inventec's reading. X seizes on the Product Exhibit's statement that Twitter would provide Inventec with a "rolling non-binding four (4) month forecast," but ignores what immediately follows: a separate section titled "Material Binding." That section provides that "Twitter will not have liability for excess ***<u>common</u>*** materials that Supplier ***<u>also sources for its other customer projects</u>***. . . ." *See* Mot., Ex. 1 at Section n.i (emphasis added). That language closely tracks Section 4.4 of the MPA (*i.e.*, "common materials" is treated similarly to "standard" components). Both provisions distinguish between common/standard materials on the one hand and custom/non-standard components on the other. Thus, the Product Exhibit only reinforces the reasonableness of Inventec's interpretation of the MPA.

### 2. X Conflates Liability for Finished Goods with Liability for Custom Components.

X attempts to sidestep the clear implication of Section 4.4 (and Section n.i of the Product Exhibit) by conflating two distinct concepts: X's obligation to purchase finished goods and X's liability for custom components procured to satisfy X's forecasts. Inventec does not dispute that a "non-binding forecast" meant X was not obligated to purchase a specific number of finished racks merely because it forecasted that amount. But that is not Inventec's claim. Inventec's claim is that, under Section 4.4, X's forecasts for *non-standard components* gave rise to liability for the custom, X-specific components Inventec procured to meet those forecasted needs.

Contrary to X's focus on finished goods, Inventec is ***not*** seeking the purchase price or lost profits for finished goods X forecasted but never ordered. Instead, Inventec merely seeks to be made whole as if X never forecasted and instructed Inventec to purchase custom components; in other words, Inventec seeks the purchase price of those non-standard components customized for X's specifications. Of course, X knew Inventec would have to procure these non-standard components in advance to satisfy X's forecasted demand, and X knew Inventec could not readily reuse, repurpose, or resell the non-standard components to another customer if X later reduced or abandoned that demand. This is why the Parties contractually agreed that X would be responsible for any such excess non-standard components.

The Product Exhibit relied on by X makes this distinction even clearer. The Product Exhibit separates "Forecast" from "Material Binding," placing them in back-to-back but distinct subsections. The former addresses forecasted demand for finished Products; the latter addresses responsibility for materials procured to meet that forecasted demand. If "non-binding forecast" meant what X says it means—that X had no liability whatsoever for any materials procured in response to a forecast—there would have been no need to state, two paragraphs later, that X had no liability for "excess common materials" sourced for other customer projects. That carveout would be unnecessary and mere surplusage. Those provisions exist because the Parties treated finished-product purchase obligations and material-liability obligations as different subjects.

Likewise, X's reliance on Section 4.3 does not eliminate its separate liability under Section 4.4. Section 4.3 governs a specific circumstance: X's cancellation or termination of Purchase Orders and the liability that follows from that cancellation. Section 4.4 addresses a different subject: forecasts and the Parties' allocation of risk for standard versus non-standard components procured to meet those forecasts. X's argument collapses those distinct provisions into one, but the MPA does not. If Section 4.3 were the only provision governing liability for custom components, Section 4.4's separate treatment of non-standard components would have no work to do. The Court should reject an interpretation that renders Section 4.4 meaningless. *See Hathaway*, 242 F.2d at 900 ("A fundamental rule of construction is that a court must give effect to every word or term employed by the parties and reject none as meaningless or surplusage in arriving at the intention of the contracting parties.").

X's reliance on *Vizio* fails for the same reason: it depends on treating Inventec's component-liability theory as if it were a demand for finished-product purchase obligations.[1] In *Vizio*, the supplier argued that sales forecasts themselves constituted binding purchase orders, attempting to convert non-binding estimates into firm commitments to purchase finished products. *Vizio Inc. v. Gemtek Tech. Co., No. SACV13160JLSRNBX*, 2014 WL 10538995, at *2-*3 (C.D. Cal. Aug. 27, 2014). The court rejected this attempt to bypass the contract's detailed purchase order requirements, finding that treating forecasts as purchase orders would render key contractual provisions meaningless. *Id.*

Here, in contrast, Inventec is not arguing that the forecasts are themselves purchase orders. Instead, Inventec contends that X is liable for non-standard components that Inventec specifically procured in response to X's forecast. Compl. at ¶¶ 19, 23, 25, 44, 50. As explained above, this narrower theory aligns with the MPA's differentiated treatment of standard versus non-standard components in Section 4.4 and finds support in related provisions of the Product Exhibits. This is more than sufficient for Inventec's breach-of-MPA claim to clear the pleading stage.

---

[1] X's reliance on *Vizio* is especially misplaced because X advanced the same argument in *Wiwynn Corp. v. X Corp.,* No. 3:24-cv-05322-AGT (N.D. Cal.), yet the Court still denied dismissal of the breach-of-MPA claim. In the very decision X invokes in Section V.F of its Motion, the Court held that materially similar MPA language supported a reasonable interpretation under which X's forecasts for custom components were binding. *Wiwynn Corp. v. X Corp.*, 2025 WL 409388, at *1–*2 (N.D. Cal. Jan. 31, 2025). The Court explained that the MPA stated only that forecasts for standard components were non-binding, which suggested that the parties intended to treat forecasts for standard and customized components differently. *Id.* at *2. That reasoning applies here with equal force.

**3. Course of Performance and Course of Dealing Confirm Inventec's Interpretation.**

X also argues that Inventec cannot rely on the Parties' course of performance because the MPA contains an integration clause. Mot. at 11. That argument misstates both Inventec's theory and California law. Inventec is not invoking course of performance to contradict the MPA or to manufacture a new obligation out of whole cloth. Inventec invokes the Parties' course of performance and course of dealing to confirm the meaning of Section 4.4—namely, that X bore responsibility for non-standard components procured for X-specific products in response to X's forecasts, directions, confirmations, and approvals.

California law expressly permits reference to course of performance in situations such as this. Code of Civil Procedure section 1856 provides that even where a writing is intended as the parties' final agreement, it "may be explained or supplemented by course of dealing or usage of trade or by course of performance." Cal. Code Civ. Proc. § 1856(c). The statute further provides that the parol evidence rule "does not exclude other evidence of the circumstances under which the agreement was made or to which it relates," evidence offered "to explain an extrinsic ambiguity," or evidence used "otherwise [to] interpret the terms of the agreement." Cal. Code Civ. Proc. § 1856(g).

X's integration clause argument fails because Inventec is not seeking to vary or contradict an unambiguous contract term. Inventec is explaining the meaning of the contract's own language. Section 4.4 distinguishes between standard and non-standard components. The Product Exhibit likewise distinguishes between "excess common materials" and "components that are unique to the Product per forecast from Twitter." Inventec's course-of-performance allegations confirm that the Parties understood those distinctions to have practical significance: X could avoid being bound to purchase a specific quantity of finished goods absent a Purchase Order, but it remained responsible for non-standard components procured for X-specific products in accordance with X's forecasts and approvals.

**4. Inventec Adequately Pleads Wrongful Termination Of The MPA.**

X's final attack on Count I is that Inventec supposedly fails to allege wrongful termination of the MPA because it does not identify the precise date or manner of termination, or plead that the lack

of thirty days' notice caused damages. Mot. at 12. That argument imposes a level of specificity Rule 8 does not require and ignores the allegations pleaded.

The Complaint alleges that X wrongfully terminated the MPA in violation of Section 13.3, which required thirty days' prior written notice before X could terminate the agreement and/or any open Purchase Orders. Compl. at ¶ 51. Inventec further alleges that X refused to pay the combined balance owed to Inventec and declined to cure despite repeated demands. Compl. at ¶¶ 32–43, 52. Those allegations plausibly plead that X effectively terminated or abandoned the Parties' relationship without providing the required notice.

X's demand for a more precise "when" or "how" is a factual quibble inappropriate for a motion to dismiss. The Complaint identifies the relevant contractual provision, the notice requirement, X's conduct showing termination or abandonment, and the resulting harm. Nothing more is required at the pleading stage.

X's causation argument also fails. Inventec specifically alleges that X's wrongful termination impaired Inventec's ability to mitigate procurement risks. Compl. at ¶ 51. That allegation is plausible given the nature of the Parties' relationship and the components at issue. This case concerns long-lead-time, non-standard components customized for X-specific racks. Advance notice mattered because it would have given Inventec an opportunity to cancel additional component orders, halt further procurement, redirect inventory, negotiate alternate uses, reduce storage and handling costs, and otherwise mitigate the fallout from X's withdrawal. Indeed, the Complaint alleges that Inventec immediately attempted to mitigate damages, including by cancelling approximately $12 million in components and attempting to resell, reuse, or repurpose unused components. Compl. at ¶ 44.

Whether thirty days' written notice would have reduced Inventec's damages, and by how much, is a factual question. X cannot defeat a termination claim at the pleading stage by insisting that Inventec prove now precisely what mitigation opportunities it lost because of X's failure to provide notice. Discovery will show what procurement, cancellation, resale, storage, and mitigation options were available during that period.

X's reading would also render Section 13.3's notice requirement toothless. If X could simply stop performing, refuse to pay, withdraw from agreed resolutions, and abandon the relationship

without giving notice—then argue that the lack of notice caused no harm because the damage was already underway—the thirty-day notice provision would have little practical effect. Courts do not construe contracts to render bargained-for provisions meaningless. *Headlands Rsrv., LLC v. Ctr. For Nat. Lands Mgmt.*, 523 F. Supp. 2d 1113, 1126 (C.D. Cal. 2007) ("Courts must interpret contractual language in a manner which gives force and effect to *every* provision, and not in a way which renders some clauses nugatory, inoperative, or meaningless.").

Inventec has adequately alleged that X breached Section 13.3 and that the breach impaired Inventec's ability to mitigate damages. Compl. ¶ at 51. That is more than sufficient to survive dismissal.

**B. Inventec Sufficiently Pleads Additional Breach Of Contract Claims**

X next attacks Counts II through IV. It argues that the Rack Forecast Agreement is unenforceable because it was unsigned, that the alternative oral contract claim is untimely, and that X's written confirmation regarding the Switches is unenforceable. Mot. at 12–15. X's arguments fail.

**1. The MPA's Integration Clause Does Not Bar The Parties' Subsequent Agreements.**

X's threshold argument that the Rack Forecast Agreement and Switches agreement are barred by the MPA's integration clause fails as the integration clause does not prohibit later agreements. By its own terms, Section 15.11 provides:

> This Agreement constitutes the complete and exclusive understanding and agreement of the parties with respect to the subject matter hereof and supersedes all prior understandings and agreements, whether written or oral, with respect to its subject matter. Any waiver, modification or amendment of any provision of this Agreement will be effective only if in writing and signed by the parties.

Notably, Section 15.11 states that the MPA supersedes ***prior*** understandings and agreements. It says nothing about barring subsequent agreements between the Parties. X therefore cannot use Section 15.11 to erase the Rack Forecast Agreement or the Switches agreement, both of which were ***subsequent*** agreements arising from later events. *See Suski v. Coinbase, Inc.*, 55 F.4th 1227, 1231 (9th Cir. 2022) ("An integration clause, however, does not preclude a superseding contract from being

formed in the future."); *id.* at 1231–32 ("'[a]n integration clause only covers antecedent and contemporaneous agreements; it does not foreclose the possibility of future agreements.'") (quoting *In re Insurance Installment Fee Cases*, 211 Cal. App. 4th 1395, 1423 (2012)).

The Rack Forecast Agreement was not a pre-MPA understanding. It arose in October 2022, almost two years after the MPA, when the Parties negotiated a resolution of X's reduced forecasts and Inventec's resulting excess components inventory. Compl. at ¶¶ 29–31. The Switches agreement likewise arose from X's later written confirmation and direction that Inventec order long-lead-time Switches for X's forecasted needs. Compl. at ¶¶ 22–24, 40, 75.

Nor does X identify any specific provision of the MPA that the subsequent agreements supposedly "waived, modified, or amended." X instead points to language in the Rack Forecast Agreement stating only that certain obligations contained therein "supplement and are incremental to" those imposed by the MPA. Mot. at 18. Even then, the language on which X relies appears only in a narrow indemnity provision.[2] Nothing in the subsequent agreements waive, amend, or modify Section 2.1, Section 2.4, Section 4.3, Section 4.4, or any other MPA provision. They are separate agreements addressing later, specific commercial circumstances: X's agreement to purchase 168 racks to resolve the 2022 forecast issue and related excess components inventory, and X's written confirmation that Inventec should order Switches for X-specific racks. That is not a waiver or amendment of any "provision" of the MPA.

At most, X can argue that if a later agreement actually waived, modified, or amended a specific MPA provision, then Section 15.11 required a signed writing. But that is not what Inventec alleges. Inventec alleges that the Rack Forecast Agreement and Switches agreement are separate subsequent agreements, supported by X's written approval, oral approval, direction, confirmation, and partial

[2] The complete provision to which X cites states: "The following obligations supplement and are incremental to those set forth in the MPA: Supplier shall defend, indemnify, and hold harmless Twitter, and its officers, directors, managers, employees, agents, affiliates, permitted successors and permitted assigns, against any and all losses, damages, liabilities, deficiencies, claims, actions, judgments, settlements, interest, awards, penalties, fines, costs, or expenses of whatever kind, including attorneys' fees, fees and the costs of enforcing any right to indemnification under this Agreement, and the cost of pursuing any insurance providers, incurred by Twitter/awarded against Twitter (collectively, "Losses"), arising out of or resulting from any claim of a third party or Party to this Agreement based on, arising out of or in connection with any of the Released Claims." Compl., Ex. C, 2.(e).

performance. Compl. at ¶¶ 29–31, 55–57, 65–67, 75. Section 15.11 does not bar those claims at the pleading stage.

**2. The Rack Forecast Agreement Is Enforceable.**

X separately argues that the Rack Forecast Agreement is unenforceable because it was not formally signed. Mot. at 13–14. That argument fails at the pleading stage because the Complaint alleges objective assent, written approval, and partial performance.

Under California law, contract formation turns on mutual assent, which may be shown by the parties' words, writings, and conduct. Cal. Civ. Code §§ 1550, 1565; *Binder v. Aetna Life Ins. Co.*, 75 Cal. App. 4th 832, 850 (1999) ("Mutual assent may be manifested by written or spoken words, or by conduct."). A formal signature is not invariably required unless the parties objectively manifested an intent not to be bound until execution. *Banner Entm't, Inc. v. Superior Court*, 62 Cal. App. 4th 348, 358 (1998) ("Whether it was the parties' mutual intention that their oral agreement to the terms contained in a proposed written agreement should be binding immediately is to be determined from the surrounding facts and circumstances of a particular case and is a question of fact for the trial court."). Whether the parties intended execution as a condition precedent to contract formation is generally a factual question inappropriate for resolution on a motion to dismiss. *Id.*

Here, X proposed that it would purchase 168 racks from Inventec as a resolution for the excess components inventory caused by X's forecast reductions. Compl. at ¶ 29. X's representative stated that he would work on the purchase-order approval process and send an agreement documenting the Parties' terms. *Id.* X then confirmed that its CEO had approved the Rack Forecast Agreement orally and in writing. *Id.* at ¶ 30. Inventec thereafter shipped thirty-three of the agreed-upon 168 racks pursuant to purchase orders received from X under the Rack Forecast Agreement, and X accepted and paid for those racks. *Id.* at ¶ 31.

Those allegations plausibly show that the Parties formed an enforceable agreement. The Rack Forecast Agreement identified the specific racks, quantities, delivery timing, and purchase-order process. It provided that Twitter "shall issue Purchase Order(s)" for the racks and that Inventec "shall fulfill the PO and deliver the Racks as set forth below." X's attempt to characterize the agreement as unenforceable because additional purchase orders were contemplated gets the issue backwards. The

agreement itself required X to issue purchase orders. X's failure to issue the remaining purchase orders is therefore the breach—not a defense to contract formation.

X's cases do not compel dismissal. Cases such as *Roth v. Garcia Marquez*, 942 F.2d 617 (9th Cir. 1991), and *J.B.B. Investment Partners, Ltd. v. Fair*, 232 Cal. App. 4th 974 (2014), turned on records showing that the parties did not intend to be bound absent formal execution. The Complaint here alleges the opposite: X approved the Rack Forecast Agreement, X's CEO approved it orally and in writing, X partially performed under the Rack Forecast Agreement by issuing purchase orders for the first thirty-three racks, X accepted delivery, and X paid for them. Compl. at ¶¶ 29–31.

This partial performance confirms the plausibility of Inventec's claim. *See DC3 Ent., LLC v. John Galt Ent., Inc.*, 412 F. Supp. 2d 1125, 1146 (W.D. Wash. 2006) ("Under California law, an implied-in-fact contract is possible where there is no enforceable writing, but the parties' performance indicates mutual assent and contract formation."). X did not merely discuss the Rack Forecast Agreement and walk away. It performed under it by issuing purchase orders for thirty-three racks, accepting the racks, and paying for them. Compl. at ¶ 31. That conduct supports the reasonable inference that both parties understood the Rack Forecast Agreement to be operative and binding. X cannot accept the benefits of the agreement as to the first thirty-three racks and then avoid the remaining 135 racks by pointing to its own failure to complete internal formalities.

At minimum, whether the Rack Forecast Agreement was an enforceable written agreement cannot be resolved on the pleadings.

**3. The Alternatively Pleaded Oral Contract Claim Is Timely.**

X next argues that Inventec's alternative oral contract claim is time-barred. Mot. at 14. Inventec's claim is timely. X relies on California Code of Civil Procedure section 339's two-year limitations period for contracts not founded on a writing. But the alleged oral agreement concerned the sale of goods—168 non-standard server racks. Compl. at ¶¶ 29–31, 65–73. California Commercial Code section 2725 governs actions for breach of contract for the sale of goods and provides a four-year statute of limitations. Cal. Com. Code § 2725(1). X's alleged breach occurred in late 2022 or thereafter, when X refused to issue purchase orders for the remaining racks and refused to pay. Compl. at ¶¶ 36–39, 68–72. Inventec filed this action within four years. Count III is therefore timely.

#### 4. Inventec has Adequately Pleaded A Written-Confirmation Agreement For The Switches.

X's challenge to Count IV likewise fails because it mischaracterizes the claim. Inventec does not allege that Invoice No. U320001889, standing alone, created a contract. Nor does Inventec seek to impose liability for finished Products delivered absent a Purchase Order. Rather, Inventec alleges that X specifically instructed Inventec to order long-lead-time Switches, confirmed that Inventec had placed those purchase orders, and then refused to reimburse or pay Inventec after Inventec acquired the Switches in reliance on X's written direction.

X's purchase-order argument again conflates two distinct concepts. Inventec is not seeking damages for finished goods that X never ordered. Inventec seeks recovery for long-lead-time Switches that X specifically directed Inventec to procure for X-specific racks. Compl. at ¶¶ 22–24, 40. Nor can X dismiss that procurement as merely part of Inventec's ordinary inventory-management obligations under the MPA. The MPA contemplated rolling forecasts for non-standard components, and the Product Exhibit on which X relies refers to a rolling four-month forecast. But the Complaint alleges something materially different. X specifically instructed Inventec in April 2022 to order Switches to cover X's forecast through January 2023, because those Switches had a one-year lead time. Compl. ¶¶ 22–24. That request went well beyond routine maintenance of inventory for a rolling three- or four-month forecast, as contemplated by the MPA and Product Exhibit.

The absence of a formal purchase-order number on the invoice is not dispositive where the claim is based on X's written direction, X's confirmation, Inventec's procurement, and X's refusal to pay. X cannot recharacterize a special procurement request for nearly a year's worth of Switches as ordinary inventory management and then avoid liability because it declined to issue a formal purchase order after Inventec performed.

That is especially true at the pleading stage. Whether X's written confirmation functioned as a separate written agreement presents factual questions. X may not direct Inventec to procure long-lead-time components, confirm that Inventec did so, and then avoid liability solely by refusing to issue a formal purchase order after Inventec performed.

### C. The Complaint Properly and Sufficiently Pleads Promissory Estoppel

Contrary to X's arguments, Inventec's promissory estoppel claim is both properly pleaded in the alternative and supported by specific allegations of clear promises and detrimental reliance. The claim provides an independent basis for relief based on X's explicit commitments regarding non-standard component liability.

#### 1. Inventec's Promissory Estoppel Claim Is Based on the Rack Forecast Agreement (Not the MPA) and Is Properly Pleaded in the Alternative to Inventec's Breach of Contract Claim.

X asks the Court to dismiss Inventec's promissory estoppel cause of action because the Complaint alleges a breach of contract cause of action based on the MPA. Mot. at 15-16. However, Inventec's promissory estoppel claim is based on the Rack Forecast Agreement, not the MPA, and is pleaded in the alternative "to the extent the Rack Forecast Agreement is deemed not to be a valid and enforceable written or oral contract for any reason." Compl. at ¶ 82. Further, X ignores Inventec's right, under California and federal law, to plead in the alternative. Pleading causes of action for breach of contract and promissory estoppel based on similar facts is expressly permitted by the Federal Rules of Civil Procedure, which allow a party to "state as many separate claims or defenses as it has, regardless of consistency." Fed. R. Civ. P. 8(d)(3); *see also Molsbergen v. U.S.*, 757 F.2d 1016, 1019 (9th Cir. 1985) (holding that a party may plead inconsistent claims under the Federal Rules of Civil Procedure and that those claims must be analyzed independently). "Even though inconsistent findings of fact may not survive the proof stage, inconsistent claims are explicitly permitted at the pleading stage under Fed. R. Civ. P. 8(d)(3)." *TreeFrog Devs., Inc. v. Seidio, Inc.*, No. 13CV0158-IEG KSC, 2013 WL 4028096, at *8 n.5 (S.D. Cal. Aug. 6, 2013); *Astiana v. Hain Celestial Grp., Inc.,* 783 F.3d 753, 762 (9th Cir. 2015) ("To the extent the district court concluded that the cause of action was nonsensical because it was duplicative of or superfluous to Astiana's other claims, this is not grounds for dismissal."); *Corcoran v. CVS Health Corp.,* 169 F. Supp. 3d 970, 989 (N.D. Cal. 2016) (rejecting defendant's argument that the plaintiff could not advance duplicative damages theories because "Rule 8 plainly entitles Plaintiffs to plead a claim in the alternative").

California courts have expressly allowed breach of contract and promissory estoppel claims to proceed in tandem at the pleading stage based on this principle. "Although a cause of action for promissory estoppel is inconsistent with a cause of action for breach of contract based on the same facts, when a pleader is in doubt about what actually occurred or what can be established by the evidence, the modern practice allows that party to plead in the alternative and make inconsistent allegations." *Fleet v. Bank of Am. N.A.*, 229 Cal. App. 4th 1403, 1413 (2014) (internal citation, quotation marks, and brackets omitted); *see also, e.g.*, *Putnam v. Putnam Lovell Grp. NBF Sec., Inc.*, No. C 05–1330 CW, 2006 WL 1821207, at *7 (N.D. Cal. June 30, 2006) (denying motion to dismiss breach of implied contract and promissory estoppel claims pleaded in the alternative because "plaintiffs are allowed to plead mutually exclusive claims in the alternative, but are not allowed to 'recover on inconsistent theories'") (quoting *Mike Nelson Co. v. Hathaway*, No. F 05–0208 (AWAI), 2005 WL 2179310, at *4 (E.D. Cal. Sept. 8, 2005)); *Trunov v. Rusanoff*, No. 12–CV–04149 NC, 2012 WL 6115608 at *3 (N.D. Cal. Dec. 10, 2012) (denying motion to dismiss promissory estoppel counterclaim pleaded in the alternative to a breach of contract counterclaim because "[t]he facts alleged that support the existence of an oral contract do not preclude a claim of promissory estoppel").[3]

X next attacks Inventec's promissory estoppel claim by stating that actual consideration was given and that promissory estoppel is not needed, asserting that "Inventec's only alleged act of reliance—'purchasing and delivering' other servers, for which X Issued Purchase Orders and paid invoices—was contractually bargained for." Mot. at 16. As an initial matter, this position cannot be reconciled with X's other (incorrect) arguments that Inventec cannot establish that there was an enforceable contractual obligation as to the non-standard racks. Further, here the facts are distinct from the cases that X relied on (*see* Mot. at 16 [citing cases refusing to apply the promissory estoppel doctrine based on bargained-for considerations given by plaintiff-promisees]) because Inventec's promissory estoppel claim is pleaded in the alternative "to the extent the Rack Forecast Agreement is

[3] X's reliance on an appellate court case distinguishing recovery from breach of contract and promissory estoppel claims (Mot. at 15, citing *Douglas E. Barnhart, Inc. v. CMC Fabricators, Inc.*, 211 Cal. App. 4th 230, 243 (2012)) is misplaced. *Douglas* held that because a promissory estoppel claim is not an action "on a contract" under Civil Code § 1717, a party's success on such a claim does not make it the prevailing party for purposes of recovering contractual attorney's fees. *Id.* at 249.

deemed not to be a valid and enforceable written or oral contract for any reason." Compl. at ¶ 82. Therefore, Inventec's promissory estoppel claim is not based on "'duties under [an] Agreement'" that are "contractually bargained for."[4] Mot. at 16.

### D. Inventec is Entitled to Bring a Cause of Action for Breach of the Implied Covenant of Good Faith and Fair Dealing

Inventec is entitled to bring both a claim for breach of contract and for implied covenant of good faith and fair dealing. X's motion mischaracterizes the implied covenant claim as seeking to create new obligations rather than protect Inventec's right to receive the benefits of its bargain. The claim is properly grounded in specific contractual provisions, the purpose of which X has frustrated.

#### 1. Inventec Properly Grounds its Claim in Specific Provisions of the MPA or Rack Forecast Agreement.

The implied covenant of good faith and fair dealing "is read into contracts and functions as a supplement to the express contractual covenants, to prevent a contracting party from engaging in conduct which (while not technically transgressing the express covenants) frustrates the other party's rights to the benefits of the contract." *Clements Fam. Tr. v. Vimmia, LLC*, No. 8:25-CV-00122-WLH-DFM, 2025 WL 2427782, at *16 (C.D. Cal. May 27, 2025) (internal quotations omitted). A "breach of a specific provision of the contract is not necessary to a claim for breach of the implied covenant of good faith and fair dealing. (*Id.*; internal quotations omitted); *see also Reinhardt v. Gemini Motor Transp.*, 879 F. Supp. 2d 1138, 1144 (E.D. Cal. 2012) (citing *Marsu, B.V. v. Walt Disney Co.*, 185 F.3d 932, 937 (9th Cir. 1999)).

Not only has Inventec alleged specific facts supporting breaches of specific provisions of the MPA and Rack Forecast Agreement sufficient to support its claims (*see, e.g.*, Compl. at ¶¶ 17-19,

[4] For similar reasons, X's argument that Inventec's claim for promissory estoppel is barred because it "occurred in the context of the bargained-for MPA" which is "fully integrated" is unavailing. Again, Inventec's promissory estoppel claim is based on the Rack Forecast Agreement, not the MPA, and is pleaded in the alternative "to the extent the Rack Forecast Agreement is deemed not to be a valid and enforceable written or oral contract for any reason." Compl. at ¶ 82. Further, the MPA's integration clause does not apply to the Rack Forecast Agreement because this agreement serves a different purpose—it does not seek to "waive, modify, or amend" the terms of the MPA (Mot. at 16) but, instead, memorializes X's separate commitment to purchase 168 non-standard racks from Inventec. This is consistent with X's position that "[t]he MPA does not require X to buy anything…it simply outlines the process through which X could purchase servers from Inventec." Mot. at 2.

30-31, 37), it has also plausibly alleged contextual facts that X has engaged in a course of conduct depriving Inventec of the economic benefits it anticipated receiving (*see, e.g.*, *id.*, ¶¶ 37-38, 41-43, 91-94). For example, Inventec alleges in Paragraph 17 of its Complaint that "Section 4.4 of the Master Purchase Agreement holds X Corp. liable for cancellations of certain components." Inventec further alleges in Paragraph 38 of its Complaint that this provision was breached when "X Corp. required Inventec to build non-standard racks with specific switches for its benefit…X Corp. then failed to provide appropriate notice or good cause for significantly decreasing the quantity of non-standard product it required, thereby damaging Inventec by requiring it to go out-of-pocket by millions of dollars to build those non-standard racks for X Corp." Such allegations, especially when accompanied by the factual detail provided by Inventec, are a classic formulation of a breach of the implied covenant claim. *See Clements Fam. Tr.*, 2025 WL 2427782, at *16 (Denying Defendants' motion to dismiss Plaintiffs' claim for breach of covenant of good faith and fair dealing because Plaintiffs' allegations regarding Defendants misrepresentation of their financial position and false statements they made about their inventory to profit from Plaintiffs' efforts is "conduct, while not technically transgressing the express covenants in the Agreement—would frustrate Plaintiffs' rights to the benefit of the contract.") (internal quotations omitted).

**2. Inventec Does Not Seek to Create New Duties but Rather to Enforce the Parties' Reasonable Contractual Expectations.**

Contrary to X's assertions, Inventec is not seeking to impose obligations beyond the MPA and the Rack Forecast Agreement. Rather, Inventec contends that X exercised the discretion afforded by the MPA and the Rack Forecast Agreement in bad faith to deprive Inventec of the benefits for which it bargained. This is distinguishable from the plaintiff's argument advanced in *Openshaw v. FedEx Ground Package Sys., Inc.*, 576 F. App'x 685 (9th Cir. 2014). In *Openshaw*, the plaintiff's contract with FedEx required him to provide trucks and drivers. *Id.* at 688. However, the plaintiff attempted to impose a new affirmative obligation on FedEx by arguing that the implied covenant required FedEx to help him satisfy his existing contractual obligations to provide trucks and drivers. *See id.* The Ninth Circuit rejected plaintiff's argument because it would have shifted his own contractual responsibilities onto FedEx. *See id.*

In contrast, here, Inventec is not imposing any new affirmative obligations on X outside of the MPA and Rack Forecast Agreement. Inventec has already purchased non-standard components based on X's forecasts (*see* Compl. at ¶¶ 20, 25) but it is X who did not fulfill its own obligations arising from the MPA or Rack Forecast Agreement by refusing to issue all necessary purchase orders or otherwise recognizing its liability for the costs of the non-standard components. Indeed, inherent in Section 4.4 of the MPA is that: (i) X provides forecasts for non-standard components needed to fulfill its requests for non-standard racks; (ii) Inventec purchases those non-standard components in accordance with X's forecasts; and (iii) X consumes the cost of the non-standard components incurred by Inventec. The Rack Forecast Agreement recognizes X's obligation to consume the cost of the non-standard components under the MPA. Therefore, X's refusal to accept liability for the cost of the non-standard components frustrates Inventec's rights to the benefits under the MPA and Rack Forecast Agreement.[5] The implied covenant exists for this reason—to prevent one contracting party from unfairly frustrating the other party's contractual rights. *See In re Yahoo! Inc. Customer Data Sec. Breach Litig.*, No. 16-MD-02752-LHK, 2017 WL 3727318, at *48-*49 (N.D. Cal. Aug. 30, 2017) (Denying defendants' motion to dismiss plaintiffs' implied covenant of good faith and fair dealing claim because "Plaintiffs' implied covenant claim does not impose these 'extra-contractual duties'" and finding "that Plaintiffs have sufficiently alleged an interference with the benefits of the contract for purposes of Plaintiffs' claim under the implied covenant.") (internal citations omitted).

**E. The Complaint Properly Pleads Misrepresentation Claims**

Inventec has timely and properly pleaded its misrepresentation claims. X's challenges to these claims ignore the detailed allegations in the Complaint regarding specific false statements, including dates, speakers, and content. The claims are further not barred by the statute of limits or economic loss rule, nor are they deficient under heightened pleading standards.

[5] For these same reasons, X's reliance on *Microsoft Corp. v. Hon Hai Precision Indus. Co.*, No. 19-CV-01279-LHK, 2020 WL 836712, at *7-8 (N.D. Cal. Feb. 20, 2020) is unavailing since Inventec is not seeking X's help to perform Inventec's own contractual obligations.

**1. Inventec's Misrepresentation Claims are Timely Brought and are Not Barred by the Statute of Limitations.**

X improperly alleges that Inventec's misrepresentation claims are barred by the statute of limitations because the facts underlying these claims "date back to October 2022, more than three years ago. Compl. ¶¶ 30, 96, 102." Mot. at 19. However, X's arguments fail because they improperly equate the date on which the Parties allegedly entered into the Rack Forecast Agreement (Compl. at ¶ 30), or the date on which the alleged misrepresentations were made (*id.* at ¶¶ 96, 102) with the date on which Inventec's causes of action accrued or were discovered. *See Wartell v. Wells Fargo Bank, N.A.*, 755 F. Supp. 3d 1252, 1255-56 (N.D. Cal. 2024) (Finding that Plaintiff's negligence claim was not barred by the statute of limitations because "[u]nder state law, '[g]enerally speaking, a cause of action accrues at the time when the cause of action is complete with all of its elements.' [citation] The discovery rule is an exception to the accrual rule and postpones 'accrual of a cause of action until the plaintiff discovers, or has reason to discover, the cause of action.'").

If more facts about the accrual or discovery of X's misrepresentations are required, Inventec will be able to address it through an amended complaint. For example, Inventec was uncertain about whether X would comply with the terms of the Rack Forecast Agreement until on or around August 15, 2023 when X's counsel informed Inventec's prior counsel that X believed that there was no Rack Forecast Agreement and, thus, X had no liability. Thus, at the earliest, Inventec discovered as of mid-August 2023 that X misrepresented its intention of fully compensating Inventec for the procurement of non-standard components in accordance with the Rack Forecast Agreement. Therefore, to the extent the Court requires additional facts about the accrual or discovery of X's misrepresentations, Inventec could amend its Complaint to include these additional facts. Thus, dismissal of Inventec's misrepresentation claims based on the statutes of limitations is improper at this time. *See id.* at 1256 ("Statute-of-limitations issues that turn on fact disputes generally are better addressed at summary judgment, not through a motion to dismiss.! *Supermail Cargo, Inc. v. United States*, 68 F.3d 1204, 1206–07 (9th Cir. 1995) (a motion for summary judgment is the proper procedure to evaluate the expiration of the statute of limitations when the inquiry turns on disputed facts; the equitable-tolling doctrine generally is not amenable to resolution in a motion to dismiss under Rule 12(b)(6); '[i]n fact,

a complaint cannot be dismissed unless it appears beyond doubt that the plaintiff can prove no set of facts that would establish the timeliness of the claim').").

**2. Inventec's Misrepresentation Claims Are Not Barred By the Economic Loss Rule.**

X argues that Inventec's misrepresentation claims are barred by the economic loss rule because "Inventec's purported acts of reliance 'constitute[d] nothing more than [its] usual performance under the Agreement.'" Mot. at 20. However, X again fails to distinguish that Inventec's misrepresentation claims pertain to the Rack Forecast Agreement, which memorializes X's separate commitment to purchase 168 non-standard racks from Inventec, and is different from acts "perform[ed] [under] the MPA." *Id.* Indeed, Inventec specifically alleges that on or about October 18, 2022, X's representative, Christopher Kan, "made false representations in order to fraudulently induce Inventec to sign the Rack Forecast Agreement and carry out its terms by procuring and sending the Agreed Upon Racks to X." *See* Compl. at ¶¶ 30, 96-98, 102-104. In other words, these misrepresentations were made *before* Inventec executed the Rack Forecast Agreement to fraudulently induce Inventec to enter into the agreement. This is different from *Foster Poultry Farms v. Alkar-Rapidpak-MP Equip., Inc.*, 868 F. Supp. 2d 983, 993 (E.D. Cal. 2012) where the Court found that plaintiff did "not allege[] that the statements in the Hanson Letter induced it to enter into any contract. [Defendant] sent the Hanson Letter *after* [plaintiff] signed the 2002 purchase agreement for the post-pasteurization equipment. Thus, the Hanson Letter could not have induced [plaintiff] to enter into the 2002 contract." (Emphasis added); *see* Mot. at 19. Therefore, Inventec's misrepresentation claims are not "straightforward claims for breach of a commercial contract" when these misrepresentations were made even before such a contract was executed.[6] Mot. at 20.

The seminal case on this issue is *Robinson Helicopter Co., Inc. v. Dana Corp.*, 34 Cal.4th 979 (2004). There, the California Supreme Court explained that, when assessing whether to apply the economic loss rule to bar tort damages, "[t]ort damages have been permitted in contract cases where a breach of duty directly causes physical injury . . . ; for breach of the covenant of good faith

[6] Again, X's contradictory position cannot be reconciled with X's other conflicting arguments that Inventec cannot establish that there was an enforceable contractual obligation as to the non-standard racks.

and fair dealing in insurance contracts . . . ; for wrongful discharge in violation of fundamental public policy; or where the contract was fraudulently induced." *Id.* at 989-90 (internal citations omitted). The Court further explained that "[i]n each of these cases, the duty that gives rise to the tort liability is either completely independent of the contract or arises from conduct which is both intentional and intended to harm." *Id.* at 990. Multiple courts within the Ninth Circuit and California have applied *Robinson Helicopter* and held "an adequately pled promissory fraud claim that induces the formation of a contract is sufficient to trigger the fraudulent inducement exception to the economic loss rule." *See, e.g.*, *R. Power Biofuels, LLC v. Chemex LLC*, No. 16-CV-00716-LHK, 2017 WL 1164296, at *6, *9 (N.D. Cal. Mar. 29, 2017) ("A fraudulently induced standalone agreement…can satisfy the fraudulent inducement exception to the economic loss rule."); *Joli Grace, LLC v. Country Visions, Inc.*, No. 2:16-1138 WBS EFB, 2016 WL 6996643, at *9 n.6 (E.D. Cal. Nov. 30, 2016); *Pacific Contours Corp. v. Fives Machining Sys., Inc.*, No. SACV 18-00413-DOC (JDEx), 2018 WL 6204579, at *7 (C.D. Cal. Oct. 29, 2018).

Here, based on X's representations, Inventec procured non-standard components, set them aside exclusively for X—all while incurring significant storage and handling expenses—and was unable to mitigate damages earlier on because Inventec assumed that X would still be liable for the cost of the non-standard components in accordance with the Rack Forecast Agreement. However, Inventec was ultimately left with millions of dollars worth of non-standard components it could not resell or reuse due to X's refusal to pay for the remaining non-standard components. *See* Compl. at ¶¶ 20, 23-25, 29-31, 37-39, 44-46; *see also id.* at Ex. C. Therefore, X made these representations with the intention of inducing Inventec to enter into the Rack Forecast Agreement. *Id.* at ¶¶ 97-98, 103-104. Inventec would not have agreed to enter into the Rack Forecast Agreement but for X's representations that it would assume full liability for these non-standard components. *See, e.g.*, *id.* at ¶¶ 29-31. Thus, to the extent X contends that it intended not to fully assume liability for such agreed upon non-standard components, this agreement was the product of fraud. On at least these facts alone, Inventec could pursue a claim for fraudulent inducement or intentional misrepresentation with

or without its breach of contract claim.[7]

### F. Inventec's Claims Differ From the Claims Dismissed in the *Wiwynn* Case

X's reliance on the motion to dismiss ruling in *Wiwynn* is misplaced. *Wiwynn* involved a different supplier, different allegations, and a different contractual framework. Indeed, X itself acknowledges that "the Inventec MPA and Product Exhibit are even clearer" than the Wiwynn agreements. *See* Mot. at 21. Because X concedes that the governing contractual language differs, X cannot simultaneously ask this Court to adopt the *Wiwynn* Court's interpretation of a different agreement.

Further, Wiwynn's promissory estoppel, breach of the implied covenant of good faith and fair dealing, and intentional and negligent misrepresentation claims were based on its MPA with X. In contrast, except for Inventec's claim for breach of the covenant of good faith and fair dealing (which applies to both the MPA and the Rack Forecast Agreement), the other causes of action that X claims are "nearly identical" (Mot. at 20) to Wiwynn's are based only on Inventec's Rack Forecast Agreement with X. This factual distinction is critical. The Court in *Wiwynn* dismissed Wiwynn's promissory estoppel claim because the existence of the MPA was not in dispute. In contrast, here, the existence of the Rack Forecast Agreement is in dispute. *Compare, e.g.*, Compl. at ¶¶ 55-56, *with* Mot. at 13-14. Indeed, Inventec's promissory estoppel claim only applies to the Rack Forecast Agreement, not the MPA, "to the extent the Rack Forecast Agreement is deemed not to be a valid and enforceable written or oral contract for any reason." Compl. at ¶ 82. Thus, Inventec's promissory estoppel claim is distinguishable from Wiwynn's and any analysis relating to Wiwynn's promissory estoppel claim is not applicable here.

Additionally, in *Wiwynn*, the Court dismissed Wiwynn's negligent and intentional misrepresentation claims because there were no factual allegations suggesting that X fraudulently

[7] Similarly, courts have denied analogous motions to dismiss as to negligent misrepresentation claims, holding that the economic loss rule does not preclude a claim for negligent misrepresentation. *Gregorio v. Clorox Co.*, No. 17-CV-03824-PJH, 2018 WL 732673, at *5 (N.D. Cal. Feb. 6, 2018) (denying a motion to dismiss negligent misrepresentation claim holding that the economic loss rule does not apply to claims of negligent misrepresentation); *see Kalitta Air, L.L.C. v. Cent. Texas Airborne Sys., Inc.*, 315 F. App'x 603, 607 (9th Cir. 2008) (citing *Robinson Helicopter Co., Inc. v. Dana Corp.*, 34 Cal.4th 979 (2004)) ("California law classifies negligent misrepresentation as a species of fraud for which economic loss is recoverable.") (internal citation omitted).

induced Wiwynn to sign the MPA. It was only after the MPA had been in effect for years did the Parties' dispute arise. In contrast, here, Inventec's negligent and intentional misrepresentation claims are based on X's conduct that occurred *before* the Parties entered into the Rack Forecast Agreement. Compl. at ¶¶ 98, 103. Indeed, Inventec does allege factual allegations that suggest X fraudulently induced Inventec to sign the Rack Forecast Agreement.

Lastly, X contradicts itself by arguing that unlike the "near-identical" *Wiwynn* case where Wiwynn's breach of the MPA claim survived X's motion to dismiss, the Court here should dismiss Inventec's breach of the MPA claim in light of § 4.3 of the agreement. *See* Mot. as 21. However, § 4.3 of the MPA only governs a narrow and specific circumstance: X's cancellation of an existing Purchase Order. Inventec's Complaint alleges a different scenario—X didn't merely cancel an existing Purchase Order but instead directed Inventec to procure long-lead non-standard components based on forecasts, later dramatically reduced those forecasts, negotiated the Rack Forecast Agreement to address the resulting excess components inventory, accepted performance under that agreement, and then refused to honor the remainder of its commitments. Section 4.3 of the MPA does not govern, much less preclude, liability arising from this event. Thus, it is immaterial that Inventec's "cancellations" provision in the MPA differs from Wiwynn's. X's reliance on factual allegations and contractual language from an entirely separate case brought by a different supplier is an improper request for the Court to decide the current motion based on another plaintiff's pleadings rather than the well-pleaded allegations contained in Inventec's Complaint.

## V. <u>CONCLUSION</u>

For all of the reasons stated herein, Inventec respectfully submits that X's motion should be denied. To the extent any aspect of X's motion is granted, Inventec respectfully submits that it should be granted leave to amend.

Dated: July 14, 2026

Respectfully submitted,

PILLSBURY WINTHROP SHAW PITTMAN LLP

By: /s/ David J. Tsai
David J. Tsai

Attorneys for Plaintiff Inventec Corporation