SAWYER & LABAR LLP
Adrian Sawyer, State Bar No. 203712
sawyer@sawyerlabar.com

1700 Montgomery Street, Suite 108
San Francisco, California 94111
Telephone: 415.262.3820

GIBBS & BRUNS LLP
Anthony Kaim *(pro hac vice)*
akaim@gibbsbruns.com
Caitlin Halpern *(pro hac vice)*
chalpern@gibbsbruns.com
Nick Beachy *(pro hac vice)*
nbeachy@gibbsbruns.com
Elisa Wulfsberg *(pro hac vice)*
ewulfsberg@gibbsbruns.com

1100 Louisiana St # 5300
Houston, TX 77002
713-650-8805 *(phone)*
713-750-0903 *(fax)*

*Attorneys for Defendant X Corp.*

SAWYER & LABAR LLP
1700 MONTGOMERY ST, STE 108
SAN FRANCISCO, CA 94111
TELEPHONE: 415.262.3820
www.sawyerlabar.com

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN FRANCISCO DIVISION**

INVENTEC CORPORATION,

Plaintiff,

v.

X CORP.,

Defendant.

Case No. 3:26-cv-05145-WHO

**X CORP.'S REPLY IN SUPPORT OF MOTION TO DISMISS**

Date: August 12, 2026
Time: 2:00 pm
Courtroom: 2, 17th Floor

**CONTENTS**


TABLE OF AUTHORITIES ........ iii

I. INTRODUCTION ........ 1

II. ARGUMENT ........ 1

A. Breach of Contract (Count I) ........ 1

1. Inventec's Excess Inventory Claim Has No Basis in the Contract. ........ 1

2. Inventec Does Not Allege Termination, "Wrongful" or Otherwise ........ 5

B. Breaches of Other Alleged Contracts ........ 5

1. The Rack Forecast Agreement is not a Contract (Counts II–III) ........ 5

2. Inventec's "Switches" Claim is Barred by the MPA (Count IV) ........ 10

3. The Promissory Estoppel Claim is Self-Defeating (Count V) ........ 11

4. Breach of the Covenant of Good Faith and Fair Dealing (Count VI) ........ 13

C. Inventec's Misrepresentation Claims are Untimely and Unsupported (Counts VII and VIII) ........ 14

III. CONCLUSION ........ 15


SAWYER & LABAR LLP
1700 MONTGOMERY ST, STE 108
SAN FRANCISCO, CA 94111
TELEPHONE: 415.262.3820
www.sawyerlabar.com

SAWYER & LABAR LLP
1700 MONTGOMERY ST, STE 108
SAN FRANCISCO, CA 94111
TELEPHONE: 415.262.3820
www.sawyerlabar.com

## TABLE OF AUTHORITIES

**Cases** **Page(s)**

*Careau & Co. v. Sec. Pac. Bus. Credit, Inc.*,
272 Cal. Rptr. 387 (1990) ... 14

*Carma Devs. (Cal.), Inc. v. Marathon Dev. Cal., Inc.*,
826 P.2d 710 (Cal. 1992) ... 14

*Day v. GEICO Cas. Co.*,
2022 WL 2135746 (N.D. Cal. June 14, 2022) ... 13

*Elghembri v. Muhammad*,
2025 WL 2689856 (N.D. Cal. Sept. 18, 2025) (Orrick, J.) ... 5

*Fontenot v. Wells Fargo Bank, N.A.*,
129 Cal. Rptr. 3d 467 (2011) ... 12

*Fox v. Ethicon Endo–Surgery, Inc.*,
110 P.3d 914 (Cal. 2005) ... 15

*In re Ingenu, Inc.*,
2024 WL 3634243 (Bankr. S.D. Cal. Feb. 13, 2024) ... 5

*JMP Sec. LLP v. Altair Nanotechnologies Inc.*,
880 F. Supp. 2d 1029 (N.D. Cal. 2012) ... 13

*Jones v. Wachovia Bank*,
230 Cal. App. 4th 935 (Cal. App. 2014) ... 12

*Kuffel v. Seaside Oil Co.*,
90 Cal. Rptr. 209 (Ct. App. 1970) ... 5

*Lexicon Growth LP v. Tortop*,
2026 WL 1832339 (N.D. Cal. June 25, 2026) ... 8, 15

*Midwest Motor Supply Co. v. Superior Ct.*,
270 Cal. Rptr. 3d 683 (2020) ... 6

*Mulato v. Wells Fargo Bank, N.A.*,
76 F. Supp. 3d 929 (N.D. Cal. 2014) ... 13

*Richards v. Centripetal Networks, Inc.*,
709 F. Supp. 3d 914 (N.D. Cal. 2024) ... 14

*Roth v. Garcia Marquez*,
942 F.2d 617 (9th Cir. 1991) ... 7, 8

*Singelyn v. PNC Bank Nat'l Ass'n*,
2024 WL 1601857 (C.D. Cal. Jan. 12, 2024) ..... 12

*Stanford Ranch, Inc. v. Maryland Cas. Co.*,
89 F.3d 618 (9th Cir. 1996) ..... 3

*Vizio Inc. v. Gemtek Tech. Co.*,
2014 WL 10538995 (C.D. Cal. Aug. 27, 2014) ..... 3, 4

**Statutes**

Cal. Civ. Code §§ 1550, 1565 ..... 8

Cal. Civ. Proc. Code §§ 338, 339 ..... 14

Cal. Com. Code § 1304 ..... 14

Cal. Com. Code § 2201 ..... 9, 10

Cal. Com. Code § 2725 ..... 9

SAWYER & LABAR LLP
1700 MONTGOMERY ST, STE 108
SAN FRANCISCO, CA 94111
TELEPHONE: 415.262.3820
www.sawyerlabar.com

SAWYER & LABAR LLP
1700 MONTGOMERY ST, STE 108
SAN FRANCISCO, CA 94111
TELEPHONE: 415.262.3820
www.sawyerlabar.com

## I. INTRODUCTION

Inventec's core claim is simple. Inventec alleges that X owes it money for computer components that X never purchased, under a comprehensive contract that fully spells out X's obligations. When two sophisticated companies enter into a fully integrated master agreement, blackletter law dictates that their relationship is governed by that written contract and that contract alone. But since the contract does not say what Inventec wants it to say, Inventec tries to locate liability somewhere else. None of Inventec's amorphous allegations about extrinsic understandings and unsigned agreements can change the parties' written contract. Inventec fails to state a claim because its causes of action contradict the clear terms of the parties' agreement.

## II. ARGUMENT

### A. Breach of Contract (Count I)

#### 1. Inventec's Excess Inventory Claim Has No Basis in the Contract.

Inventec's contract theory is that X "failed to properly compensate Inventec for the price of the excess non-standard components purchased by Inventec." Compl. (ECF 1) ¶ 50. Its position rests on these two sentences from the contract: (1) "Forecast[s] provided by [X] for Supplier's standard components are non-binding," and (2) "Twitter will not have liability for excess common materials that Supplier also sources for its other customer projects." Master Purchase Agreement ("**MPA**") (ECF 1-1) § 4.4; Product Exhibit (ECF 14-3) at 14 § E(n)(1).

On their face, nothing in these provisions makes X liable for non-standard components. Nor do they answer the dispositive question: *when* can Inventec become entitled to payment for non-standard components?

The MPA and subsequent Product Exhibit provide a four-step process for X to purchase servers from Inventec. That process answers the dispositive question:

SAWYER & LABAR LLP
1700 MONTGOMERY ST, STE 108
SAN FRANCISCO, CA 94111
TELEPHONE: 415.262.3820
www.sawyerlabar.com

1. **Forecast.**
   *X tells Inventec how many servers that it expects, at the time of the forecast, to order in the future.*

2. **Procurement.**
   *Inventec ensures it has enough components on hand to meet its customers' forecasted demand.*

3. **Purchase Order.**
   *X "may" issue a formal Purchase Order if its needs remain consistent.*

4. **Delivery and Payment.**
   *Inventec assembles and delivers the servers. Then X pays Inventec's "invoice, referencing [X's] purchase order."*

According to Inventec, the obligation to pay for excess non-standard components arises the moment X sends a forecast. The contract establishes that a Purchase Order is required.

At Step 1, the Product Exhibit makes clear that all forecasts are "non-binding," conclusively rejecting Inventec's strained interpretation of Section 4.4 of the MPA. Product Exhibit (ECF 14-3) at 14 § E(l)(i). At Step 2, the Product Exhibit states that Inventec will "routinely purchase[] products and hold[] inventory to cater to [X] demand," and "will maintain an inventory of raw materials and components necessary to manufacture Products in accordance with the forecast." *Id.* at 7, 14 §§ E(c)(ii), E(n)(ii). Not until Step 3, after X issues a Purchase Order, does Inventec become entitled to any payment. If X issues and then *cancels* a Purchase Order, X must "reimburse" Inventec for remaining non-standard materials that Inventec "cannot otherwise sell on the open market or to others, use for itself or others, recover its payment or be relieved of its payment obligations for, or otherwise mitigate." MPA § 4.3.[1] Full payment is reserved for Step 4, after Inventec has delivered the final product. *Id.* § 2.1.

Inventec would have the Court throw out these negotiated procedures and replace them with a new agreement of Inventec's own creation. In Inventec's version, forecasts expressly made "non-binding" in the Product Exhibit become binding;[2] Purchase Orders become pointless formalities;

---

[1] There is no allegation that X issued a Purchase Order related to any disputed components.

[2] Inventec pushes this theory despite the MPA not addressing what a "binding" forecast would mean or require.

SAWYER & LABAR LLP
1700 MONTGOMERY ST, STE 108
SAN FRANCISCO, CA 94111
TELEPHONE: 415.262.3820
www.sawyerlabar.com

and ***Inventec's*** promises to "routinely purchase[]" components somehow become ***X's*** promises of payment. This argument has no basis in the contract and cannot give rise to a claim.

In line with the rest of its Response, Inventec does not address the myriad problems with its theory. In its motion to dismiss, X not only cited the language of the Product Exhibits providing that forecasts are non-binding; it also pointed out that if forecasts *were* binding, numerous contractual provisions would be meaningless. MTD at 8–9. X also demonstrated—with references to the MPA, the Product Exhibit, and ample legal authority—that the duty to source components in advance and the pre-delivery risk of loss for those components rested with Inventec. *Id.* at 10–11. And X showed that Inventec's purported course of performance would both *contradict* the express terms of the MPA and *add* brand-new terms to the contract—neither of which is permissible. *Id.* at 11–12.

Rather than addressing these arguments head-on, Inventec merely rehashes its theory of MPA Section 4.4 and appeals to a purported implication that disregards the actual contractual terms. Provisions that *limit* X's liability for standard components cannot be read to implicitly *create* liability for other components. *Cf Stanford Ranch, Inc. v. Maryland Cas. Co.*, 89 F.3d 618, 626 (9th Cir. 1996) (insurance policy exclusions do not implicitly create additional coverage).

Inventec feebly tries to distinguish the damning *Vizio* case. *See Vizio Inc. v. Gemtek Tech. Co.*, 2014 WL 10538995 (C.D. Cal. Aug. 27, 2014). Inventec argues that Gemtek sought payment for unordered *finished products*, while Inventec's claims are based only on leftover *components* (parts purchased by the supplier based on the forecasts). Resp. (ECF 23) at 8. In fact, Gemtek sought both. *See Vizio*, 2014 WL 10538995, at *2–4. As to "finished but unshipped" products, the *Vizio* court found that "the parties' course of performance" could not "overcome the plain meaning of the Supply Agreement," which required purchase orders. *Id.* at *2–3. As to "leftover components," the dispute turned on a provision like MPA Section 4.3, which made the buyer liable for certain

SAWYER & LABAR LLP
1700 MONTGOMERY ST, STE 108
SAN FRANCISCO, CA 94111
TELEPHONE: 415.262.3820
www.sawyerlabar.com

components *if and only if* it issued a purchase order.[3] Once again, the court enforced the contract's plain text and rejected a conflicting course of performance argument. *Vizio*, 2014 WL 10538995, at *4. As Inventec concedes, courts reject attempts to "bypass the contract's detailed purchase order requirements" because "treating forecasts as purchase orders would render key contractual provisions meaningless." Resp. at 8.

Even on Inventec's suspect framing, the clear and simple *Vizio* analysis applies all the same: Payment requires a Purchase Order, and X did not issue Purchase Orders, so X has no duty to pay. When the MPA requires payment, it says so directly: Section 2.4 of the MPA, titled "Payment," says X "will pay each invoice, referencing [X's] Purchase Order," within 60 days. MPA § 2.4. The parties agreed that "IN NO EVENT SHALL [X] BE RESPONSIBLE FOR ANY AMOUNTS UNDER THIS AGREEMENT OTHER THAN THE PAYMENT OBLIGATIONS SET FORTH IN SECTION 2.4 ABOVE." *Id.* § 11 (capitalization in original). Section 2.4 confirms: "Unless otherwise specified in this Agreement, [X] will not reimburse Supplier for any expenses incurred by Supplier in connection with its obligations." *Id.* § 2.4.

The agreement specifies only one reimbursement obligation for unused custom components. X "shall reimburse Supplier for non-standard, custom materials/components as set forth" in Section 4.3. The MPA says precisely when this reimbursement obligation arises (when X cancels a Purchase Order), provides a process the parties must follow (good-faith negotiations to dispose of excess components), describes the scope of the reimbursement obligation (only amounts "actually paid" by Inventec for parts that cannot be sold, re-used, returned, or disposed), and caps X's liability based specifically on terms in the Purchase Order ("the amount to be paid for the applicable Products in the cancelled Purchase Order(s).") *Id.* § 4.3.

[3] *Compare Vizio* at *4 (contract provides that the buyer can be liable for "Unique Components" that were "ordered by [Gemtek] based on a purchase order" and that "cannot be returned or cannot be utilized" for other customers' products), *with* MPA § 4.3 (addressing liability for custom materials that Inventec "cannot otherwise sell on the open market, use for itself or others, recover its payment or be relieved of its payment obligations for, or otherwise mitigate its inventory" after cancellation of a purchase order).

SAWYER & LABAR LLP
1700 MONTGOMERY ST, STE 108
SAN FRANCISCO, CA 94111
TELEPHONE: 415.262.3820
www.sawyerlabar.com

Inventec agrees that these express provisions making X liable for excess custom components *do not apply* to its claims. Resp. at 8. It seeks to hold X liable for excess custom components anyway. That is not a plausible interpretation of the parties' contract, and the claim must be dismissed.

**2. Inventec Does Not Allege Termination, "Wrongful" or Otherwise.**

Inventec's Complaint makes a passing reference to the idea that X "wrongfully terminated" the MPA in breach of the MPA's termination provision. As its Response makes clear, Inventec does not allege that X *actually terminated* the agreement with less than 30 days' notice. Rather, Inventec contends that X "effectively terminated or abandoned the Parties' relationship" through inaction. Resp. at 10. This "effective termination" theory does not appear on the face of the complaint, *see* Compl. ¶ 51, and is therefore "irrelevant for Rule 12(b)(6) purposes," *Elghembri v. Muhammad*, 2025 WL 2689856, at *2 (N.D. Cal. Sept. 18, 2025) (Orrick, J.) (citation omitted), but even if it did, the argument is entirely circular. The allegation is that X terminated the MPA by breaching the MPA (i.e., by failing to pay for excess components)—but this assumes that X breached the MPA in the first place. As explained above, it did not.

Moreover, the result of X not complying with the termination provision would simply be that no termination occurred. "California law strictly enforces contract termination provisions[.]" *In re Ingenu, Inc.*, 2024 WL 3634243, at *24 (Bankr. S.D. Cal. Feb. 13, 2024) (citation omitted). "[T]he express term of a contract is not shortened or affected by a termination clause unless the termination clause is exercised in the manner prescribed by the contract." *Kuffel v. Seaside Oil Co.*, 90 Cal. Rptr. 209, 217 (Ct. App. 1970). Either X complied with the termination provision, and the contract terminated, or it did not, and the contract continued. Neither option gives rise to a legal claim.

**B. Breaches of Other Alleged Contracts**

**1. The Rack Forecast Agreement is not a Contract (Counts II–III)**

The Rack Forecast Agreement is not a binding contract in any form. A contract was never formed because of (1) Section 15.11 of the MPA, (2) the terms of the Rack Forecast Agreement itself, (3) the parties' conduct and mutual understanding, and (4) the statute of frauds.

SAWYER & LABAR LLP
1700 MONTGOMERY ST, STE 108
SAN FRANCISCO, CA 94111
TELEPHONE: 415.262.3820
www.sawyerlabar.com

First, as Inventec acknowledges, Section 15.11 of MPA provides that it is the "complete and exclusive understanding and agreement of the parties with respect to the subject matter" of the MPA, and that "[a]ny waiver, modification or amendment of any provision of th[e] [MPA] will be effective only if ***in writing*** **and** ***signed by the parties***." MPA § 15.11 (emphasis added). Both of Inventec's claims based on the alleged Rack Forecast Agreement fail this modification requirement: the written Rack Forecast Agreement (Count II) is not signed by the parties, and the oral Rack Forecast Agreement (Count III) is neither signed nor written.

Inventec does not dispute that the Rack Forecast Agreement is unsigned. *See e.g.*, Compl. ¶ 55 ("X Corp. did not formally execute the Rack Forecast Agreement"). Instead, Inventec argues that Section 15.11 does not apply because the Rack Forecast Agreement is a "separate" agreement, rather than an "amendment" or "modification" of the MPA. Resp. at 12. Inventec is wrong.

"A modification is understood to refer to a 'change in the obligations of a party by a subsequent mutual agreement of the parties.'" *Midwest Motor Supply Co. v. Superior Ct.*, 270 Cal. Rptr. 3d 683, 689 (2020) (citation omitted). The Rack Forecast Agreement would have explicitly modified the parties' obligations under the MPA. Under the MPA, X is never required to place any orders. Product Exhibit at 14 § E(n)(vi) ("During the term hereof, [X] ***may*** issue Purchase Orders for the product(s) at the prices set forth in the Pricing Appendix to the Product Exhibit." (emphasis added)). In contrast, the Rack Forecast Agreement would have required X to "purchase and receive 168 Agreed Upon Racks." Compl. ¶ 57; *see also* Compl. Ex. C (ECF 1-3) at 1 (requiring that X "shall" issue purchase orders for racks "within approximately 30 days"). Under the MPA, X can only be responsible for paying for racks if, and when, it *does* issue a purchase order. MPA § 2.4 ("[X] will pay each invoice, *referencing [X's] Purchase Order*, submitted by [Inventec]" (emphasis added)); *id.* § 11 (limiting X's payment obligations to those "set forth in section 2.4"). In contrast,

Inventec alleges that the Rack Forecast Agreement would have made X responsible for "pay[ing] for" the 168 Racks, even if it did not issue those purchase orders. Compl. ¶ 70.

The agreement would have also been "subject to and governed by" the MPA, modified the "warranties provided to [X] under the MPA," addressed claims allegedly arising out of the MPA, and imposed obligations "supplement[al]" and "incremental to those set forth in the MPA." Compl. Ex. C at 1–3.

Inventec is therefore wrong that the Rack Forecast Agreement was a "separate" agreement addressing "specific commercial circumstances." Resp. at 12. The Rack Forecast Agreement directly modifies X's obligations "with respect to the subject matter" of the MPA. Because such a modification had to be "*in writing* and *signed by the parties*" to be effective, Section 15.11 of the MPA bars the Rack Forecast Agreement.

Second, the terms of the (unsigned) Rack Forecast Agreement *itself* required that it be signed by the parties to be effective. This requirement appears both at the start and end of the Agreement:

- "*Effective upon the signing of this Agreement* ('Agreement') with an effective date as of the latest date next to the parties' signatures below . . . ." Compl. Ex. C at 1.
- "This is a legally binding agreement *effective upon both parties signing*." *Id.* at 4.

The Ninth Circuit affirmed the dismissal of a breach of contract claim in this exact scenario—in a case that Inventec fails to adequately distinguish. *See Roth v. Garcia Marquez*, 942 F.2d 617, 626 (9th Cir. 1991). In *Roth*, an author's agent and a filmmaker negotiated and discussed the final terms of a movie deal for the author. *Id.* at 625–26. They went so far as to "confirm[] the final agreement" and thank one another "for concluding the deal." *Id.* Despite those communications, the contract required a signature from the author to be effective, and the author never signed. *Id.* at 626. The Ninth Circuit held that, based on the contract's text, the author's signature was a condition precedent to contract formation and was "required for the contract to be binding." *Id.* at 626–27. Because there was no signature, there was no contract. *Id.* Inventec's only

SAWYER & LABAR LLP
1700 MONTGOMERY ST, STE 108
SAN FRANCISCO, CA 94111
TELEPHONE: 415.262.3820
www.sawyerlabar.com

purported basis to distinguish *Roth* is that the case "turned on records showing that the parties did not intend to be bound absent formal execution." Resp. at 20. But that evidence in *Roth* is the same evidence that exists in the Rack Forecast Agreement: the text of the alleged contract required a signature before it would be effective, and it was unsigned.

A case from last month in this district resulted in the same outcome. *Lexicon Growth LP v. Tortop*, 2026 WL 1832339, at *5 (N.D. Cal. June 25, 2026). The contract at issue "unambiguously state[d] that it 'shall not be effective until signed by all parties hereto,'" and the court concluded that "[i]n light of this language and under the legal authority discussed above, [a party's] signature on the document was a condition precedent to contract formation because 'the terms of the document make it so.'" *Id.* Because a party's signature was missing, there was no contract and the court therefore dismissed the plaintiff's breach of contract claim without leave to amend. *Id.* at *5–6.

Third, if this Court looks past the provisions in the MPA and Rack Forecast Agreement and focuses on the parties' conduct, the result is the same: the parties' conduct reveals an unambiguous mutual understanding that signatures were required before the Rack Forecast Agreement could be effective. After X and Inventec confirmed that they were both "ok" with the draft agreement, Compl. Ex. B (ECF No. 1-2) at 2, Inventec asked X to "check what's the status for signature?" Compl. Ex. D (ECF No. 1-4) at 2. X responded that "[t]he agreement was withdrawn and needed further review," and Inventec asked X to "[p]lease give us a hand to make it released as soon as possible." *Id.*

Based on Inventec's own pleading, it is not plausible that the parties believed the unsigned Rack Forecast Agreement was in effect. Rather, Inventec's conduct—continuing to ask about that signature—makes clear that it understood a signature was necessary before the agreement would go into effect. X's response that the agreement was "withdrawn" and "needs further review" confirms the same. Inventec thus has not plausibly alleged the mutual assent necessary to show contract formation for the Rack Forecast Agreement. Cal. Civ. Code §§ 1550, 1565.

SAWYER & LABAR LLP
1700 MONTGOMERY ST, STE 108
SAN FRANCISCO, CA 94111
TELEPHONE: 415.262.3820
www.sawyerlabar.com

SAWYER & LABAR LLP
1700 MONTGOMERY ST, STE 108
SAN FRANCISCO, CA 94111
TELEPHONE: 415.262.3820
www.sawyerlabar.com

Inventec's allegation that X "partially performed" the Rack Forecast Agreement does not change this analysis. Compl. ¶¶ 57–58, 67–68. Although partial performance can constitute contract acceptance in some cases, Inventec is mistaken that X's conduct—issuing purchase orders for 33 of the racks, *see* Resp. at 14—amounted to partial performance. X issued those purchase orders *before* the parties began negotiating the Rack Forecast Agreement. The draft Rack Forecast Agreement makes this clear: as to those 33 racks, it states that a "PO . . . already issued." Compl. Ex. C at 1. Because the Rack Forecast Agreement's terms were offered *after* X issued those purchase orders, those previously issued purchase orders cannot be considered partial performance. Put differently, at the time X issued those purchase orders, there was not yet an offer to accept.

Fourth, Inventec's Rack Forecast Agreement claims are barred by the statute of frauds. Inventec argues that its oral contract claim is timely because it is a contract for the sale of goods governed by California Commercial Code section 2725. Resp. at 14. But that means Inventec must satisfy an exception to Section 2201's requirement that a contract for the sale of goods over $500 (as this one would be) must be in writing and signed "by the party against whom enforcement is sought." Cal. Com. Code § 2201.[4] Those exceptions, found in Section 2201(3), do not apply here.

The first exception applies to "specially manufactured" goods if "before notice of repudiation is received and under circumstances which reasonably indicate that the goods are for the buyer," the seller takes steps to procure the specialty goods. Cal. Com. Code § 2201(3)(a). While there are purported "specially manufactured" goods at issue here (the excess components), Inventec did not procure those goods *in connection with the purported Rack Forecast Agreement. See id.* (requiring a link between the "contract which does not satisfy the requirements of subdivision (1)"

[4] Although Inventec has not explicitly asserted that its claim based on the written-but-unsigned Rack Forecast Agreement is also a contract for the sale of goods governed by California Commercial Code Section 2201, both Rack Forecast Agreement claims are based on the same purported agreement that allegedly obligated X to purchase 168 racks.

SAWYER & LABAR LLP
1700 MONTGOMERY ST, STE 108
SAN FRANCISCO, CA 94111
TELEPHONE: 415.262.3820
www.sawyerlabar.com

and the "specially manufactured" goods procured). Instead, Inventec procured excess components covering the 168 racks pursuant to X's forecasts *under the MPA*. *See e.g.*, Product Exhibit at 14 § E(n)(ii) (requiring Inventec to "maintain an inventory of raw materials and components necessary" to meet X's forecasts). By the time Inventec alleges that the parties first proposed the Rack Forecast Agreement, Inventec had already procured the "specially manufactured" goods. Compl. ¶¶ 23–29 (alleging that Inventec procured the components in April and June but that the parties did not propose the Rack Forecast Agreement until "[o]n or about October 4, 2022"). After all, the whole point of the proposed agreement was for Inventec to use up its excess components. Inventec therefore cannot rely on the "specially manufactured" goods exception.

The other two exceptions fail, too. X has not "admit[ted]" that a "contract for sale was made," and Inventec does not allege that "payment has been made and accepted" for the remaining 135 racks or that those racks "have been received and accepted." Cal. Com. Code § 2201(3)(b)–(c).

### 2. Inventec's "Switches" Claim is Barred by the MPA (Count IV)

In its Complaint, Inventec alleges that X's "written confirmation" and "resulting Inventec Invoice No. U320001889" created a contract. Compl. ¶ 75. Inventec now disavows that the invoice itself created a contract and instead relies solely on X's purported "instruct[ion]" that Inventec order the Switches and "confirm[ation] that Inventec had placed those purchase orders." Resp. at 21.

Again, this claim is barred by Section 15.11 of MPA. Inventec seeks to impose liability on X for its failure to pay for a specific component (Switches) that Inventec procured, despite the fact that the MPA imposed no liability on X to pay for such components before issuing a purchase order. *See* MPA § 2.1 ("[X] will pay [Inventec] the price specified in the applicable Purchase Order(s)."); *id.* § 2.4 ("[X] will pay each invoice, *referencing [X's] Purchase Order*, submitted by [Inventec]" (emphasis added)); *id.* § 11 ("IN NO EVENT SHALL TWITTER BE RESPONSIBLE FOR ANY AMOUNTS UNDER THIS AGREEMENT OTHER THAN THE PAYMENT OBLIGATIONS

SAWYER & LABAR LLP
1700 MONTGOMERY ST, STE 108
SAN FRANCISCO, CA 94111
TELEPHONE: 415.262.3820
www.sawyerlabar.com

SET FORTH IN SECTION 2.4 ABOVE.").

Inventec's claim that X is somehow liable for the Switches would modify sections 2.1, 2.4, and 11 of MPA to impose new payment obligations on X whenever it "instructed" Inventec to purchase components and "confirmed" that Inventec did so—even where X never issued a purchase order. It would also modify the MPA's existing obligation that Inventec manage inventory by "trigger[ing] material demand based on material lead-time,"[5] Product Exhibit at 6 § E(c)(i)(1), by shifting the liability for those materials to X. These modifications to the MPA would have been effective only if "in writing and signed by the parties." MPA § 15.11. Inventec does not allege that the parties ever signed a new written agreement making X liable for components upon X's "written confirmation" that Inventec purchase them, and Inventec therefore cannot plausibly allege a breach of a "written agreement" to purchase those Switches.

### 3. The Promissory Estoppel Claim is Self-Defeating (Count V)

Inventec has flip-flopped on the asserted basis of its promissory estoppel claim. But whether based on the MPA or the Rack Forecast Agreement, the claim fails and should be dismissed.

In the Complaint, Inventec alleges that by "approving the purchase of components by Inventec," X "made [a] clear and unambiguous promise to pay" for those components, which Inventec detrimentally relied on. Compl. ¶ 83. This is not an actionable promise to begin with,[6] but it also is no different from Inventec's allegation that X breached the MPA by "fail[ing] to properly compensate Inventec for the price of the excess non-standard components purchased by Inventec at

[5] Inventec contends that the Switches fell outside of its inventory management obligation because the lead time was longer than X's routine forecasts. Resp. at 21. But the Product Exhibit requires that Inventec manage inventory by "triggering demand based on material lead time" *regardless* of the length of the lead time. Product Exhibit at 6 § E(c)(i)(1) (imposing no cap on the lead time).

[6] The contract makes clear that X's component approvals are not promises of payment, but confirmation that the component is correct for X's server design. *See* Product Exhibit at 7 § E(c)(i)(4) (bills of material must be "valid parts approved for sale to [X])," *id.* at 8 § E(d)(ii) (X must approve design changes).

SAWYER & LABAR LLP
1700 MONTGOMERY ST, STE 108
SAN FRANCISCO, CA 94111
TELEPHONE: 415.262.3820
www.sawyerlabar.com

the direction of X Corp." *Id.* ¶ 50 (Count I). Inventec cannot plead a promissory estoppel claim by "rel[ying] upon obligations arising out of a written agreement for which there was bargained-for consideration." *Singelyn v. PNC Bank Nat'l Ass'n*, 2024 WL 1601857, at *4 (C.D. Cal. Jan. 12, 2024) (citing *Fontenot v. Wells Fargo Bank, N.A.*, 129 Cal. Rptr. 3d 467, 483–84 (2011) ("Here, the only alleged promise not to foreclose is contained in the forbearance agreement . . . [which] was given for proper consideration . . . [therefore,] the complaint cannot state a claim for promissory estoppel.")). Neither X nor Inventec dispute that the MPA is a valid and binding contract for which there was bargained-for consideration. Inventec thus cannot state a claim for promissory estoppel based on a promise arising from the MPA.

In its Response, Inventec pivots and alleges that its promissory estoppel claim is solely based on the Rack Forecast Agreement. Resp. at 16. But in that case, Inventec has failed to plausibly allege reliance.

A promissory estoppel claim requires both a promise and detrimental "reliance by the party to whom the promise is made." *Jones v. Wachovia Bank*, 230 Cal. App. 4th 935, 945 (Cal. App. 2014). The alleged acts of reliance must come *after* the alleged promise—otherwise, what is being relied on? So if Inventec's promissory estoppel claim is "based on the Rack Forecast Agreement," Resp. at 16, Inventec's alleged damages must have accrued *after* the Rack Forecast Agreement was negotiated. Yet the claim seeks the same damages as Inventec's other causes of action—the cost of the components Inventec *had already purchased* and sought to find a use for. Compl. ¶¶ 23–29, 88 (alleging that Inventec bought the excess components in April and June 2022, months before the Rack Forecast Agreement was drafted in October 2022). Inventec could not have relied on the Rack Forecast Agreement before it was ever discussed.

Inventec's only alleged act of reliance after October 2022 is the delivery of 33 server racks. Compl. ¶ 85. But Inventec does not plead any facts suggesting that it was injured by this routine

SAWYER & LABAR LLP
1700 MONTGOMERY ST, STE 108
SAN FRANCISCO, CA 94111
TELEPHONE: 415.262.3820
www.sawyerlabar.com

transaction. More to the point, the relevant Purchase Orders were issued *before* the Rack Forecast Agreement was drafted. When Inventec fulfilled those orders, it was not "relying" on anything other than the MPA. A plaintiff cannot show detrimental reliance by showing it "complied with [its] preexisting contractual duties." *Mulato v. Wells Fargo Bank, N.A.*, 76 F. Supp. 3d 929, 952 (N.D. Cal. 2014); *see also JMP Sec. LLP v. Altair Nanotechnologies Inc.*, 880 F. Supp. 2d 1029, 1041 (N.D. Cal. 2012) (same). Here, X had previously issued Purchase Orders for those 33 racks, *see* Compl. Ex C ("PO … already issued"), so Inventec had a duty to ship them "within six (6) weeks from the purchase order receipt date," Product Exhibit at 14 § (E)(n)(iv).[7] Inventec's preexisting contractual obligation to deliver racks for which X had issued a purchase order cannot form the basis for reliance.

**4. Breach of the Covenant of Good Faith and Fair Dealing (Count VI)**

Inventec's good faith and fair dealing claim collapses into its contract theory and fails for the same reasons. Inventec says its claim is "grounded" in Section 4.4 of the MPA because X allegedly frustrated Inventec's contractual expectation that X would pay for excess components. *See* Resp. at 20 ("X's refusal to accept liability for the cost of the non-standard components frustrate[d] Inventec's rights to the benefits under the MPA and Rack Forecast Agreement."). But that simply repackages Inventec's contract argument. The implied covenant protects the benefits of the bargain the parties actually made; it does not allow a court to create contractual rights that are absent from the agreement itself. *Day v. GEICO Cas. Co.*, 2022 WL 2135746, at *2 (N.D. Cal. June 14, 2022) ("[T]he implied covenant can neither substantively *alter* the terms of the contract nor impose

[7] Inventec wrongly asserts that its contractual obligation to deliver racks pursuant to issued purchase orders "cannot be reconciled" with X's position that there is no "enforceable contractual obligation as to the non-standard racks." Resp. at 17. Somehow, Inventec misses the key difference: X admits that it can be obligated to purchase and pay for racks after issuing a purchase order. For the 33 racks at issue, X issued a purchase order; Inventec delivered the racks; and X paid for them. X has no obligation for the rest of the racks because it never issued purchase orders for them.

SAWYER & LABAR LLP
1700 MONTGOMERY ST, STE 108
SAN FRANCISCO, CA 94111
TELEPHONE: 415.262.3820
www.sawyerlabar.com

substantive duties or limits on the contracting parties beyond those incorporated in the specific terms of their agreement." (cleaned up)).

Moreover, since X is not liable for excess components under the contract, it cannot be liable for the same components under an implied covenant theory. The claim should be dismissed "as superfluous," as the allegations "do not go beyond the statement of a mere contract breach and, relying on the same alleged acts, simply seek the same damages or other relief already claimed in a companion contract cause of action," *Richards v. Centripetal Networks, Inc.*, 709 F. Supp. 3d 914, 923 (N.D. Cal. 2024) (quoting *Careau & Co. v. Sec. Pac. Bus. Credit, Inc.*, 272 Cal. Rptr. 387 (1990)).

Nor is there anything actionable in Inventec's allegation that X implicitly promised it "would act in good faith and deal fairly with Inventec," that X "would do nothing to interfere with Inventec's interests and commitments," and that X "would give at least the same level of consideration to the interests of Inventec as X Corp. would give to its own interests." Compl. ¶ 91. The implied duty of good faith and fair dealing "does not create a separate duty of fairness and reasonableness which can be independently breached." Cal. Com. Code § 1304, cmt. 1; *see Carma Devs. (Cal.), Inc. v. Marathon Dev. Cal., Inc.*, 826 P.2d 710, 727 (Cal. 1992) (the implied covenant is read into contracts "to protect the express covenants or promises of the contract, ***not to protect some general public policy interest not directly tied to the contract's purpose.***") (citation omitted) (emphasis added).

**C. Inventec's Misrepresentation Claims are Untimely and Unsupported (Counts VII and VIII)**

Inventec's misrepresentation claims are barred for many reasons, but the most obvious is the statute of limitations. Inventec's misrepresentation claims date back to October 2022, beyond the applicable two- and three-year limitations periods. Cal. Civ. Proc. Code §§ 338(d), 339. The facts Inventec relies on to support the application of the discovery rule, Resp. at 21, appear nowhere in its Complaint. "A plaintiff whose complaint shows on its face that his claim would be barred without

SAWYER & LABAR LLP
1700 MONTGOMERY ST, STE 108
SAN FRANCISCO, CA 94111
TELEPHONE: 415.262.3820
www.sawyerlabar.com

the benefit of the discovery rule must specifically plead facts to show (1) the time and manner of discovery *and* (2) the inability to have made earlier discovery despite reasonable diligence." *Fox v. Ethicon Endo–Surgery, Inc.*, 110 P.3d 914 (Cal. 2005) (citation omitted).

Amendment would be futile. Inventec cannot demonstrate that it "discovered as of mid-August 2023 that X misrepresented its intention of fully compensating Inventec for the procurement of non-standard components in accordance with the Rack Forecast Agreement." Resp. at 21. X told Inventec that it would not be signing the draft agreement in October 2022. *See* Compl. Ex. D. The draft agreement itself contemplated orders being delivered "no later than December 2022." Compl. Ex. C. By August 2023, Inventec *could not have believed*—and certainly not with reasonable diligence—that the Rack Forecast Agreement was effective.

The economic loss rule also independently bars the misrepresentation claims, and Inventec's invocation of the fraudulent-inducement exception fails on its own allegations. The supposed "misrepresentation"—that X would pay for the racks and components—is the very promise underlying Inventec's contract claims; *Robinson Helicopter* is limited to tortious conduct independent of the alleged breach, not a breach recast as fraud. 34 Cal. 4th 979, 991 (2004). And the inducement theory is incoherent. Inventec says it was fraudulently induced "to sign the Rack Forecast Agreement," Compl. ¶ 98—an agreement it admits was never signed—and its alleged reliance (procuring components) predates the October 2022 representations by months. *See supra* § II.B.3.

## III. CONCLUSION

X respectfully requests that Inventec's Complaint be dismissed with prejudice, because the parties "agree on the contents of the documents and the chronology of events," so amendment would be futile. *Lexicon Growth LP*, 2026 WL 1832339, at *6.

DATED: July 21, 2026

Respectfully submitted,

**SAWYER & LABAR LLP**

By: */s/ Adrian Sawyer*
Adrian Sawyer
State Bar No. 203712
sawyer@sawyerlabar.com

1700 Montgomery Street, Suite 108
San Francisco, California 94111
415-262-3820 *(phone)*

**GIBBS & BRUNS LLP**

Anthony Kaim *(pro hac vice)*
akaim@gibbsbruns.com
Caitlin Halpern *(pro hac vice)*
chalpern@gibbsbruns.com
Nick Beachy *(pro hac vice)*
nbeachy@gibbsbruns.com
Elisa Wulfsberg *(pro hac vice)*
ewulfsberg@gibbsbruns.com

1100 Louisiana St # 5300
Houston, TX 77002
713-650-8805 *(phone)*
713-750-0903 *(fax)*

*Attorneys for Defendant X Corp.*

SAWYER & LABAR LLP
1700 MONTGOMERY ST, STE 108
SAN FRANCISCO, CA 94111
TELEPHONE: 415.262.3820
www.sawyerlabar.com

**SIGNATURE ATTESTATION**

Pursuant to Civil Local Rule 5-1(i)(3), the e-filing attorney hereby attests that concurrence in the content of the foregoing document and authorization to file the foregoing document has been obtained from the other signatories, as indicated by a conformed signature (/s/) within the foregoing e-filed document.

DATED: July 21, 2026

Respectfully submitted,

SAWYER & LABAR LLP

By: /s/ *Adrian Sawyer*
Adrian Sawyer

*Attorney for Defendant X Corp.*

SAWYER & LABAR LLP
1700 MONTGOMERY ST, STE 108
SAN FRANCISCO, CA 94111
TELEPHONE: 415.262.3820
www.sawyerlabar.com