**K&L GATES LLP**
DAVID J. TSAI (SBN 244479)
david.tsai@pillsburylaw.com
Four Embarcadero Center, Suite 1200
San Francisco, CA 94111-5998
Telephone: 415.882.8200

*Attorneys for Plaintiff Inventec Corporation*

**SAWYER & LABAR LLP**
Adrian Sawyer, State Bar No. 203712
sawyer@sawyerlabar.com
1700 Montgomery Street, Suite 108
San Francisco, California 94111
Telephone: 415.262.3820

**GIBBS & BRUNS LLP**
Anthony Kaim *(pro hac vice)*
akaim@gibbsbruns.com
Caitlin Halpern *(pro hac vice)*
chalpern@gibbsbruns.com
Nick Beachy *(pro hac vice)*
nbeachy@gibbsbruns.com
Elisa Wulfsberg *(pro hac vice)*
ewulfsberg@gibbsbruns.com
1100 Louisiana St # 5300
Houston, TX 77002
713-650-8805 *(phone)*
713-750-0903 *(fax)*

*Attorneys for Defendant X Corp.*

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

INVENTEC CORPORATION, a Taiwan corporation,

Plaintiff,

vs.

X CORP., a Delaware corporation,

Defendant.

Case No. 26-cv-05145-WHO

**JOINT INITIAL CASE MANAGEMENT STATEMENT**

Date: September 15, 2026
Time: 2:00 p.m.
Judge: Honorable William H. Orrick

Plaintiff Inventec Corporation ("Inventec" or "Plaintiff") and Defendant X Corp. ("X" or "Defendant") jointly submit this Joint Case Management Statement.

**JURISDICTION & SERVICE**

No Party challenges jurisdiction. This Court has diversity jurisdiction under 28 U.S.C. § 1332(a)(2) because there is complete diversity between Inventec and X Corp. and because the amount in controversy exceeds $75,000.

This Court has personal jurisdiction over X pursuant to the forum-selection clause in the parties' Master Purchase Agreement ("MPA"), which provides that any legal action or proceeding arising under the MPA must be brought exclusively in the federal or state courts located in San Francisco, California. Venue is proper in this District under 28 U.S.C. § 1391 and the parties' contractual forum-selection clause.

No Party challenges service.

**FACTS**

Inventec' s Statement:

Inventec is a global manufacturer of electronic products and computer equipment. X Corp., formerly Twitter, engaged Inventec to manufacture custom server racks and related components for X's data-center operations. These server racks were generally composed of two types of components: standard components, meaning components that were not customized, and non-standard components, meaning components that were "customized per Twitter's request." On or about December 13, 2020, the parties entered into a Master Purchase Agreement governing that relationship.

Because the custom racks required long-lead-time components, X provided Inventec with rolling forecasts of its anticipated demand. Section 4.4 of the MPA expressly distinguishes between standard and non-standard components. It states: "Forecast provided by Twitter for Supplier's standard Components are non-binding. For non-standard Components (any components that are customized per Twitter's request), Twitter anticipates providing Supplier with a three-month rolling forecast." Thus, while the MPA expressly states that forecasts for standard components are non-binding, it treats non-standard components differently. That distinction reflects the Parties'

understanding that non-standard components, because they were customized for X, procured at X's request, and difficult to resell or repurpose if X changed course, created a different allocation of risk.

In late 2021 and 2022, in reliance on X's forecasts, Inventec procured substantial quantities of non-standard components for X-specific racks. X thereafter repeatedly reduced its forecasted demand, leaving Inventec with excess non-standard inventory that could not readily be resold or repurposed.

Recognizing its responsibility for the excess non-standard components, X negotiated a separate Rack Forecast Agreement with Inventec under which X agreed to purchase 168 non-standard racks to consume that inventory. X's representative confirmed that X's CEO had approved the Rack Forecast Agreement, and X accepted and paid for 33 of the 168 agreed-upon racks consistent with that agreement.

Following Elon Musk's acquisition of X, however, X abruptly reversed course. X refused to issue purchase orders for the remaining agreed-upon racks and refused to pay for the non-standard components that Inventec had procured for X-specific products in reliance on X's forecasts. Inventec repeatedly sought payment and attempted to mitigate its losses by cancelling, reselling, repurposing, or otherwise absorbing the unused components where possible. Despite those efforts, Inventec has been unable to fully mitigate the losses caused by X's refusal to honor its obligations. As a direct result of X's actions, Inventec has suffered damages of at least $30 million.

<u>X's Statement</u>:

X and Inventec are parties to an undisputedly binding contract, the Master Purchase Agreement ("MPA"), as supplemented and modified by subsequently executed Product Exhibits. The MPA provides a framework by which X could order finished products like server racks and for Inventec to assemble and deliver them in response to such orders. The MPA does not require X to buy anything from Inventec, but rather outlines the processes for X to buy servers if and when it needed them.

X has a duty to pay Inventec for Products only when they are (i) ordered by X through a formal Purchase Order and (ii) delivered by Inventec. At that point, Inventec may submit an invoice for the delivered Products, which must reference a Purchase Order issued by X. Only then does X's payment duty arise.

The rest of the MPA corroborates the plain reading that X must pay Inventec only for Products ordered and delivered pursuant to a Purchase Order. For example, the MPA provides that, unless specified, X will not reimburse Inventec for expenses incurred in connection with its obligations. Additionally, the MPA authorizes X to change a Purchase Order “without liability,” while Inventec’s theory would impose liability for changing a mere forecast of future orders. The MPA is, further, the parties’ “complete and exclusive understanding and agreement” as to its “subject matter” and can only be modified by signed written agreement.

Here, Inventec does not seek damages for Products it delivered to X to fulfill Purchase Orders. Rather, this case concerns unused, excess components. The MPA’s only provision imposing potential liability for unused, excess components applies only to custom components and requires that X first issue (and then cancel) a Purchase Order. Here, it is undisputed that X did not issue any Purchase Orders for the unused, excess components at issue. As a result, X has no duty to pay, and the risk of loss remains Inventec’s. Additionally, discovery and expert testimony will establish that many of the components at issue were not custom and instead were procured for other Inventec customers.

These unused components allegedly relate or correspond to X’s forecasts of anticipated server needs. The MPA contemplates a mechanism by which X could assist Inventec in managing its supply chain and procurement obligations through optional, estimated “forecasts.” The subsequent Product Exhibits (which control in the event of any conflict with the MPA) require X to provide a forecast but expressly qualify the forecasts as “non-binding.” X’s needs changed and so, as was its right, X chose not to order as many servers as originally forecasted. Additionally, while X was entitled to reduce its forecast for any reason or no reason, discovery will show that X reduced its forecasts because of deficient performance by Inventec.

Inventec has no claim under the contract for the excess components at issue. Nor does it have a claim for wrongful termination of the MPA, because that claim likewise assumes that X breached the MPA by failing to pay for the excess components at issue. And because the MPA is a “complete and exclusive” fully integrated contract that excludes informal modifications, the MPA precludes Inventec’s additional theories based on the unsigned Rack Forecast Agreement and emails pertaining to an invoice for switches. Those additional theories fail on their own merit, too. The Rack Forecast

Agreement required both X and Inventec's signatures to be effective, but it was never signed. The Switches invoice does not reference a Purchase Order (because X never issued one), and even if it did, the Switches invoice is made up of largely standard components, which cannot form the basis for any liability. Inventec's contradictory, extracontractual claims and theories also fail for various other reasons, including because the claims repackage Inventec's failed contract theories, fail to plead essential elements, and are barred by the statute of limitations.

Moreover, even if Inventec had a claim for breach of a legal duty related to these components (it doesn't), Inventec did not reasonably or diligently attempt to resell, reuse, or otherwise recoup the value of the components, which retain significant value on the open market even today.

## LEGAL ISSUES

Inventec' s Statement:

The legal issues to be decided include:

- Whether the MPA makes X liable for non-standard components procured by Inventec for X-specific products based on X's forecasts.
- Whether the MPA's distinction between standard and non-standard components supports Inventec's interpretation that X bore liability for non-standard components procured for X-specific products.
- Whether the Rack Forecast Agreement is enforceable based on X's approval, written confirmation, objective assent, and partial performance.
- Whether Inventec may plead breach of an oral agreement in the alternative to its written-contract claim.
- Whether X's specific direction to procure switches created an enforceable obligation to pay for those switches.
- Whether Inventec may pursue promissory estoppel in the alternative if X disputes the enforceability of the Rack Forecast Agreement.

- Whether X breached the implied covenant of good faith and fair dealing by exercising contractual discretion in bad faith to deprive Inventec of the benefit of the parties' agreements.
- Whether Inventec is entitled to recover damages, interest, costs, attorneys' fees to the extent recoverable, and other relief.

X's Statement:

The legal issues to be decided include, but are not limited to:

- Whether X Corp.'s payment duty under the MPA is limited to invoices for Products ordered by X Corp. pursuant to a Purchase Order and delivered by Inventec.
- Whether X's forecasts were binding, meaning they required X to pay for custom excess components if it subsequently reduced the forecast.
- Whether X's forecast in combination with email correspondence created a binding commitment to pay for custom excess components if it subsequently reduced the forecast.
- Whether X Corp. engaged in the wrongful termination of the MPA.
- Whether the Rack Forecast Agreement is an enforceable contract.
- Whether the Switches invoice, alone or in combination with X Corp.'s email confirmation to purchase the components reflected therein, created a contract.
- Whether X Corp. breached the covenant of good faith and fair dealing implied in the MPA and its course of performance with Inventec.
- Whether, assuming the Rack Forecast Agreement is a contract, X Corp. breached the covenant of good faith and fair dealing implied in the Rack Forecast Agreement and its course of performance with Inventec.
- Whether Inventec could have detrimentally relied on promises reflected in the Rack Forecast Agreement by delivering server racks to X Corp. pursuant to earlier-issued Purchase Orders, or by procuring components before the Rack Forecast Agreement was ever discussed.
- Whether Inventec's claims for intentional and negligent misrepresentation are barred

by the statute of limitations.

- Whether X Corp. intentionally misrepresented to Inventec that X Corp. would assume liability of the server racks reflected in the Rack Forecast Agreement.
- Whether X Corp. negligently misrepresented to Inventec that X Corp. would assume liability of the server racks reflected in the Rack Forecast Agreement.
- Whether Inventec sufficiently complied with its obligation under the MPA to attempt to resell, reuse, or otherwise recoup the value of the excess components.

**MOTIONS**

X filed a motion to dismiss on June 30, 2026. The Court heard that motion on August 12, 2026. No ruling has yet been entered.

The Parties each anticipate that they may file dispositive motions and other motions as appropriate.

**AMENDMENT OF PLEADINGS**

Inventec does not presently anticipate amending the Complaint. Inventec reserves the right to do so, including in response to any order on X's pending motion to dismiss.

If the Court denies X's pending motion to dismiss, X intends to file an Answer to Inventec's Complaint.

**EVIDENCE PRESERVATION**

The Parties certify that they have reviewed the Guidelines Relating to the Discovery of Electronically Stored Information ("ESI Guideline") and have met and conferred pursuant to Fed. R. Civ. P. 26(f) regarding reasonable and proportionate steps taken to preserve evidence relevant to this case.

**DISCLOSURES**

The Parties have agreed to exchange initial disclosures on September 8, 2026.

**DISCOVERY**

The Parties have not yet engaged in any formal discovery in this matter. The Parties do not believe that any changes to the discovery schedule or the limitations on discovery imposed under the Federal Rules and Local Rules should be made by the Court at this time. The Parties will negotiate and file a stipulated protective order and ESI protocol as appropriate.

**CLASS ACTIONS**

Not Applicable.

**RELATED CASES**

Inventec's position is that this case is not related to any others. Specifically, this case is not related to *Wiwynn Corporation v. X Corp.*, 3:24-cv-05322-AGT (N.D. Cal. 2024) because it involves different parties, different contracts, different factual allegations, and different causes of action. Given this, there is no efficiency that is added by this Court specifically appointing Judge Tse to preside over discovery issues in this matter.

X's position is that this case is related to *Wiwynn Corporation v. X Corp.*, 3:24-cv-05322-AGT (N.D. Cal. 2024), including because the cases involve substantially similar events and have overlapping factual and legal issues. Judge Tse presided over the *Wiwynn* case and is familiar with many of the issues in this case. In the interest of judicial efficiency, and to avoid an unduly burdensome duplication of labor and expense, X hereby requests that the Court appoint Judge Tse under Civil Local Rule 72-1 to preside over all discovery issues that may arise in this case.

**RELIEF**

Inventec requests the following relief:

(1) Monetary damages in an amount to be determined at trial, but no less than $33 million;

(2) Award of its attorneys' fees and costs; and

(3) Award of pre-judgment and post-judgment interest on all damages awarded.

X does not currently anticipate seeking affirmative relief.

**SETTLEMENT AND ADR**

Inventec is willing to engage in early private mediation or a judicial settlement conference in an effort to determine whether the Parties can resolve this dispute efficiently before incurring substantial discovery-related expenses. Inventec proposes that the Parties complete private mediation or a judicial settlement conference by January 31, 2027.

X's position is that an ADR process is unlikely to be fruitful at this time and will be an unproductive expenditure of the Parties' resources. Among other issues, X had significant pre-suit communications with Inventec's prior counsel, who ultimately declined to file suit. X is also familiar with numerous defects and potential defects in Inventec's claims, given its recent experience litigating overlapping claims in the *Wiwynn* matter. X therefore proposes that discovery should be substantially complete prior to the Parties engaging in any private mediation or judicial settlement conference.

**OTHER REFERENCES**

The Parties do not believe this case is appropriate for reference to binding arbitration, a special master, or the Judicial Panel on Multidistrict Litigation.

**NARROWING OF ISSUES**

At the time, the Parties are not aware of any issues that can be narrowed by agreement and do not presently anticipate any requests to bifurcate issues, claims, or defenses.

**SCHEDULING**

The Parties propose the following schedule:

| | Inventec's Proposal | X's Proposal |
|---|---|---|
| Fact Discovery Cutoff | July 9, 2027 | March 31, 2027 |
| Designation of Experts | Opening Reports – July 30, 2027 | Opening Reports: April 21, 2027 |

| | Inventec's Proposal | X's Proposal |
|---|---|---|
| | Rebuttal Reports – August 27, 2027 | Rebuttal Reports: May 19, 2027 |
| Expert Discovery Cutoff | September 24, 2027 | June 9, 2027 |
| Dispositive Motions (Briefing) | October 27, 2027 | June 30, 2027 |
| Dispositive Motions (Hearing) | December 1, 2027 | August 4, 2027 |
| Pretrial Conference | January 24, 2028 | September 13, 2027 |
| Trial | February 7, 2028 | September 20, 2027 |

## TRIAL

Inventec has demanded a jury trial. The parties estimate the trial will take approximately 5 court days.

## DISCLOSURE OF NON-PARTY INTERESTED ENTITIES OR PERSONS

The Parties have each filed a Certification of Interested Entities or Persons as required by Civil Local Rule 3-15. Neither Party is presently aware of any additional non-party interested entities or persons beyond those disclosed in those certifications.

## PROFESSIONAL CONDUCT

The attorneys of record have reviewed the Guidelines for Professional Conduct for the Northern District of California.

Dated: September 8, 2026

Respectfully submitted,

K&L GATES LLP

*David J. Tsai*
David J. Tsai

*Attorneys for Plaintiff*
*Inventec Corporation*

Dated: September 8, 2026

SAWYER & LABAR LLP

GIBBS & BRUNS LLP

*Caitlin A. Halpern*
Caitlin A. Halpern

*Attorneys for Defendant*
*X Corp.*