United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| INVENTEC CORPORATION,<br>Plaintiff,<br>v.<br>X CORP.,<br>Defendant. | Case No. 26-cv-05145-WHO<br><br>**ORDER ON MOTION TO DISMISS AND MOTIONS TO SEAL**<br><br>Re: Dkt. Nos. 2, 13, 14 |

In this contract dispute, plaintiff Inventec Corporation ("Inventec") alleges that defendant X Corp. ("X") failed to adhere to various contracts entered into by the parties that would require X to purchase a number of non-standard server racks. X now moves to dismiss Inventec's complaint, as it believes the parties' Master Purchase Agreement ("MPA") did not affirmatively *require* it to purchase the servers it forecasted to Inventec, and that the other "agreements" Inventec alleges were breached were not contracts at all. X's arguments are unpersuasive. For the reasons set forth below, X's motion to dismiss is DENIED in large part and GRANTED only with respect to Counts VII and VIII, with leave to amend.

**BACKGROUND**

Inventec is a "leading global manufacturer of computers, telephones, notebooks, servers, and products related to cloud computing, wireless communication, and intelligent devices." Complaint ("Compl.") [Dkt. No. 1] ¶ 8. One product Inventec manufactures and designs are "server racks, which are open frames or cabinets designed for organizing and securing information technology ("IT") equipment." *Id.* ¶ 11. Server racks "often include specific network switches, which are networking hardware that connect devices on a computer rack by forwarding data between devices." *Id.* ¶ 13.

On December 13, 2020, Inventec and X entered into a Master Purchase Agreement ("MPA") "pursuant to which Inventec agreed to sell and deliver various products to X Corp., including, as relevant here, non-standard server racks and switches." *Id.* ¶ 14. These racks were "custom manufactured by Inventec to X Corp.'s unique specifications." *Id.* ¶ 15. Inventec alleges that the MPA "holds X Corp. liable for cancellations of certain components." *Id.* ¶ 17. This includes Section 4.4 of the MPA, which provides:

> **4.4 Forecast.** Forecast provided by Twitter for Supplier's standard Components are non-binding. For non-standard Components (any components that are customized per Twitter's request), Twitter anticipates providing Supplier with a three-month rolling forecast.

*Id.*

Inventec alleges that the "course of performance and course of dealing between the parties over the years further confirms their mutual understanding that X Corp.'s forecasts for non-standard components were binding." *Id.* ¶ 19. This relationship was amicable between December 2020 through early 2022, with "Inventec receiving and fulfilling multiple purchase orders from X Corp. for non-standard racks, based on X Corp.'s anticipated order forecast." *Id.* ¶ 21.

In November 2021, X indicated to Inventec that it should prepare the raw materials for 521 non-standard racks to meet X's forecasted need for 2022. *Id.* ¶ 20. X then instructed Inventec to issue orders for these switches on April 19, 2022. *Id.* ¶ 22. One day later, X Corp. revised its forecast for the 2022 year through January 2023 to 505 non-standard server racks. *Id.* ¶ 23. That number later dropped to 442 on June 15, 2022, and down to 215 on July 26, 2022—despite Inventec having already moved forward with procuring the components necessary to build the 505 server racks. *Id.* ¶¶ 25–26. The parties met from August 2022 through October 2022 to discuss the forecast decrease which "resulted in Inventec having excess inventory." *Id.* ¶ 29. On October 4, 2022, "X Corp. proposed, and ultimately agreed, that it would purchase 168 non-standard server racks from Inventec, with delivery no later than December 2022." *Id.* X Corp. made such a proposal to "resolve[] . . . without any further obligation or liability to X Corp." claims related to the "2022 forecasts." *Id.*

The parties memorialized their amended agreement (the "Rack Forecast Agreement") on

October 18, 2022. *Id.* ¶ 30. Consistent with the Rack Forecast Agreement, Inventec shipped to X Corp. thirty-three of the 168 racks. *Id.* ¶ 31. X Corp. took delivery and paid for them in accordance with the terms of the Rack Forecast Agreement. *Id.*

On October 27, 2022, Elon Musk acquired X Corp. *Id.* ¶ 33. Inventec alleges that X Corp. "did not formally execute the Rack Forecast Agreement after giving affirmative assent to its terms because the intended signatory to the Rack Forecast Agreement was unexpectedly terminated at Mr. Musk's direction during the turmoil that occurred at X Corp. following Mr. Musk's purchase of X Corp." *Id.* It also alleges that Musk "intentionally created a chaotic environment at X Corp. following his acquisition (including by terminating key personnel who were involved in commercial transactions with suppliers and vendors) in an attempt to refuse to honor X Corp.'s contractual obligations with certain of X Corp.'s vendors, including Inventec." *Id.* ¶ 34. X Corp. then, "at Mr. Musk's direction, attempted to renegotiate prices and contractual terms with certain of its vendors and suppliers, refusing to pay what it owed without good cause to do so." *Id.* ¶ 35.

Around the time that Musk acquired X Corp., "Inventec was notified that the Rack Forecast Agreement was cancelled." *Id.* ¶ 36. When Inventec replied asking for the status of the Rack Forecast Agreement, a representative for X Corp. noted that the CFO of X Corp., the "key person in [the] agreement and PO process," was let go, and that employees were "waiting on further instructions from [X Corp's] management team." *Id.* ¶ 36. X Corp. ultimately "failed and/or refused to issue any purchase orders for the other 135 of the 168 racks agreed to in the Rack Forecast Agreement (the "Agreed Upon Racks") in order to consume excess non-standard components." *Id.* ¶ 37. Inventec sent an invoice to X. Corp for the remaining racks in the amount of $31,735,789. *Id.* X Corp. refused—and continues to refuse—to pay. *Id.* ¶¶ 37–39.

Inventec also sent X Corp. an invoice ("Invoice No. U320001889") in the amount of $1,729,954 in January 2023 for "the switches X Corp. had specifically instructed Inventec to purchase because of the approximate 1-year lead time associated with procuring those components." *Id.* ¶ 40. While Inventec acquired and procured the Switches in reliance of X Corp.'s instructions, X Corp. similarly refuses to pay. *Id.* ¶¶ 40–41. While Inventec has been able to recoup approximately $4.9 million by "re-selling and/or repurposing the unused components

that were intended to be used in products for X Corp.," due to the nature of the components, "Inventec has been and continues to be limited in its ability to resell or reuse a substantial amount of components—which hold a significant total value—despite Inventec's best efforts." *Id.* ¶ 44.

**LEGAL STANDARD**

Under Federal Rule of Civil Procedure 12(b)(6), a district court must dismiss a complaint if it fails to state a claim upon which relief can be granted. To survive a Rule 12(b)(6) motion to dismiss, the plaintiff must allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim is facially plausible when the plaintiff pleads facts that "allow the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted). There must be "more than a sheer possibility that a defendant has acted unlawfully." *Id.* While courts do not require "heightened fact pleading of specifics," a plaintiff must allege facts sufficient to "raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555, 570.

In deciding whether the plaintiff has stated a claim upon which relief can be granted, the Court accepts the plaintiff's allegations as true and draws all reasonable inferences in favor of the plaintiff. *See Usher v. City of Los Angeles*, 828 F.2d 556, 561 (9th Cir. 1987). However, the court is not required to accept as true "allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1055 (9th Cir. 2008).

If the court dismisses the complaint, it "should grant leave to amend even if no request to amend the pleading was made, unless it determines that the pleading could not possibly be cured by the allegation of other facts." *Lopez v. Smith*, 203 F.3d 1122, 1127 (9th Cir. 2000), *overruled on other grounds*, *Singleton v. Gates*, No. 25-743, 2026 WL 1494029 (9th Cir. May 28, 2026). In making this determination, the court should consider factors such as "the presence or absence of undue delay, bad faith, dilatory motive, repeated failure to cure deficiencies by previous amendments, undue prejudice to the opposing party and futility of the proposed amendment." *Moore v. Kayport Package Express*, 885 F.2d 531, 538 (9th Cir. 1989).

## DISCUSSION

### I. BREACH OF CONTRACT

Inventec's first cause of action asserts that X Corp. breached the terms of the MPA (Count I), *see* Compl. ¶¶ 47–53, the Rack Forecast Agreement (Count II), *see id.* ¶¶ 54–63, an oral agreement with respect to the Rack Forecast Agreement (Count III), *see id.* ¶¶ 64–73, as well as the Written Confirmation and Inventec Invoice No. U320001889 (Count IV), *see id.* ¶¶ 74–80. To plead a breach of contract claim under California law, a plaintiff must allege "(1) the [existence of a] contract, (2) plaintiff's performance or excuse for nonperformance, (3) defendant's breach, and (4) the resulting damages to plaintiff." *Reichert v. Gen. Ins. Co. of Am.*, 68 Cal. 2d 822, 830 (1968). I address each count below.

#### A. MPA (Count I)

X argues that the "MPA is straightforward: Inventec gets paid after receiving a Purchase Order and delivering a Product." Mot. at 6 (citing MPA §§ 2.1, 2.2, 2.4). To this end, X maintains that it has a duty to pay "only if two conditions are satisfied: (1) X issues a formal Purchase Order, and (2) X accepts delivery of a finished Product." Mot. at 6. The MPA defines a Purchase Order as a "written order to [Inventec] to purchase Products, which might include (but not limited to) Product descriptions, quantities, price, delivery dates and shipment methods." MPA at 2. A Product is similarly defined as "the items identified on Purchase Orders issued by [X]." *Id.* Taken together, X argues that because the complaint recognizes that X "refused to issue any purchase orders," Inventec "pleads its way out of court." Mot. at 6–7 (quoting Compl. ¶ 37).

X Corp. also argues that "Inventec hangs its claim on forecasts," ultimately oscillating between two theories: "[i]n one, X's forecasts are claimed to be binding; in the other, X is allegedly bound by emails approving Inventec's component purchases." Mot. at 7. X believes that these are "incompatible" theories, and "neither remedies the fatal flaw in Inventec's case: No plausible reading of the MPA puts X on the hook for finished Products without a Purchase Order, much less unassembled components." *Id.* To this point, X Corp. makes three arguments: (1) Inventec's interpretation of the contract is incompatible with the terms of the MPA, *see* Mot. at 8–9; (2) the text of the MPA refutes Inventec's attempt to re-allocate risk, *see id.* at 10–11; and (3)

United States District Court
Northern District of California

an alleged course of performance cannot overrule the clear terms of the contract, *see id.* at 11–12. None of these arguments has merit.

**1. Interpretation of the MPA**

The parties first dispute how to interpret the MPA. Section 4.4 of the MPA states: "Forecast provided by [X] for [Inventec's] standard components are non-binding. For non-standard components (any components that are customized per [X's] request), [X] anticipates providing [Inventec] with a three-month rolling forecast." In X's view, this language only refers to "non-binding" forecasts for standard components but contains no binding language with respect to custom components. Mot. at 8. Even so, X notes that the Product Exhibit, which "supplements the MPA," states that for *all* components, "[X] shall provide [Inventec] with a rolling non-binding four (4) month forecast." *Id.* (quoting Product Exhibit at 14 § (E)(1); *see also* Product Exhibit at 1 ("In the event of any conflict or inconsistency between the terms of this Product Exhibit and the MPA, the Product Exhibit shall control.").

Neither argument has merit. First, Section 4.4 notes that only *standard* component forecasts are non-binding. Oppo. at 5; *see* Compl. ¶ 17. "This phrasing suggests that the parties intended to treat forecasts for standard and customized components differently," as in contract interpretation, the "mention of one matter implies the exclusion of all others." *Wiwynn Corp. v. X Corp.*, 2025 WL 409388, at *1 (N.D. Cal. Jan. 31, 2025); *Murphy v. DirecTV, Inc.*, 724 F.3d 1218, 1234 (9th Cir. 2013) (quoting *Steven v. Fid. & Cas. Co. of N.Y.*, 58 Cal. 2d 862, 871 (1962) (applying the maxim of *expressio unius est exclusion alterius* in contract interpretation). In other words, that the standard component forecasts are nonbinding "implies the exclusion of all other forecasts as non-binding, meaning forecasts for custom components are plausibly binding." *Wiwynn*, 2025 WL 409388, at *1 (cleaned up).

X's reliance on the Product Exhibit is also unpersuasive. As Inventec notes in its opposition, the Product Exhibit includes language indicating that X "will not have liability for excess *common* materials that [Inventec] also sources for its other customer projects." Oppo. at 6. Like Section 4.4 of the MPA, the reference to "common" or standard components reasonably suggests an interpretive difference between standard components (which X has no liability for)

and non-standard components (which X could be liable for). At a minimum, Inventec's reading of the text of the MPA and Product Exhibits are reasonable and do not support dismissal at the pleadings stage.

**2. Risk of Loss**

X also argues that it did not assume any risk of loss, as various provisions of the MPA and Product Exhibit "place[] the onus on Inventec, not its customer, to recognize and solve shortages of forecasted components." Mot. at 10; *see* MPA § 6.2 (Inventec must inform X of any "materials or manufacturing capacity constraint that could adversely affect [Inventec's] ability to meet [X's] requirements."); Product Exhibit at 14 § E(n)(iii) ("If [Inventec] becomes aware that it may encounter difficulty meeting any forecast quantity of products, it shall immediately notify [X], providing details of the expected shortfall, causes of the shortfall and proposed solution."); *id.* at 14 § E(n)(ii) (Inventec "will maintain an inventory of raw materials and components necessary to manufacture products in accordance with the forecasts."). X maintains that the "single, narrow deviation to Inventec's acceptance of risk" was the "cancellation provision" in Section 4.3 of the MPA, where "the parties agreed that X may have liability for excess components when Products are ordered through a Purchase Order that is later canceled[.]" *Id.* (citing MPA § 4.3). Taken together, X believes that if the parties "meant to shift even more risk to X, they would have," as "Section 4.3 shows they knew how." *Id.* at 11. And given the lack of express terms noting that forecasts are binding, X concludes that it cannot bear the risk of loss here. *See id.*

Inventec responds by arguing that X's "reliance on Section 4.3 does not eliminate its separate liability under Section 4.4." Oppo. at 8. It argues that "Section 4.3 governs a specific circumstance: X's cancellation or termination of Purchase Orders and the liability that flows from that cancellation." *Id.* Section 4.4, by contrast, "addresses a different subject: forecasts and the Parties' allocation of risk for standard versus non-standard components procured to meet those forecasts." *Id.* "If Section 4.3 were the only provision governing liability for custom components," it continues, "Section 4.4's separate treatment of non-standard components would have no work to do." Inventec encourages me to "reject [this] interpretation that [would] render[] Section 4.4 meaningless." *Id.*

Inventec's interpretation of Sections 4.3 and 4.4 is reasonable and supports its breach of contract claim under the MPA. That other provisions in the MPA suggest the risk of loss falls with Inventec, not X, is a question that will be better addressed after the pleadings stage and discovery are complete. X's motion to dismiss under this theory is DENIED.

**3. Course of Performance**

Next, X argues that Inventec cannot rely on previous course of performance evidence to overcome the clear terms of the MPA. Mot. at 11. X notes that the MPA is a fully integrated contract, which "constitutes the complete and exclusive understanding and agreement of the parties," and "supersedes all prior understandings and agreements, whether written or oral." *Id.* (quoting MPA § 15.11). Because the MPA contains these terms, X concludes that Inventec "cannot rely on post-contract implied terms." *Id.* at 12 (quoting *Stanley v. Univ. of S. Cal.*, 178 F.3d 1069, 1078 (9th Cir. 1999)). Inventec responds by arguing that it is not utilizing course of performance evidence to "contradict the MPA or to manufacture a new obligation out of whole cloth." Oppo. at 9. Instead, it purports to use such evidence to "confirm the meaning of Section 4.4 [of the MPA]—namely, that X bore responsibility for non-standard components procured for X-specific products in response to X's forecasts, directions, confirmations, and approvals." *Id.*

Under California law, for cases involving integrated contracts, "the use of parol evidence is always subject to the limitation that parol evidence may not be used to vary or contradict the words the parties agreed upon, since an integrated writing must be taken as the best and final expression of their intent." *Thompson v. Asimos*, 6 Cal. App. 5th 970, 987 (2016) (citing Cal. Civ. Proc. Code § 1856(a); Cal. Comm. Code § 2202). If there is no ambiguity, the court's "inquiry into meaning has been completed and the one reasonable interpretation applies to the facts." *Id.* (citing *Bank of the West v. Superior Court*, 2 Cal. 4th 1254, 1264 (1992)).

While the parties agree about the language of the MPA, they disagree about how to interpret it. Inventec argues that it is utilizing this parol evidence to give meaning to the terms of the MPA, including the "practical significance" between distinctions in wording in the MPA and Product Exhibit. That is plausible at this juncture. X's motion to dismiss on parol evidence grounds is DENIED.

**4. Wrongful Termination**

X's final argument on the MPA concerns the allegation that it breached Section 13.3 of the MPA by "wrongful termination," "impairing Inventec's ability to mitigate procurement risks." Mot. at 12 (quoting Compl. ¶ 51). Section 13.3 states:

> **13.3 Termination for Convenience.** Twitter may immediately terminate this Agreement and/or any open Purchase Orders at any time, for any reason or no reason, by providing thirty (30) days prior written notice to Supplier of its election to terminate.

MPA § 13.3. X Corp. argues this allegation is "conclusory," as Inventec never alleges "when, how, or with what type of notice X terminated the contract." Mot. at 12. Moreover, it points out that there is no allegation by Inventec that "if given 30 days' written notice, [Inventec] would not have suffered its purported damages," giving rise to causation issues. *Id.*

In response, Inventec argues that the complaint alleges that "X wrongfully terminated the MPA in violation of Section 13.3," including by X "refus[ing] to pay the combined balance owed to Inventec and declin[ing] to cure despite repeated demands." Oppo. at 10 (citing Compl. ¶¶ 32–43, 52). In its view, such allegations "plausibly plead that X effectively terminated or abandoned the Parties' relationship without providing the required notice." *Id.*

I agree with Inventec. X's demand for a more specific pleading, including descriptions of "when, how, or with what type of notice X terminated the contract," appears to require more than what Federal Rule 8 requires. The allegations in the complaint "allow the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. Taken as true, they are also sufficient to "raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555, 570. X's motion to dismiss on grounds of the termination clause of the MPA is DENIED.

**B. Rack Forecast Agreement – Written Agreement (Count II)**

X also moves to dismiss Inventec's claim that it breached the parties' Rack Forecast Agreement. Mot. at 13–14; *see* Compl. ¶¶ 54–63. The draft Rack Forecast Agreement noted that the agreement was "legally binding . . . effective upon both parties signing below." *Id.*; Compl. Ex. C at 4. Inventec admits in its complaint, however, that "X Corp. did not formally execute the Rack Forecast Agreement after giving affirmative assent to its terms." *Id.* ¶ 55. X takes this

concession to assert that the Rack Forecast Agreement cannot constitute a binding contract as both parties' signatures were an "essential requirement of the deal according to the proposed agreement itself." Mot. at 13. It also argues that because the Rack Forecast Agreement "expressly refers to and incorporates the MPA," which requires that any "waiver, modification, or amendment" of its terms be "in writing and signed by the parties," dismissal is proper under the terms of the MPA. *Id.*

Inventec counters by arguing that the complaint "alleges objective assent, written approval, and partial performance" to survive the pleading stage. Oppo. at 13. In its view, California law does not require a formal signature "unless the parties objectively manifested an intent not to be bound until execution." *Id.* (citing *Banner Ent'mt, Inc. v. Superior Court*, 62 Cal. App. 4th 348, 358 (1998) ("Whether it was the parties' mutual intention that their oral agreement to the terms contained in a proposed written agreement should be binding immediately is to be determined from the surrounding facts and circumstances of a particular case and is a question of fact for the trial court."). And because the question of whether the parties intended execution as a condition precedent to contract formation is a "factual question inappropriate for resolution on a motion to dismiss," Inventec concludes that dismissal is improper. *Id.*

I agree with Inventec that the intent of the parties is a question of fact improper for resolution at the pleadings stage. Inventec has plausibly alleged that the parties intended for the Rack Forecast Agreement to constitute a binding contract, notwithstanding the lack of signatures. X Corp.'s motion to dismiss is DENIED.

**C. Oral Contract – Rack Forecast Agreement (Count III)**

Count III of the complaint asserts that "[t]o the extent that the Rack Forecast Agreement is not deemed an enforceable written agreement . . . then Inventec alleges in the alternative that it and X Corp. entered into an enforceable oral agreement, the terms of which are memorialized in the Rack Forecast Agreement." Compl. ¶ 67. X moves to dismiss Count III on the theory that Inventec's claim is untimely. Mot. at 14. I disagree.

Both parties agree that X's alleged breach of the oral contract occurred in late 2022. X claims that Section 339 of the California Code of Civil Procedure governs, which establishes a

two-year statute of limitations for any "contract, obligation or liability not founded upon an instrument of writing." Cal. Civ. Proc. Code § 339; *see* Mot. at 14. Inventec responds by arguing that because the alleged oral agreement concerned the sale of goods—the 168 non-standard server racks—California Commercial Code 2725 governs, which sets forth a four-year statute of limitations for the sale of goods. Cal. Com. Code § 2725(1).

Inventec has the stronger argument. The breach of oral contract claim is pleaded as an alternative to the enforceability of the written terms of the Rack Forecast Agreement. The Rack Forecast Agreement focused on X Corp.'s purchase of the 168 non-standard server racks. Such racks clearly qualify as goods under California law, as they are tangible, movable objects. *See* Cal. Comm. Code § 2105. Because Section 2725(1) of the California Commercial Code governs this transaction, a four-year statute of limitations applies, and Inventec's claims are timely. X Corp.'s motion to dismiss Count III is DENIED.

**D. Inventec Invoice No. U320001889 (Count IV)**

Count IV of the complaint focuses specifically on Inventec's January 2023 invoice for "the switches X Corp. had specifically instructed Inventec to purchase because of the approximate 1-year lead time associated with procuring those components." Compl. ¶ 40. Inventec alleges that X's "written confirmation that Inventec should order the Switches, and resulting Inventec Invoice No. U320001889, are a contract between Inventec and X Corp. for the order and delivery of the Switches." *Id.* ¶ 75. And because X had a "contractual duty to pay for the Switches," but ultimately failed to pay, Inventec concludes that X breached the terms of the Invoice agreement. *Id.* ¶¶ 76–80.

Inventec counters by arguing that X misconstrues its claim. Inventec "does not allege that Invoice No. U320001889, standing alone, created a contract," it argues; instead, it "alleges that X specifically instructed Inventec to order long-lead-time Switches, confirmed that Inventec had placed those purchase orders, and then refused to reimburse or pay Inventec after Inventec acquired the Switches in reliance on X's written direction." Oppo. at 15. This procurement issue also spanned well beyond the MPA's contemplated rolling forecast period. *Id.* Accordingly, Inventec argues that X cannot avoid liability at the pleading stage by refusing to issue a formal

purchase order after directing, confirming, and benefiting from Inventec's procurement. *See id.*

While discovery and summary judgment may prove that the parties did not intend for the Inventec Invoice to serve as a binding contract on the parties, Inventec sufficiently pleads the claim to survive the pleadings stage. X's motion to dismiss Count IV is DENIED.

## II. Promissory Estoppel (Count V)

Count V of the complaint alleges that "to the extent that the Rack Forecast Agreement is deemed not to be a valid and enforceable written or oral contract for any reasons, then Inventec asserts this claim for Promissory Estoppel in the alternative." Compl. ¶ 82. Under California law, the elements of a claim for promissory estoppel are: "(1) a promise clear and unambiguous in its terms; (2) reliance by the party to whom the promise is made; (3) his reliance must be both reasonable and foreseeable; and (4) the party asserting the estoppel must be injured by his reliance." *B & O Mfg., Inc. v. Home Depot U.S.A., Inc.*, No. 07-cv-02864-JSW, 2007 WL 3232276, at *6 (N.D. Cal. Nov. 1, 2007) (quoting *Laks v. Coast Fed. Sav. & Loan Ass'n*, 60 Cal. App. 3d 885, 890 (1976)).

X maintains that Inventec's promissory estoppel claim "relies upon obligations arising out of a written agreement for which there was bargained-for consideration," meaning that the claim "instead must be pleaded as one for breach of the bargained-for contract." Mot. at 15–16 (quoting *Singelyn v. PNC Bank Nat'l Ass'n*, No. EDCV 22-02026-CJC (SPX), 2024 WL 1601857, at *4 (C.D. Cal. Jan. 12, 2024)). It again focuses on the MPA, alleging that because this agreement was the "complete and exclusive understanding" of the parties, Inventec's promissory estoppel claim fails. *Id.* Moreover, X argues that the MPA precludes any finding of reliance, as the "only alleged act of reliance—'purchasing and delivering' other servers, for which X issued Purchase Orders and paid invoices—was contractually bargained for." *Id.* (citing Compl. ¶ 85). In other words, because there was bargained-for consideration stemming out of the MPA, X concludes that there can be no promissory estoppel claim here, as Inventec was "already contractually obligated" to perform the acts it now alleges as reliance. *Id.*; *see Morgan v. Aurora Loan Servs., LLC*, No. CV124350CASMRWX, 2012 WL 12952304, at *6 (C.D. Cal. Aug. 13, 2012).

Inventec responds by claiming that its promissory estoppel claim is based on the Rack

Forecast Agreement, not the MPA. Oppo. at 16. Moreover, while X takes issue with the potential inconsistencies between the breach of contract and promissory estoppel claims, Inventec argues that it has the right to plead in the alternative or to plead inconsistent theories at the pleadings stage. *Id.* at 16–17; *see* Fed. R. Civ. P. 8(d)(3) (allowing parties to "state as many separate claims or defenses as it has, regardless of consistency"); *Fleet v. Bank of Am., N.A.*, 229 Cal. App. 4th 1403, 1413 (2014) ("Although a cause of action for promissory estoppel is inconsistent with a cause of action for breach of contract based on the same facts, when a pleader is in doubt about what actually occurred or what can be established by the evidence, the modern practice allows that party to plead in the alternative and make inconsistent allegations.") (internal citations and quotations omitted). Finally, with respect to reliance, Inventec asserts that X's position "cannot be reconciled" with its other arguments that Inventec has not established an enforceable contract for the non-standard racks. Oppo. at 17.

X adds in reply that even if the promissory estoppel claim was based on the Rack Forecast Agreement, dismissal would be appropriate because "Inventec's alleged damages must have accrued *after* the Rack Forecast agreement was negotiated" but the complaint "seeks the same damages as Inventec's other causes of action—the cost of the components Inventec *had already purchased* and sought to find a use for." Repl. at 12. (emphasis in original) (citing Compl. ¶¶ 23–29, 88).

X's motion to dismiss is DENIED. "When, as here, parties execute an agreement and exchange consideration, 'traditional contract principles govern.'" *Morgan v. Aurora Loan Servs., LLC*, 2012 WL 12952304, at *6 (C.D. Cal. Aug. 13, 2012) (citing *Fontenot v. Wells Fargo Bank, N.A.*, 198 Cal. App. 4th 256, 275 (2011)). But "when the *existence* of a contract is in dispute, the plaintiff may plead contract and promissory estoppel claims in the alternative." *Wiwynn Corp.*, 2025 WL 409388, at *2 (citing *KST Data, Inc. v. Northrop Grumman Sys. Corp.*, 2017 WL 10519638, at *4-5 (C.D. Cal. Nov. 16, 2017). Unlike in *Wiwynn*, where X "concede[d] that the MPA exist[ed]," but ultimately "read[] the MPA different from [the plaintiff]," here, Inventec's promissory estoppel claim is based on the Rack Forecast Agreement, which X argues is not even a contract. *See* Section I.B, *supra*. Given the dispute over the existence of the contract, Inventec is

entitled to plead promissory estoppel in the alternative.

**III. Breach of Covenant and Fair Dealing (Count VI)**

Inventec's sixth cause of action asserts that X breached the implied covenant of good faith and fair dealing. Compl. ¶¶ 89–94. Under California law, "[e]very contract imposes upon each party a duty of good faith and fair dealing in its performance and its enforcement." *Carma Devs. (Cal.), Inc. v. Marathon Dev. California, Inc.*, 2 Cal.4th 342, 371 (1992) (internal quotations omitted). "A breach of the implied duty of good faith and fair dealing goes beyond a breach of contract and involves 'a failure or refusal to discharge contractual responsibilities, prompted not by an honest mistake, bad judgment or negligence but rather by a conscious and deliberate act, which unfairly frustrates the agreed common purposes and disappoints the reasonable expectations of the other party, thereby depriving that party of the benefits of the agreement.'" *Schertzer v. Bank of Am.*, 109 F.4th 1200, 1213 (9th Cir. 2024) (quoting *Careau & Co. v. Sec. Pac. Bus. Credit, Inc.*, 222 Cal. App. 3d 1371, 1394 (1990)). "The covenant of good faith finds particular application in situations where one party is invested with a discretionary power affecting the rights of another. Such power must be exercised in good faith." *Carma*, 2 Cal.4th at 372.

Inventec alleges that "[i]mplied in the MPA and Rack Forecast Agreement, as well as the longstanding course of performance between the parties, was a covenant that X Corp. would act in good faith and deal fairly with Inventec, that X Corp. would do nothing to interfere with Inventec's interests and commitments, and that X Corp. would give at least the same level of consideration to the interests of Inventec as X Corp. would give its own interests." Compl. ¶ 92. It then alleges that X Corp. breached this duty by "consciously depriving Inventec from the rights and benefits to which [it] was entitled under the MPA, the Rack Forecast Agreement, as well as the longstanding course of performance between the parties." *Id.* ¶¶ 92–93.

X Corp. moves to dismiss this claim on two grounds. First, it argues that "a plaintiff alleging breach of the implied covenant must plead the specific contractual provisions that the defendant allegedly frustrated, which Inventec has failed to do." Mot. at 17. It also argues that the "implied covenant may not create any new duties, as Inventec's claim requires." *Id.* I address each argument below.

**A. Failure to Ground Claim**

X Corp. first claims that "Inventec's claim for breach of the covenant of good faith and fair dealing does not refer to any specific contractual provision and fails for this reason alone." Mot. at 18; *see W. Am. Ins. v. Shaghal Ltd.*, No. CV2107751CJCJPRX, 2022 WL 17370532, at *3 (C.D. Cal. June 23, 2022) (the implied covenant of good faith and fair dealing "functions as a *supplement* to the express contractual covenants," meaning the "precise nature and extent of the duty imposed by the implied covenant depends upon the contours of the underlying contract") (quoting *Thrifty Payless, Inc. v. The Americana at Brand, LLC*, 218 Cal. App. 4th 1230, 1244 (2013)) (emphasis original) (cleaned up); *Day v. GEICO Cas. Co.*, No. 21-CV-02103-BLF, 2022 WL 2135746, at *2 (N.D. Cal. June 14, 2022) ("To allow a party to plead a breach of contract claim based on a violation of the covenant of good faith and fair dealing untethered from a specific contractual provision would undermine the certainty a contract provides, especially in light of later changed circumstances favorable to one party over the other.").

X Corp. is incorrect. Inventec has sufficiently alleged facts that show that X Corp. derived Inventec of the benefit of its bargain, even if no contract provision was expressly violated. In any event, the complaint sufficiently highlights numerous provisions that show Inventec was induced by X Corp. to build customized racks, but was ultimately burdened with unexpected costs after X Corp. drastically reduced its 2022 orders. Oppo. at 18–19; *see* Compl. 17 ("Section 4.4 of the Master Purchase Agreement holds X Corp. liable for cancellations of certain components."); *id.* ¶ 38 ("X Corp. required Inventec to build non-standard racks with specific switches . . . [but] failed to provide appropriate notice or good cause for significantly decreasing the quantity of non-standard product it required.").

On this record, Inventec has sufficiently established that the breach of implied covenant claim is grounded in the terms of the MPA, which is laid out in the complaint. The motion to dismiss is DENIED on the failure to ground claim argument.

**B. New Duties**

X Corp. also argues that "Inventec alleges that the MPA and unexecuted Rack Forecast Agreement implied a covenant that X 'would act in good faith and deal fairly,' 'do nothing to

interfere with Inventec's interests and commitments,' and 'give at least the same level of consideration to the interests of Inventec' as its own." Mot. at 18 (quoting Compl. ¶ 91). X believes the MPA "says nothing of the sort." *Id.*

X Corp. believes that this case is akin to *Openshaw v. FedEx Ground Package Sys., Inc.*, 576 F. App'x 685 (9th Cir. 2014). In *Openshaw*, plaintiff claimed that FedEx breached the implied covenant of good faith and fair dealing by "not offering [him] a spare truck when he needed it" or "telling Openshaw about a spare driver when he needed one." *Id.* at 688. The contract, however, "obligated Openshaw to provide trucks and drivers and to operate at a national standard." *Id.* Recognizing that the implied covenant of good faith and fair dealing could not "impose a substantive duty on FedEx to *help* Openshaw provide trucks and drivers or to meet delivery standards," the Ninth Circuit panel ruled in favor of FedEx. *Id.* (emphasis in original). Applying the reasoning of *Openshaw*, X Corp. argues that Inventec seeks to "convert their counterparties' rights to have their needs met (X's demand for servers and FedEx's for drivers) into an extra-contractual duty to make it easier to meet them (by requiring X to pay for Inventec's inventory and FedEx to provide Openshaw with trucks and drivers)." Mot. at 18–19. It argues that this is "beyond the implied covenant's reach." *Id.* at 19.

Inventec responds by arguing that it is "not seeking to impose obligations beyond the MPA and Rack Forecast Agreement." Oppo. at 19. Instead, it contends that "X exercised the discretion afforded by the MPA and the Rack Forecast Agreement in bad faith to deprive Inventec of the benefits for which it bargained," which it believes distinguishes this case from *Openshaw*. *See id.* Put differently, "Inventec has already purchased non-standard components based on X's forecasts (see Compl. at ¶¶ 20, 25) but it is X who did not fulfill its own obligations arising from the MPA or Rack Forecast Agreement by refusing to issue all necessary purchase orders or otherwise recognizing its liability for the costs of the non-standard components." *Id.* at 20. Inventec argues that the Rack Forecast Agreement and MPA both recognize X's obligation to consume the cost of these non-standard components. *Id.* Its refusal to accept liability, therefore, "frustrates Inventec's rights to the benefits" under the agreements. *Id.*

Construing all facts in Inventec's favor, Inventec has plausibly alleged that X Corp.

"consciously" failed to discharge its responsibilities under the MPA and Rack Forecast Agreement due to its "improper objective . . . [to avoid] payment of Inventec's legitimate claims." Compl. ¶¶ 92–93. Because this decision "unfairly frustrate[d] the agreed common purposes and . . . reasonable expectations" of Inventec, X Corp.'s motion to dismiss is DENIED. *See Schertzer v. Bank of Am.*, 109 F.4th at 1213.

**IV. Intentional and Negligent Misrepresentation (Counts VII and VIII)**

Inventec's final causes of action assert that X engaged in intentional misrepresentation (Count VII) and negligent misrepresentation (Count VIII). *See* Compl. ¶¶ 95–105. Both claims allege that X represented to Inventec that it would "assume liability of the Agreed Upon Racks," but ultimately had "no intention of fully compensating Inventec for the procurement of such non-standard components." *Id.* ¶¶ 95–96. Instead, it made those representations to fraudulently induce Inventec to sign the Rack Forecast Agreement. *Id.* ¶ 98.

X argues that both claims must be dismissed because they are barred by the statute of limitations and the economic loss rule. Mot. at 19–20. I agree with respect to the statute of limitations. X argues that California law applies a three-year statute of limitations for a fraud or intentional misrepresentation claim, and two years for a negligent misrepresentation claim. *Id.* at 19 (citing *Graebner v. James*, No. C 12-01694 WHA, 2012 WL 6156729, at *5 (N.D. Cal., Dec. 11, 2012) (Alsup, J.); Cal. Civ. Proc. Code §§ 338(d), 339). Neither party appears to dispute that the "facts underlying Inventec's intentional and negligent misrepresentation claims . . . date back to October 2022, more than three years ago." Mot. at 19 (citing Compl. ¶¶ 30, 96, 102). Under California law, therefore, Inventec's claims would be barred under the statute of limitations.

Inventec argues that the delayed discovery rule applies. *See* Oppo. at 21. "California's delayed discovery rule requires a plaintiff with a claim that would otherwise be barred by the statute of limitations to plead and prove '(1) the time and manner of discovery and (2) the inability to have made earlier discovery despite reasonable diligence.'" *Landers v. Ford Motor Co.*, No. [], 2025 WL 1122397, at *1 (C.D. Cal. Mar. 4, 2025) (quoting *Fox v. Ethicon Endo-Surgery, Inc.*, 35 Cal.4th 797, 808 (2005) (internal citations omitted). "Under the discovery rule, the statute of limitations begins to run when the plaintiff suspects or should suspect that her injury was caused

by the wrongdoing, that someone has done something wrong to her." *Jolly v. Eli Lilly & Co.*, 44 Cal. 3d 1103, 1110 (1988). "The Ninth Circuit explained that this inquiry ordinarily cannot be resolved as a matter of law." *Landers*, 2025 WL 1122397, at *1; *see People ex rel. Allstate Ins. Co. v. Discovery Radiology Physicians, P.C.*, 94 Cal. App. 5th 521, 552 (2023) ("When a plaintiff reasonably should have discovered facts for purposes of the accrual of a cause of action or application of the delayed discovery rule is generally a question of fact, properly decided as a matter of law only if the evidence (or, in the case of a demurrer, the allegations in the complaint and facts properly subject to judicial notice) can support only one reasonable conclusion.").

Inventec argues that X's motion to dismiss is unwarranted because it "improperly equate[s] the date on which the Parties allegedly entered into the Rack Forecast Agreement (Compl. at ¶ 30), or the date on which the alleged misrepresentations were made (*id.* at ¶¶ 96, 102) with the date on which Inventec's causes of action accrued or were discovered." Oppo. at 21. It also provides other facts it believes shows the delayed discovery rule should apply:

> For example, Inventec was uncertain about whether X would comply with the terms of the Rack Forecast Agreement until on or around August 15, 2023 when X's counsel informed Inventec's prior counsel that X believed that there was no Rack Forecast Agreement and, thus, X had no liability. Thus, at the earliest, Inventec discovered as of mid August 2023 that X misrepresented its intention of fully compensating Inventec for the procurement of non-standard components in accordance with the Rack Forecast Agreement.

*Id.*

I agree with Inventec that these allegations, if pleaded, could plausibly establish a dispute of fact that would allow this claim to survive the pleadings stage. The problem with Inventec's argument, however, is that these facts appear nowhere in the complaint. As currently pleaded, Inventec does not plausibly allege that the delayed discovery rule factors are met. But Accordingly, X's motion to dismiss is GRANTED on these two causes of action with leave to amend.

## V. MOTIONS TO SEAL

In conjunction with its motion to dismiss, X seeks to file under seal a Product Exhibit attached as Exhibit 1. *See* Dkt. No. 14. It argues that the Product Exhibit is "confidential

information" as defined by the parties' MPA and contains sensitive business and commercial information. *See id.* at 3–4. While the public has a legitimate interest in "understanding the judicial process," *Kamakana v. City & Cnty. of Honolulu*, 447 F.3d 1172, 1179 (9th Cir. 2006) (simplified), I agree with X that the "parties' interest in protecting sensitive commercial information . . . outweighs the public's right of access." *Wiwynn Corp. v. X Corp.*, No. 24-cv-05322-AGT, 2025 WL 409402, at *1 (N.D. Cal. Jan. 30, 2025) (Tse, M.J.). X's motion to seal is GRANTED.

Inventec also filed an administrative motion to consider whether Exhibits A and C of its complaint should be sealed per X's confidentiality designations. *See* Dkt. No. 2. X did not file a statement or declaration in support of sealing. Should X still wish for these exhibits to remain under seal, it must file a statement in support of sealing within 7 days of this Order. I will decide then whether sealing is warranted.

**CONCLUSION**

For the reasons set forth above, X's motion to dismiss the intentional and negligent misrepresentation claims (Counts VII and VIII) is GRANTED with leave to amend and is DENIED as to the rest. Inventec shall have 20 days from this Order to file an amended complaint addressing the issues identified above. X's motion to seal its Product Exhibit is GRANTED.

**IT IS SO ORDERED.**

Dated: September 15, 2026

William H. Orrick
United States District Judge